# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONEXANT SYSTEMS, INC., *et al.*,[1] | ) | Case No. 13-10367 (MFW) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DISCLOSURE STATEMENT FOR THE SECOND MODIFIED JOINT PLAN OF REORGANIZATION OF CONEXANT SYSTEMS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Paul M. Basta (admitted *pro hac vice*)
Joshua A. Sussberg (admitted *pro hac vice*)
Christopher T. Greco (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:     (302) 426-9193

- and -

Morton Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-2700
Facsimile:     (215) 568-6603

*Co-Counsel to the Debtors
and Debtors in Possession*

Dated: April 19, 2013

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Conexant Systems, Inc. (9439); Conexant CF, LLC (6434); Brooktree Broadband Holding, Inc. (5436); Conexant, Inc. (8218); and Conexant Systems Worldwide, Inc. (0601).  The Debtors' main corporate address is 4000 MacArthur Blvd., Newport Beach, California 92660.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................5

II.     OVERVIEW OF THE PLAN ...............................................................................5

III.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN...................................8

IV.     THE GLOBAL SETTLEMENT WITH THE CREDITORS' COMMITTEE AND
        MODIFIED PLAN OF REORGANIZATION ...................................................9

V.      RESOLUTION OF OBJECTIONS TO LEASE REJECTION MOTION .........................10

VI.     FOREIGN INSOLVENCY PROCEEDINGS ....................................................11

VII.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ............12
        A.      Key Terms Used in this Disclosure Statement ........................................12
        B.      Additional Important Information .............................................................13

VIII.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN............................................................................................................14
        A.      What is chapter 11? ..................................................................................14
        B.      Why are the Debtors sending me this Disclosure Statement? ....................15
        C.      Am I entitled to vote on the Plan? ...........................................................15
        D.      What will I receive from the Debtors if the Plan is consummated?..............15
        E.      What will I receive from the Debtors if I hold an Administrative Claim or a Priority Tax
                Claim? ........................................................................................................17
        F.      How will the Administrative Claims Cap, the Secured Claims Cap and the Priority Non-
                Tax Claims Cap affect my recovery?..........................................................17
        G.      What is the General Unsecured Claims Recovery Pool and how will it be administered? ...........17
        H.      How was the amount of the General Unsecured Claims Recovery Pool determined?..................18
        I.      How will my vote affect my recovery from the General Unsecured Claims Recovery
                Pool?...........................................................................................................18
        J.      What happens to my recovery if the Plan is not confirmed or does not go effective? ..................18
        K.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date" and
                "Consummation?" ......................................................................................19
        L.      What are the sources of cash and other consideration required to fund the Plan?..........................19
        M.      Are there risks to owning the New Common Stock upon emergence from chapter 11?................19
        N.      What rights will Holdco's new stockholders have?....................................19
        O.      What is the Management Incentive Program and how will it affect the distribution I
                receive under the Plan?..............................................................................19
        P.      How will the release of the Causes of Action impact my recovery under the Plan?.....................20
        Q.      Will the final amount of Allowed General Unsecured Claims affect my recovery under
                the Plan? .....................................................................................................20
        R.      What effect will the New Notes have on the Reorganized Debtors? ........................................20
        S.      Will there be releases and exculpation granted to parties in interest as part of the Plan? .............20
        T.      What is the deadline to vote on the Plan? ..................................................21
        U.      How do I vote for or against the Plan? ......................................................21
        V.      Why is the Bankruptcy Court holding a Confirmation Hearing and when is the
                Confirmation Hearing set to occur?..........................................................21

| | | |
|---|---|---|
| W. | What is the purpose of the Confirmation Hearing? | 21 |
| X. | What is the effect of the Plan on the Debtors' ongoing business? | 22 |
| Y. | What is the effect of the Plan on the Debtors' corporate structure? | 22 |
| Z. | Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? | 22 |
| AA. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 23 |
| BB. | Do the Debtors recommend voting in favor of the Plan? | 23 |

**IX.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW** .......... 23

**X.    EVENTS LEADING TO THE CHAPTER 11 FILINGS** ................. 23

**XI.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ............... 23

| | | |
|---|---|---|
| A. | Corporate Structure Upon Emergence | 23 |
| B. | Expected Timetable of the Chapter 11 Cases | 24 |
| C. | First Day Relief | 24 |
| D. | The Severance Program | 24 |
| E. | The Emergence Bonus Plan | 24 |

**XII.    PROJECTED FINANCIAL INFORMATION** ................. 24

**XIII.    RISK FACTORS** ................. 25

| | | |
|---|---|---|
| A. | Risks Related to Recoveries Under the Plan | 25 |
| B. | Risks Related to the Debtors' and Reorganized Debtors' Businesses | 26 |

**XIV.    SOLICITATION AND VOTING PROCEDURES** ................. 28

| | | |
|---|---|---|
| A. | Holders of Claims Entitled to Vote on the Plan | 29 |
| B. | Voting Record Date | 29 |
| C. | Voting on the Plan | 29 |
| D. | Ballots Not Counted | 30 |

**XV.    CONFIRMATION OF THE PLAN** ................. 30

| | | |
|---|---|---|
| A. | Requirements for Confirmation of the Plan | 30 |
| B. | Best Interests of Creditors/Liquidation Analysis | 30 |
| C. | Feasibility | 31 |
| D. | Acceptance by Impaired Classes | 31 |
| E. | Confirmation without Acceptance by All Impaired Classes | 32 |
| F. | Valuation of the Debtors | 33 |

**XVI.    CERTAIN SECURITIES LAW MATTERS** ................. 33

| | | |
|---|---|---|
| A. | New Common Stock and New Notes | 33 |
| B. | Issuance and Resale of New Common Stock and New Notes Under the Plan | 33 |

**XVII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ................. 35

| | | |
|---|---|---|
| A. | Introduction | 35 |
| B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors | 36 |
| C. | Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims and Interests | 39 |

**EXHIBITS**

EXHIBIT A      Second Modified Plan of Reorganization

EXHIBIT B      Restructuring Support Agreement

EXHIBIT C      Declaration of Sailesh Chittipeddi, President and CEO of Conexant Systems, Inc., in Support of First Day Pleadings

EXHIBIT D      Disclosure Statement Order

EXHIBIT E      Financial Projections

EXHIBIT F      Valuation Analysis

EXHIBIT G      Liquidation Analysis

## I.    INTRODUCTION

Conexant Systems, Inc. ("***Conexant***") and its debtor affiliates, as debtors and debtors in possession (each, a "***Debtor***" and, collectively, the "***Debtors***"), submit this disclosure statement (the "***Disclosure Statement***") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with the solicitation of acceptances with respect to the *Second Modified Joint Plan of Reorganization of Conexant Systems, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "***Plan***"), dated April 19, 2013.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Conexant and each of its four affiliated Debtors.

**THE DEBTORS, THE SECURED LENDER, THE EQUITY SPONSORS AND THE CREDITORS' COMMITTEE (COLLECTIVELY, THE "*CONSENTING PARTIES*") BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS AND THE CONSENTING PARTIES BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    OVERVIEW OF THE PLAN

The Debtors are very pleased that after extensive, good faith negotiations, the Plan embodies a settlement among the Debtors and the Consenting Parties, each of which is supportive of the Plan and the Debtors' expeditious emergence from chapter 11.

The Plan provides for the reorganization of the Debtors as a going concern and proposes an appropriate post-emergence balance sheet, which will poise the Debtors for future success.  Specifically, the Plan contemplates a substantial reduction in the Debtors' funded debt obligations by satisfying the Secured Notes Claim held by the Debtors' sole prepetition secured lender, QP SFM Capital Holdings Limited, an entity managed by Soros Management LLC (the "***Secured Lender***"), with New Common Stock and New Notes.  As a result, the Plan contemplates satisfying Claims through the following sources:

- cash on hand to make any payments provided for in the Plan;

- new unsecured payment-in-kind notes issued by Holdco, referred to in the Plan as the "New Notes," in the amount of $76 million, which Notes will not be guaranteed by any other affiliate or subsidiary of Holdco including, for the avoidance of doubt, Conexant OpCo;

- shares of stock in Holdco, referred to in the Plan as the "New Common Stock;" and

- conversion of all of the commitments outstanding under the DIP Facility Credit Agreement into Interests of Holdco.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

In addition, following several weeks of negotiations among the Debtors, the Secured Lender and the Official Committee of Unsecured Creditors, (the "***Creditors' Committee***"), the Plan filed on the Petition Date has been modified to incorporate a settlement with the Creditors' Committee.  Under this settlement, as described in greater detail in Article IV, the General Unsecured Creditors Recovery Pool has been increased to $2.9 million, and the Secured Lender has agreed that it will waive the Secured Notes Deficiency Claim if the Plan goes effective.  The settlement among the Consenting Parties avoids potentially lengthy and expensive litigation that could have diminished value for all parties, and ensures that Conexant can meet necessary milestones and reorganize through a chapter 11 plan on an expedited basis.

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[2]**

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| | Administrative Claims | Except with respect to Administrative Claims that are Fee Claims, and except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim will either be paid (a) in full in Cash (if such Claims do not exceed the Administrative Claims Cap) or (b) a Pro Rata share of $17.5 million if such Claims are Allowed in an amount in excess of the Administrative Claims Cap and each holder consents to such treatment.  Administrative Claims will be paid on or as soon as reasonably practicable after the Effective Date or the date such Administrative Claim is Allowed; *provided, however*, that Allowed Administrative Claims that arise postpetition in the ordinary course of | $14.9 Million | 100% |

---

[2]     The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to any Claim:  (a) a Claim that is scheduled by the Debtors as neither disputed, contingent nor unliquidated and for which no contrary proof of claim has been filed; (b) a Claim that is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline.  Except for any Claim that is expressly Allowed pursuant to the Plan, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

| | | the Debtors' business will be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, and subject to the budget set forth in the DIP Facility Credit Agreement. | | |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Holders of Allowed Priority Non-Tax Claim will receive (a) payment in full in Cash if such Claims do not exceed the Priority Non-Tax Claims Cap or (b) a Pro Rata share of $1 million if such Claims exceed the Priority Non-Tax Claims Cap, to the extent all holders of such Claims consent to such treatment.  Allowed Priority Non-Tax Claims will be paid on or as soon as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim; or (iii) such other date as may be ordered by the Bankruptcy Court. | N/A | 100% |
| 2 | Other Secured Claims | Holders of Allowed Other Secured Claims will receive one of the following treatments, as determined by the applicable Debtors (with the consent of the Secured Lender):    (i) either (a) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, if such Claims do not exceed the Other Secured Claims Cap or (b) a Pro Rata share of $1 million if such Claims exceed the Other Secured Claims Cap, to the extent all holders of such Claims consent to such treatment; (ii) delivery of the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment such that the Allowed Other Secured Claim shall be rendered Unimpaired. | N/A | 100% |
| 3 | Secured Notes Claim | The holder of the Secured Notes Claim will receive (i) a Pro Rata distribution of the New Notes, calculated in respect of the aggregate amount of all Allowed DIP Facility Claims and the Secured Notes Claim and (ii) 100% of the New Common Stock.  For the avoidance of doubt, the Secured Notes Claim shall not include the Secured Notes Deficiency Claim, which claim shall be treated as a General Unsecured Claim. | $194.5 Million | 41% |

| 4 | General Unsecured Claims | Holders of Allowed General Unsecured Claims will receive a Pro Rata distribution of the General Unsecured Claims Recovery Pool; *provided, however*, that upon the Effective Date of the Plan, the Secured Lender will be deemed to waive the Secured Notes Deficiency Claim and its rights to participate in and/or receive any distribution from the General Unsecured Claims Recovery Pool. | $32.9 Million | 6% - 9% |
|---|---|---|---|---|
| 5 | Intercompany Claims | To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as is practicable, Intercompany Claims will be paid, adjusted, reinstated in full or in part, or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors with the consent of the Secured Lender. | $268.6 Million | N/A |
| 6 | Intercompany Interests | To preserve the Debtors' corporate structure, Intercompany Interests will be adjusted or reinstated in full or in part, or cancelled or discharged in full or in part, in each case, to the extent determined by the Reorganized Debtors with the consent of the Secured Lender on the Effective Date or as soon thereafter as practicable. | ($0.3 Million) | N/A |
| 7 | Interests in Conexant | Holders of Interests in Conexant will not receive any distribution on account of their Interests. On the Effective Date, Interests in Conexant will be cancelled and discharged. | N/A | N/A |

## III.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

Before the Petition Date, the Debtors worked closely with the Secured Lender, the Equity Sponsor and their respective advisors to explore strategic options to achieve a restructuring of the Debtors' prepetition debt obligations. As a result of those efforts, the Debtors, the Secured Lender and the Equity Sponsors entered into the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B** and incorporated herein by reference. The Restructuring Support Agreement provides a roadmap for the reorganization of the Debtors as a going concern and outlines the treatment of Claims and Interests. The Restructuring Support Agreement also binds the Debtors, the Secured Lender and the Equity Sponsors to support the Plan if the Debtors are successful in taking the steps necessary to meet certain conditions and milestone deadlines included therein (as such milestone may be consensually extended by agreement of the Debtors and the Secured Lender), and assuming no event occurs that would otherwise require the Debtors to instead pursue a sale process. Specifically, in the event the Plan does not proceed in accordance with the milestones and/or conditions set forth in the Restructuring Support Agreement, the restructuring will be consummated through a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "*Sale*") in which the Secured Lender would act as the stalking horse bidder. In the event of the Sale, the Debtors will seek approval of customary bidding procedures and a hearing to approve the Sale on an expedited timeline.

## IV.    THE GLOBAL SETTLEMENT WITH THE CREDITORS' COMMITTEE AND MODIFIED PLAN OF REORGANIZATION

The Plan that was filed on the Petition Date included a distribution of $2 million to be shared pro rata among holders of Allowed General Unsecured Claims.   The agreement with the Secured Lender to include the $2 million General Unsecured Claims Recovery Pool was the result of negotiations with the Debtors regarding, among other things, the extent/validity of the Secured Lender's security interest in cash and receivables.  Specifically, the Secured Notes Indenture provides that the Secured Lender is secured by the Debtors' inventory, equipment, goods, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment property, intellectual property, general intangibles, deposit accounts and the proceeds and products of each of the foregoing categories of collateral except for certain "Excluded Assets."   As contemplated in the Secured Notes Indenture, "Excluded Assets" includes Receivables and all cash (other than proceeds of the Collateral). The Secured Lender argued that it had a lien on "Excluded Assets" (as defined in the Secured Notes Indenture), , because such assets constituted traceable proceeds of the Debtors' inventory on which the Secured Lender has a perfected senior-secured lien.

Notwithstanding the Secured Lender's position, and to avoid the administrative costs and potential delay associated with any challenge to the Secured Lender's claimed lien on Excluded Assets, the Debtors assumed — for purposes of negotiating with the Secured Lender on the terms of the Plan — that the Secured Lender did not have a lien on the Excluded Assets.  In light of the foregoing, and consistent with the Liquidation Analysis attached hereto as Exhibit G, the Debtors explained to the Secured Lender that any chapter 11 plan would need to provide a distribution of more than $1.9 million to ensure that holders of Allowed General Unsecured Claims received more under the Plan than in a hypothetical Chapter 7 liquidation.   As a result, the Plan included the $2 million General Unsecured Claims Recovery Pool.  In addition, the Debtors negotiated a waiver of the Secured Lender's $114.5 million Unsecured Deficiency Claim if holders of General Unsecured Claims voted in favor of the Plan.

On March 8, 2013, the United States Trustee for the District of Delaware (the "*U.S. Trustee*") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 72].[3] On March 13, 2013, the Creditors' Committee selected Kelley Drye & Warren LLP as its legal counsel, Womble Carlyle Sandridge & Rice, LLP as its Delaware Counsel and Gavin/Solmonese LLC as its financial advisor.

Soon after its appointment, the Debtors and the Secured Lender engaged the Creditors' Committee in negotiations and discussions designed to ensure a successful restructuring for the benefit of all stakeholders.  After several weeks of intense discussions and negotiations regarding the chapter 11 cases and various aspects of relief sought in connection therewith, as well as the terms of the Plan and the extent of the Secured Lender's collateral package, the Debtors, the Secured Lender and the Creditors' Committee were able to negotiate a settlement that could be incorporated into the Plan.  Importantly, the settlement would ensure that the Debtors could achieve agreed upon milestones related to the  Plan (as contemplated in the Restructuring Support Agreement and as modified by agreement of the parties) and restructure as a going concern through the Plan — as opposed to through a sale under section 363 of the Bankruptcy Code.  The global settlement (the "*Global Settlement*") among the Debtors, the Secured Lender and the Creditors' Committee contemplates the following:

---

[3]    The Creditors' Committee consists of the following members:  (a) PRES-4340 Von Kerman LP; (b) Samsung Electronics Co., LTD; and (c) STATS ChipPAC Ltd.

- The General Unsecured Claims Recovery Pool will be increased to $2.9 million.

- Upon the Effective Date of the Plan, the Secured Lender will be deemed to waive the Secured Notes Deficiency Claim and its rights to participate in and/or receive any distribution from the General Unsecured Claims Recovery Pool.

- All objections to the Lease Rejection Motion, described below, are consensually resolved.

## V.    RESOLUTION OF OBJECTIONS TO LEASE REJECTION MOTION

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Leases, Effective Nunc Pro Tunc to the Petition Date* [Docket No. 18] (the "**Lease Rejection Motion**").   The Lease Rejection Motion sought to reject certain leases (the "**Leases**") and subleases (the "**Subleases**").   ELPF Scranton Road, Limited Partnership ("**ELPF**") and PRES-4340 Von Karman, LP ("**PRES**," and together with ELPF, the "**Landlords**") filed objections to the Lease Rejection Motion (the "**Landlord Objections**").[4]

The Landlords asserted, among other things, that although the Debtors themselves no longer physically occupied the properties subject to the Lease Rejection Motion, because the Debtors served as both a tenant and sublessor at the properties, the Debtors could not reject the Leases until the Debtors "delivered possession" of the lease premises to the Landlords.   Specifically, the Landlords asserted that possession of the properties could only be delivered after the subtenants vacated the premises, but also argued that subtenants were potentially entitled to remain on the premises following rejection of the applicable Subleases, pursuant to section 365(h)(1)(A) of the Bankruptcy Code.   Therefore, the Landlords argued that the Debtors owed postpetition rent and expenses related to the Leases and Subleases including any expenses associated with potential subtenant evictions.   Additionally, the Landlords argued that the Debtors could not reject the Leases until the expiration or termination of the Subleases under their respective terms, and thus would owe the Landlords post-petition rent under 365(d)(3) of the Bankruptcy Code until such time.

The Landlord Objections, if sustained in whole or in part, could have subjected the Debtors to substantial administrative rent and lease obligations until the subtenants had vacated or been evicted from the leased premises.   These amounts, if asserted and allowed, could have impaired the Debtors' ability to implement and consummate the Plan.

Through extensive negotiations with the Landlords, the Creditors' Committee, and the Secured Lender, the Debtors successfully negotiated consensual resolutions of the Landlord Objections, including any issues raised with respect to the Subleases.

---

[4]     *See Objection of ELPF Scranton Road Limited Partnership to Debtors' Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Leases, Effective Nunc Pro Tunc to the Petition Date* [Docket No. 130]; and *PRES-4340 Von Karmen LP's Objection to Debtors' Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Leases, Effective Nunc Pro Tunc to the Petition Date* [Docket No. 138].   Additionally, CCH Incorporated, a Sublease counterparty, filed *CCH Incorporated's Limited Objection to Debtors' Motion for Entry of An Order Authorizing the Rejection of Certain Unexpired Leases, Effective Nunc Pro Tunc to the Petition Date* [Docket No. 139], the resolution of which will be provided through a Final Order entered by the Bankruptcy Court on or before April 25, 2013.

The terms of the consensual resolutions with the Landlords are subject to final documentation and incorporation into an order entered by the Court resolving the Lease Rejection Motion (the "*Lease Order*") and are briefly summarized as follows:

Upon entry of the Lease Order, the Debtors' lease with PRES will be terminated, the Debtors' lease of ELPF will be rejected, and all subleases for space in the buildings owned by PRES and ELPF will be rejected.

The Lease Order will fix and allow the general unsecured claims of both Landlords, which claims will not be subject to objection, disallowance, reduction, or setoff. PRES's general unsecured claim will be allowed in the amount of $4,500,000, and ELPF's general unsecured claim will be allowed in the amount of $7,416,045. Within three business days of the Lease Order becoming final and non-appealable (i) the Debtors shall pay each Landlord (a) $300,000 in cash, and (b) all post-petition rent that the Debtors have received from the sub-tenants in that Landlord's building, (ii) each Landlord shall be authorized to draw any funds remaining in any letter of credit it is holding, and (iii) the Debtors shall assign to each Landlord all of the Debtors' rights to pursue the subtenants in that Landlord's building for any unpaid rent.

The Debtors have agreed that the payments of cash and post-petition rent shall not count against the Administrative Claims Cap under the Plan, and that they will not challenge the proceeds from any letters of credit drawn by the Landlords prepetition or postpetition. Pursuant to the Lease Order, the Debtors agree that the Landlords shall retain any property tax refunds the Landlords have received or receive in the future, and also agree that the proceeds from any letters of credit and any tax refunds the Landlords have received or receive in the future shall not reduce either Landlord's respective Allowed General Unsecured Claims or the Cash they receive.

The Landlords agree that they will support and vote in favor of the Plan as revised by the Global Settlement, and/or be deemed to have voted in favor of the Plan. The Landlords also agree that they will not file any other prepetition or postpetition claims against the Debtors, their Estates or the Reorganized Debtors, or seek payment of any other prepetition or postpetition obligations except as provided in the settlements and Lease Order. The Debtors and each of the Landlords agree to mutual releases consistent with the settlements, which carve out the settlement obligations and claims. ELPF's agreement to compromise its postpetition claims is subject to the Plan going effective, and ELPF shall retain all rights with respect to such claims if the Plan does not go effective. Finally, with respect to PRES, the Debtors have agreed and will be authorized to enter into a formal lease termination agreement at PRES's request containing the agreed releases, the assignment of the Debtors' rights to pursue the subtenants for unpaid postpetition rent, and such other customary lease termination terms as are consistent with the settlement.

In light of the foregoing, the Debtors, the Creditors' Committee and Secured Lender support these consensual resolutions of the Landlord Objections and believe that they are in the best interests of all stakeholders.

## VI.    FOREIGN INSOLVENCY PROCEEDINGS

Certain foreign affiliates of the Debtors — Conexant Systems Germany GmbH ("*Conexant Germany*") and Conexant Systems UK Limited ("*Conexant UK*") — commenced insolvency proceedings in Germany and the United Kingdom, respectively. Business operations at Conexant Germany and Conexant UK have been shut down.

Conexant Germany commenced insolvency proceedings on March 5, 2013, when it became apparent that an intercompany receivable owed to it by Conexant Systems, Inc. would be impaired, rendering the entity illiquid. Conexant Germany's liabilities primarily consist of a contingent, pension

11

liability. Claims that may be filed against the Debtors by Conexant Germany, if any, will constitute a General Unsecured Claim under the Plan. Conexant UK filed "administration" proceedings on March 26, 2013. The liabilities of Conexant UK primarily include obligations related to a lease for real property, which Conexant UK no longer occupies. Conexant UK's lease obligations were previously satisfied by Debtor Conexant Systems Inc. Conexant UK's assets include non-core patents that are no longer necessary for the operation of the Debtors' businesses. Following the filing of these Chapter 11 Cases, Conexant Systems, Inc. withdrew its financial support of Conexant UK, and the board of directors of Conexant UK resolved that the company was unable to meets its liabilities — including the legacy lease payment that came due on March 25, 2013 — as they came due. Claims that may be filed against the Debtors by Conexant UK, if any, will constitute a General Unsecured Claim under the Plan.

## VII.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.    Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement. This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only. Please refer to the Plan for additional defined terms.

References to the "*Bankruptcy Court*" are to the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

References to the "*Bankruptcy Rules*" mean the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

References to the "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for all of the Debtors in the Bankruptcy Court under case number 13-10367 (MFW).

References to a "*Claim*" are to any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

References to the "*Confirmation Hearing*" are to the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

References to the "*Confirmation Date*" are to the date upon which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

References to "*Interests*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

References to "*Person*" means to a person, as the term is defined in section 101(41) of the Bankruptcy Code.

12

References to the "**Plan**" and the "**Plan of Reorganization**" are to the *Second Modified Joint Plan of Reorganization of Conexant Systems, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* dated April 19, 2013, including the Plan Supplement (as modified, amended or supplemented from time to time), a copy of which is attached as **Exhibit A** hereto and incorporated herein by reference.

References to the "**Plan Supplement**" are to the compilation of documents and forms of documents, schedules and exhibits to the Plan to be Filed by the Debtors in form and substance acceptable to the Secured Lender no later than ten (10) days before the Voting Deadline on notice to parties in interest including, among others, counterparties to Executory Contracts and Unexpired Leases included on the Assumed Executory Contract and Unexpired Lease List and all holders of Claims in Voting Classes pursuant to Article III.E.1 of the Plan, and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement, including the following:  (a) the New By-Laws; (b) the New Certificates of Incorporation; (c) the Rejected Executory Contract and Unexpired Lease List (d) the Assumed Executory Contract and Unexpired Lease List; (e) a list of retained Causes of Action, if any; (f) the identification of any Disbursing Agent other than the Reorganized Debtors; (g)  the identity of the members of the New Boards; (h) the material terms of the Emergence Bonus Plan; (i) the material terms of the New Notes; and (j) the material terms of the New Working Capital Facility, if any.

### B.    Additional Important Information

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article X of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, the Plan and the section entitled "Risk Factors" before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Plan Supplement.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference have not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder (the "*Securities Act*"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration under section 1145 of the Bankruptcy Court do not apply, the securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements: any future effects as a result of the pendency of the Chapter 11 Cases; the Reorganized Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows; projected dividends; financing plans; competitive position; business strategy; budgets; projected cost reductions; projected and estimated liability costs; disruption of operations; plans and objectives of management for future operations; contractual obligations; off-balance sheet arrangements; growth opportunities for existing products and services; projected price increases; and projected general market conditions.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors' Plan may be converted to a process to sell substantially all of the Debtors' assets under Bankruptcy Code section 363; the Debtors' ability to reduce its overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases; customer responses to the Chapter 11 Cases; inability to have Claims discharged or settled during the Chapter 11 Cases; general economic, business and market conditions; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressure by customers; ability to implement cost reduction initiatives in a timely manner; ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## VIII.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.    Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.    Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depend on what type of Claim you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "***Class***."  Each Class's respective voting status is set forth below.

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Notes Claim | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 7 | Interests in Conexant | Impaired | Deemed to Reject |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Anticipated Recovery |
|:---:|---|---|
| 1 | Priority Non-Tax Claims | Each holder of an Allowed Priority Non-Tax Claim will receive (a) payment in full in Cash if such Claims do not exceed the Priority Non-Tax Claims Cap or (b) a Pro Rata share of $1 million if such Claims exceed the Priority Non-Tax Claims Cap, to the extent all holders of such Claims consent to such treatment. |
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim will receive one of the following treatments, as determined by the applicable Debtor (with the consent of the Secured Lender): (i) either (a) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, if such Claims do not exceed the Other Secured Claims Cap or (b) a Pro Rata share of $1 million if such Claims exceed the Other Secured Claims Cap, to the extent all holders of such Claims consent to such treatment; (ii) delivery of the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment such that the Allowed Other Secured Claim shall be rendered Unimpaired. |
| 3 | Secured Notes Claim | The holder of the Secured Notes Claim will receive (i) a Pro Rata distribution of the New Notes, calculated in respect of the aggregated amount of all Allowed DIP Facility Claims and the Secured Notes Claim and (ii) 100% of the New Common Stock.  For the avoidance of doubt, the Secured Notes Claim shall not include the Secured Notes Deficiency Claim, which claim shall be treated as a General Unsecured Claim. |
| 4 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim will receive a Pro Rata distribution of the General Unsecured Claims Recovery Pool; *provided*, *however*, that if the Plan is confirmed and goes effective, on the Effective Date, the Secured Lender will be deemed to waive the Secured Notes Deficiency Claim and its rights to participate in and/or receive any distribution from the General Unsecured Claims Recovery Pool. |
| 5 | Intercompany Claims | To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as practicable, Intercompany Claims will be paid, adjusted, reinstated in full or in part, or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors with the consent of the Secured Lender. |
| 6 | Intercompany Interests | To preserve the Debtors' corporate structure, Intercompany Interests will be adjusted or reinstated in full or in part, or |

| Class | Claim/Interest | Anticipated Recovery |
|-------|----------------|----------------------|
|       |                | cancelled or discharged in full or in part, in each case, to the extent determined by the Reorganized Debtors with the consent of the Secured Lender on the Effective Date or as soon thereafter as practicable. |
| 7 | Interests in Conexant | Holders of Interests in Conexant will not receive any distribution on account of their Interests. |

**E.     What will I receive from the Debtors if I hold an Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan.

As set forth in Article X of the Plan, it is a condition precedent to the Effective Date that the Allowed Administrative Claims not exceed the Administrative Claims Cap.  The Debtors do not believe that the Allowed Administrative Claims will exceed the Administrative Claims Cap, but, to the extent such Administrative Claims Cap is exceeded, no holders of such Claims object to or otherwise contest the Plan and all holders of such Claims consent to such treatment, the holders of Allowed Administrative Claims shall receive a Pro Rata share of $17.5 million.

**F.     How will the Administrative Claims Cap, the Secured Claims Cap and the Priority Non-Tax Claims Cap affect my recovery?**

It is a condition to the effectiveness of the Plan that Administrative Claims, Priority Non-Tax Claims and Other Secured Claims not exceed the Administrative Claims Cap, the Priority Non-Tax Claims Cap or the Other Secured Claims Cap, as applicable.  To the extent these caps are not exceeded, Administrative Claims, Priority Non-Tax Claims and Other Secured Claims will be satisfied in full.  If such Claims exceed the applicable cap, no holders of such Claims object to or otherwise contest the Plan and all holders of such Claims consent to such treatment, holders of Administrative Claims, Priority-Non-Tax Claims and Other Secured Claims will receive a Pro Rata share of the Administrative Claims Cap, the Priority Non-Tax Claims Cap or the Other Secured Claims Cap, as applicable.  If such Claims exceed the applicable cap and a holder of such a Claim objects to or otherwise contests the Plan, the Debtors will be unable to confirm the Plan.  For the avoidance of doubt, to the extent that Administrative Claims, Priority Non-Tax Claims and Other Secured Claims exceed the Administrative Claims Cap, the Priority Non-Tax Claims Cap or the Other Secured Claims Cap, as applicable, following Confirmation but prior to the Effective Date, the Debtors will not effectuate the Plan without the consent of the holders of such Claims to the extent that payments would result in less than 100% distributions on account of such claims.  Absent consent of the holders of such Claims, the Debtors will be unable to consummate the Plan.

**G.     What is the General Unsecured Claims Recovery Pool and how will it be administered?**

The General Unsecured Claims Recovery Pool is a pool of Cash that the Debtors will reserve for distribution on account of Allowed General Unsecured Claims.  On the Effective Date, the Reorganized Debtors will distribute $2.9 million in Cash into the General Unsecured Claims Recovery Pool, which will be held in trust for the benefit of holders of Allowed General Unsecured Claims.  The General

Unsecured Claims Recovery Pool will be administered, and distributions from such pool will be made, by a designee of the Creditors' Committee. Neither the Debtors nor the Reorganized Debtors will bear any costs of administering or distributing the General Unsecured Claims Recovery Pool, including the costs of objecting to and/or resolving General Unsecured Claims. These costs will be incurred by the designee selected by the Creditors' Committee and reimbursed from the General Unsecured Claims Recovery Pool.

### H.    How was the amount of the General Unsecured Claims Recovery Pool determined?

The amount of the General Unsecured Claims Recovery Pool reflects an amount greater than the amount that the holders of General Unsecured Claims would receive in a hypothetical Chapter 7 liquidation and the result of the Global Settlement. During the Debtors' efforts to obtain debtor in possession financing, the Secured Lender argued that it had a lien on "Excluded Assets" (as defined in the Secured Notes Indenture), which includes receivables and all of the Debtors' Cash (other than proceeds of the Secured Lender's collateral), because such assets constituted traceable proceeds of the Debtors' inventory on which the Secured Lender has a perfected senior-secured lien. Notwithstanding Soros' position, and to avoid the administrative costs and potential delay associated with any challenge to Soros' claimed lien on Excluded Assets, the Debtors assumed — for purposes of negotiating with the Secured Lender on the terms of the Plan — that the Secured Lender did not have a lien on the Excluded Assets. As a result, and after taking this into account for purposes of the Liquidation Analysis attached hereto as **Exhibit G**, the Debtors determined that holders of General Unsecured Claims would receive, at a maximum, $1.9 million in a hypothetical Chapter 7 liquidation. As a result, to avoid this potential dispute during the Chapter 11 Cases and as part of the Global Settlement embodied in the Plan, the Plan contemplates a General Unsecured Claims Recovery Pool of $2.9 million. Pursuant to the Global Settlement, on the Effective Date of the Plan, the Secured Lender will be deemed to waive the Secured Notes Deficiency Claim and its right to participate in and/or receive any distribution from the General Unsecured Claims Recovery Pool.

### I.    How will my vote affect my recovery from the General Unsecured Claims Recovery Pool?

Pursuant to the terms of the Plan, the Secured Notes Deficiency Claim is included in Class 4 — General Unsecured Claims. The Secured Notes Deficiency Claim is an Unsecured Claim in the amount of approximately $114.5 million. Pursuant to the Global Settlement, if the Plan is confirmed and goes effective, on the Effective Date, the Secured Lender will be deemed to waive the Secured Notes Deficiency Claim and its right to participate in and/or receive any distribution from the General Unsecured Claims Recovery Pool. The recovery for holders of Class 4 — General Unsecured Claims is estimated between 6% and 9%.

### J.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative, including a potential 363 Sale under the terms of the Restructuring Support Agreement, may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis," which begins on page 30, and the Liquidation Analysis attached as **Exhibit G** to this Disclosure Statement.

**K.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective – the "Effective Date" – or as soon as practicable thereafter, as specified in the Plan. *See* "Confirmation of the Plan," which begins on page 30, for a discussion of the conditions to consummation of the Plan.

**L.      What are the sources of cash and other consideration required to fund the Plan?**

The Debtors will use Cash on hand to make any payments provided for in the Plan, and the New Working Capital Facility, if obtained, will provide additional working capital after the Effective Date. The amount of Cash actually on hand on the Effective Date could vary to the extent the Debtors' actual receipts and disbursements vary from the amounts set forth in the Projections. In addition, the Secured Lender will convert all of the commitments outstanding under the DIP Facility Credit Agreement into New Notes and use any available cash-on-hand following such conversion to satisfy outstanding payments, obligations and expenses payable under the DIP Facility Credit Agreement. *See* Article XII of this Disclosure Statement, which begins on page 24, for additional information.

Additionally, the Plan contemplates the issuance of equity interests in Holdco (which the Plan refers to as "New Common Stock") and the issuance by Holdco of new unsecured notes in the amount of $76 million (which the Plan refers to as the "New Notes"), which will provide an additional source of recovery to the holder of the Secured Notes Claim and the DIP Facility Claim.

**M.      Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes. *See* "Risk Factors," which begins on page 25.

**N.      What rights will Holdco's new stockholders have?**

The holder of the Secured Notes Claim will receive 100% of the New Common Stock, which may be subject to dilution on account of the Management Incentive Program.

On the Effective Date, all existing Interests in Conexant (including common stock, preferred stock, and any options, warrants or rights to acquire any equity interests) will be cancelled.

**O.      What is the Management Incentive Program and how will it affect the distribution I receive under the Plan?**

The Plan contemplates the implementation of the Management Incentive Program, which will provide for up to 15% of the fully diluted New Common Stock, or the non-equity equivalent thereof, to be reserved for distribution to officers, directors and employees of the Reorganized Debtors, on terms to be determined by the Holdco Board.

**P.        How will the release of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the release of all Causes of Action other than those that are specifically retained; any retained Causes of Action will be identified in the Plan Supplement.  The Debtors believe that pursuing certain Causes of Action against trade creditors would not result in a net benefit to the Debtors' estates, but instead could potentially harm the Reorganized Debtors' business relationships with their trade partners.  Additionally, many of the Causes of Action, if not released, would be subject to statutory and other defenses.  The Debtors do not believe that the release of such Causes of Action, including Avoidance Actions, will materially impact recoveries under the Plan.

**Q.        Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that General Unsecured Claims, ***excluding*** the Secured Notes Deficiency Claim, total approximately $32.9 million.  Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.  Moreover, the Debtors are rejecting and in the future may reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate.  Further, the Debtors or Creditors' Committee may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.  These changes could affect recoveries for holders of Claims in Class 4, and such changes could be material.

**R.        What effect will the New Notes have on the Reorganized Debtors?**

The New Notes will be in the principal amount of $76 million, have an interest rate of 11.25% per annum to be paid semi-annually on a cash or pay in kind basis at Holdco's election and have a maturity date of 11 years from the Effective Date.  Because the New Notes are unsecured, will be issued by Holdco and are not guaranteed by, or recourse to, Conexant OpCo or any of the remaining Reorganized Debtors, the Debtors believe the New Notes will have no effect on the liquidity of the Reorganized Debtors (other than Holdco).

**S.        Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release and exculpate each of:  (a) the Debtors; (b) the Secured Lender; (c) the Secured Notes Trustee; (d) the DIP Facility Lender; (e) the Equity Sponsors; (f) the Creditors' Committee and its members; and (g) with respect to the entities in clauses (a) through (f), such entity's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

The Debtor releases, non-consensual releases and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and the Global Settlement.  All of the parties included in the definition "Released Parties" have made a substantial contribution to the Debtors' restructuring effort, whether through the provision of DIP Financing or efforts to negotiate and implement the Plan, which will preserve the going-concern value of the Debtors for the benefit of all parties in interest; each of the Secured Lender, DIP Facility Lender, Secured Notes Trustee, Equity Sponsors, and Creditors' Committee is warranted the benefit of the release and exculpation provisions.

20

Based on the foregoing, the Debtors believe that the releases in the Plan are necessary and appropriate and meet the requisite legal standard in the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

Each holder of a Claim or an Interest in the Debtors that does not elect to opt out of the release provisions contained in Article IX of the Plan, including holders of Claims or Interests that do not vote on the Plan, will be deemed to have expressly, unconditionally, generally and individually and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. The releases in the Plan represent an integral element of the Plan and Global Settlement.

For more detail see "Article IX - Settlement, Release, Injunction and Related Provisions," which begins on page 30 of the Plan, and is incorporated herein by reference.

**T.      What is the deadline to vote on the Plan?**

4:00 p.m. (prevailing Eastern Time) on May 23, 2013.

**U.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by 4:00 p.m. (prevailing Eastern Time) on May 23, 2013 at the following address:  BMG Group, Inc., Attn:  Conexant Systems, Inc., Ballot Processing, 18675 Lake Drive East, Chanhassen, Minnesota 55317.  *See* Article XIV of this Disclosure Statement, which begins on page 28.

**V.      Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for June 4, 2013 at 10:30 a.m. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than May 23, 2013 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.

**W.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

21

Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**X.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors (in consultation with the Secured Lender) that is the first business day after which all conditions to Consummation have been satisfied or waived. *See* Article X of the Plan. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**Y.    What is the effect of the Plan on the Debtors' corporate structure?**

On the Effective Date, at the election of the Secured Lender, the Debtors will organize Conexant OpCo, a new corporate subsidiary, and will contribute all of the operating assets and liabilities of Holdco to Conexant OpCo. Also on the Effective Date, all liabilities of Holdco that are not discharged pursuant to the Plan (other than obligations under the New Notes) will be transferred to Conexant OpCo, and there shall be no claims assertable against Holdco other than on account of the New Notes. Holdco will retain the stock of its subsidiaries and any other assets necessary or desirable for it to function as a holding company of the Debtors, the Reorganized Debtors (other than Holdco) and its non-Debtor subsidiaries and will issue the New Notes and New Common Stock.

**Z.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

The Secured Lender will hold 100 percent of the New Common Stock of Holdco on the Effective Date, which may be subject to dilution by the Management Incentive Program.

As of the Effective Date, the term of the current members of the board of directors of Conexant will expire, and the initial boards of directors, including the Holdco Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors will be appointed by the Secured Lender in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

The directors of the New Boards will be selected by the Secured Lender. The New Subsidiary Boards will include the Chief Executive Officer as a director. The Debtors will disclose in the Plan Supplement, to the extent known, the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors.

22

**AA.**    **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' notice, claims and solicitation agent, BMC Group, Inc., located at 18675 Lake Drive East, Chanhassen, Minnesota 55317, (888) 909-0100.

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' counsel at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims and solicitation agent at http://www.bmcgroup.com/conexant (free of charge) or the Bankruptcy Court's website at www.deb.uscourts.gov (for a fee).

**BB.**    **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

**IX.**    **THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW**

The Debtors are a leading developer of semiconductor system solutions, comprised of semiconductor devices, software and reference designs, for imaging, audio, embedded-modem and video applications.  The Debtors' expertise in analog and mixed-signal processing, DSP, firmware and software and applications allows the Debtors to deliver semiconductor devised and integrated systems for consumer electronic products in four applications:  audio, embedded-modem, video and imaging.  In 2012, the Debtors had approximately $135.2 million in net sales.  A detailed summary of the Debtors' businesses, corporate history, organizational structure and prepetition capital structure may be found in the *Declaration of Sailesh Chittipeddi, President and CEO of Conexant Systems, Inc., in Support of First Day Pleadings*, filed on the Petition Date (the "***First Day Declaration***"), which is attached hereto as **Exhibit C** and incorporated herein by reference.

**X.**    **EVENTS LEADING TO THE CHAPTER 11 FILINGS**

A number of factors contributed to the Debtors' decision to commence these Chapter 11 Cases.  Although the Debtors' business model is viable, the Debtors' substantial funded debt burden, decline in revenue and significant long-term over-market real estate commitments affected the Debtors' ability to meet their debt obligations.  For more information, as well as the strategic alternatives that the Debtors explored prepetition, see the First Day Declaration, attached hereto as **Exhibit C**.

**XI.**    **ANTICIPATED EVENTS OF THE CHAPTER 11 CASES**

**A.**    **Corporate Structure Upon Emergence**

As described in the Plan, on the Effective Date and at the election of the Secured Lender, Holdco shall organize Conexant OpCo and contribute to such subsidiary all of its operating assets used to conduct its active businesses, subject to such subsidiary contemporaneously assuming Holdco's liabilities (to the extent not discharged pursuant to the Plan).  Also on the Effective Date, all liabilities of Holdco that are not discharged pursuant to the Plan (other than obligations under the New Notes) will be transferred to Conexant OpCo, and there shall be no claims assertable against Holdco other than on account of the New

23

Notes.  Holdco shall otherwise retain the stock of its subsidiaries and any other assets necessary or desirable for it to function as a holding company of the Debtors and the Reorganized Debtors (other than Holdco) and its non-Debtor subsidiaries going forward, and shall take such further actions necessary or requested by the Secured Lender to implement any of the foregoing prior to or as of the Effective Date.

**B.**      **Expected Timetable of the Chapter 11 Cases**

The Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 120 days of the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

**C.**      **First Day Relief**

On the Petition Date, the Debtors filed several motions (the "***First Day Motions***") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors and customers following the commencement of the Chapter 11 Cases.  For more information on the First Day Motions, see Exhibit B to the First Day Declaration, attached hereto as **Exhibit C**.  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://www.bmcgroup.com/conexant.

**D.**      **The Severance Program**

Immediately before the Petition Date, the Debtors reduced their workforce by approximately 25 employees.  The Debtors have historically utilized long standing severance guidelines to provide severance for individual employees who were terminated.  The Debtors recently developed a severance program for non-insider employees (the "***Severance Program***"), designed to sustain the morale of the Debtors' current employees.  The Debtors believe that a stable Severance Program lowers the risk that key employment decisions will be made outside the Debtors' influence by employees who take matters into their own hands.  The motion seeking approval of the Severance Program, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://www.bmcgroup.com/conexant. On April 19, 2013, the Court entered an order approving the Severance Program [Docket No. #].

**E.**      **The Emergence Bonus Plan**

The Plan contemplates providing certain emergence bonuses pursuant to section 1129(a)(4) of the Bankruptcy Code to certain members of the Debtors' senior management team and certain employees of the Debtors in an aggregate amount of up to $1.5 million.  The recipients and terms of the Emergence Bonus Plan will be included in the Plan Supplement.

**XII.    PROJECTED FINANCIAL INFORMATION**

Attached hereto as **Exhibit E** is a projected consolidated income statement, which includes the following:  (a) the Debtors' consolidated, unaudited, preliminary, financial statement information for the fiscal year ended September 28, 2012 and (b) consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "***Financial Projections***") for the period from 2013 through 2017.  The Financial Projections are based on an assumed Effective Date of June 17, 2013. To the extent that the Effective Date occurs after June 17, 2013, recoveries on account of Allowed Claims could be impacted.

24

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Risks Related to Recoveries Under the Plan

#### (i)    *The Debtors may not be able to achieve their projected financial results.*

With respect to holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.  As holders of Allowed General Unsecured Claims receive a Pro Rata distribution from the General Unsecured Claims Recovery Pool, additional claims could reduce the recovery.

With respect to holders of interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results

The Financial Projections set forth in **Exhibit E** to this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economy in general and the industry segments in which the Debtors operate.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, (a) the value of the New Common Stock may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date and (c) the Debtors may be unable to service their debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### (ii)    *The Reorganized Debtors' New Common Stock will not be publicly traded under the Securities Act.*

The New Common Stock will not be listed on a national securities exchange.  Accordingly, there will be no public market for the New Common Stock and there can be no guarantee that liquid trading markets will develop.  In the event a liquid trading market does not develop, the ability to freely transfer or sell New Common Stock may be substantially limited.

#### (iii)    *Administrative Claims, Priority Non-Tax Claims and Other Secured Claims may exceed the Administrative Claims Cap, the Priority Non-Tax Claims Cap or other Secured Claims Cap, as applicable.*

It is a condition to the effectiveness of the Plan that Administrative Claims, Priority Non-Tax Claims and Other Secured Claims not exceed the Administrative Claims Cap, the Priority Non-Tax Claims Cap or the Other Secured Claims Cap, as applicable.  To the extent these caps are not exceeded, Administrative Claims, Priority Non-Tax Claims and Other Secured Claims will be satisfied in full.  If

25

such Claims exceed the applicable cap, no holders of such Claims object to or otherwise contest the Plan and all holders of such Claims consent to such treatment, holders of Administrative Claims, Priority-Non-Tax Claims and Other Secured Claims will receive a Pro Rata share of the Administrative Claims Cap, the Priority Non-Tax Claims Cap or the Other Secured Claims Cap, as applicable.  If, however,  such Claims exceed the applicable cap and a holder of such a Claim objects to or otherwise contests the Plan, the Debtors will not support Confirmation of the Plan and will instead pursue a Sale.  For the avoidance of doubt, to the extent that Administrative Claims, Priority Non-Tax Claims and Other Secured Claims exceed the Administrative Claims Cap, the Priority Non-Tax Claims Cap or the Other Secured Claims Cap, as applicable, following Confirmation but prior to the Effective Date, the Debtors will not effectuate the Plan without the consent of the holders of such Claims.  If the Debtors are unable to obtain the consent of the holders of such Claims, the Debtors may have to re-solicit votes on the Plan.

> (iv)   ***The Restructuring Support Agreement requires the Debtors to toggle to a 363 Sale upon the occurrence of certain events, unless otherwise waived by the Secured Lender.***

In the event that, among other 363 Triggering Events (as defined in the Restructuring Support Agreement), any holder of an Administrative Claim, Other Secured Claim or Priority Non-Tax Claim objects to confirmation of the Plan and the asserted Claims for such holder's class exceed the applicable Cap, the Debtors will not support Confirmation of the Plan and instead will pursue a Sale.  Although the Debtors and the Secured Lender have agreed to negotiate in good faith on the terms of a budget to wind down the Debtors' estates after consummation of a Sale, there is no guarantee that such an agreement will be reached, or that any such agreement would provide for payment in full of Administrative Claims, Other Secured Claims or Non-Priority Tax Claims.

> (v)   ***The restructuring of the Debtors may adversely affect the Debtors' tax attributes.***

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 35.

**B.      Risks Related to the Debtors' and Reorganized Debtors' Businesses**

> (i)   ***The Reorganized Debtors may lose market share and revenue to competing semiconductor providers.***

The Debtors operate in a highly competitive industry, and the markets in which the Debtors compete are intensely competitive.  Any adverse change in a particular market or any adverse change in consumers' preferences could have a material adverse effect on the Reorganized Debtors' revenue.  Other semiconductor providers may enter the markets in which the Reorganized Debtors currently operate or may operate in the future, and these companies may be larger and have more financial resources than the Reorganized Debtors.  In addition, from time to time, other semiconductor providers may alter their products to compete directly with the Reorganized Debtors.  These tactics could result in lower market share and consumer revenue or increased promotion and other expenses and, consequently, lower the Reorganized Debtors' earnings and cash flow.

(ii)     *If the Debtors lose key executive officers, technical and other personnel necessary for the design, development, manufacture and sale of the Debtors' products, the Debtors' businesses could be disrupted and the Debtors' financial performance could suffer.*

The Debtors' future success depends on the Debtors' ability to attract and retain the continued service and availability of skilled personnel at all levels of their business.  As the source of the Debtors' technological and product innovations, the Debtors' key technical personnel represent a significant asset.  Additionally, the Debtors believe that the unique combination of skills and experience possessed by their management team would be difficult to replace, and loss of their management team could have a material adverse effect on the Reorganized Debtors, including impairing the Reorganized Debtors' ability to execute their business strategy.

(iii)    *The Debtors are dependent upon third parties for the manufacture, assembly and testing of their products.  Any interruption of such services could adversely affect profitability or revenues.*

The Debtors depend upon third parties to manufacture, assemble and test their products.  Thus, any disruptions in the operations of one or more of the Debtors' suppliers could have a material adverse effect on the Debtors' business operations.

(iv)    *Risks related to semiconductor industry may adversely affect the Reorganized Debtors' business operations.*

The Reorganized Debtors' businesses will be subject to numerous risks, many of which are outside of their control.  In addition to risks related to the investment of substantial resources in developing new products for new applications and markets, the Reorganized Debtors will be vulnerable to additional risks associated with the semiconductor industry, such as constant technological change, rapid product obsolescence and price erosion, evolving technological standards, short product life cycles (for semiconductors and for the end-user products in which they are used) and wide fluctuations in product supply and demand.

(v)     *The Debtors are subject to the risks of doing business internationally.*

A majority of the Debtors' revenues come from customers located outside of the United States.  Additionally, many of the Debtors' key suppliers are located outside the United States.  The Debtors' businesses are subject to a number of risks inherent in operating abroad, including risks relating to local economic and political conditions; limitations on the Debtors' ability to protect their intellectual property under local laws; disruptions of commerce and capital or trading markets due to or related to terrorist activity, armed conflict or natural disasters; restrictive governmental actions, such as restrictions on the transferor repatriation of funds and trade protection measures, including export duties and quotas and customs duties and tariffs; and the laws and policies of the United States and other countries affecting trade, foreign investment and loans, and import or export licensing requirements.

(vi)    *The Reorganized Debtors may be adversely affected by potential litigation, including litigation arising out of these Chapter 11 Cases.*

The Reorganized Debtors may in the future become party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is

27

not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

> ### *(vii)    The Debtors have indemnification obligations to certain of their customers that are subject to pending litigation.*

The Debtors have indemnification obligations to certain of their customers, some of which are subject to pending litigation.  Such litigation could result in settlement or damages that could significantly affect the Debtors' financial results.  The impact of the Debtors' identification obligations to such customers could be material.

> ### *(viii)    The loss of a key customer could seriously impact the Reorganized Debtors' revenue levels and harm the Reorganized Debtors' business.*

The Debtors have historically derived a substantial portion of their revenue from sales to a relatively small number of customers.  The Debtors anticipate that a small number of large customers will account for a substantial portion of the Reorganized Debtors' net revenue in future periods.  As a result, the loss or financial difficulty of any significant customer could materially and adversely affect the Reorganized Debtors' financial condition and results of operations.

> ### *(ix)    The Debtors have remediation and other obligations under environmental, health and safety laws and regulations which could result in unanticipated losses or liability.*

The Debtors are one of a number of potentially responsible parties that have certain remediation and other environmental obligations arising under environmental, health and safety laws and regulations, including with respect to ongoing remediation of a former facility in Newport Beach, California, under the oversight of the Santa Ana Regional Water Quality Control Board, and other potential obligations associated with facilities currently or previously owned, operated or used by the Debtors or their predecessors.  Any determination that materials or products associated with other facilities currently or previously owned, operated or used by the Debtors or their predecessors, has, or is characterized as having, a toxicological or health-related impact on the environment or public health could result in additional claims or obligations.  To the extent dischargeable under the applicable provisions of the Bankruptcy Code, the environmental obligations shall be treated as General Unsecured Claims pursuant to the Plan.  If, however, the environmental obligations are deemed non-dischargeable, such obligations would be addressed by the Reorganized Debtors.

## XIV.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

**The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan**.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan.  The table in section VIII.C of this Disclosure Statement, which begins on page 15, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.  As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 3 and 4 (collectively, the "***Voting Classes***").

The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from holders of Claims and Interests in Classes 1, 2, 5, 6 and 7.  Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is April 19, 2013**.  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim.

### C.    Voting on the Plan

**The Voting Deadline is 4:00 p.m. prevailing Eastern time on May 23, 2013**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that they are **actually received** on or before the Voting Deadline by the Debtors' voting and claims agent (the "***Voting and Claims Agent***") at the following address:

<div style="border:1px solid black; padding:10px;">

**DELIVERY OF BALLOTS**

**BMC GROUP, INC.**
**ATTN:  CONEXANT SYSTEMS, INC. BALLOT PROCESSING**
**18675 LAKE DRIVE EAST**
**CHANHASSEN, MINNESOTA 55317**

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a ballot before the Voting Deadline.

</div>

D.     **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (a) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (b) it was transmitted by facsimile, email or other electronic means; (c) it was cast by an entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (e) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (g) it is unsigned; or (h) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

<div style="border:2px solid black; padding:10px;">

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE (888) 909-0100. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

</div>

XV.     **CONFIRMATION OF THE PLAN**

A.     **Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

B.     **Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in the class either (1) has accepted the plan or

(2) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit G** and incorporated herein by reference is a liquidation analysis (the "*Liquidation Analysis*") prepared by the Debtors with the assistance of Alvarez & Marsal North America, LLC, the Debtors' financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' businesses would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## C.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as **Exhibit E** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following these Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[5]

---

[5]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

31

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including the right to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### (i)    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### (ii)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

F.   **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.   The Valuation Analysis is set forth in **Exhibit F** attached hereto and incorporated herein by reference.

## XVI.   CERTAIN SECURITIES LAW MATTERS

A.   **New Common Stock and New Notes**

As discussed herein, the Plan provides for Holdco to distribute:  (i) New Common Stock to the holder of the Secured Notes Claim and (ii) New Notes to the holders of the DIP Facility Claim and the Secured Notes Claim.

The Debtors believe that the classes of New Common Stock and New Notes are "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (a "***Blue Sky Law***").  The Debtors further believe that the offer and sale of the New Common Stock and New Notes pursuant to the Plan are, and subsequent transfers of the New Common Stock and New Notes by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

B.   **Issuance and Resale of New Common Stock and New Notes Under the Plan**

Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Law) will not apply to the offer or sale of stock, options, warrants or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer and sale of the New Common Stock and New Notes will not be registered under the Securities Act or any applicable state Blue Sky Law.

To the extent that the issuance of the New Common Stock and New Notes is covered by section 1145 of the Bankruptcy Code, the New Common Stock and New Notes may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the New Common Stock and New Notes generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of these exemptions cannot be known unless individual state Blue Sky Laws are examined.

**Recipients of the New Common Stock and New Notes are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the New Common Stock and New Notes and the availability of any exemption from registration under the Securities Act and state Blue Sky Laws.**

33

### (i)  *Resale of New Common Stock and New Notes; Definition of Underwriter*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, or are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock and New Notes by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of New Common Stock and New Notes who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "controlling Person") with respect to the New Common Stock and the New Notes would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock or New Notes and, in turn, whether any Person may freely resell New Common Stock and New Notes.  **The Debtors recommend that potential recipients of New Common Stock and New Notes consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and applicable state Blue Sky Laws.**

34

*(ii)*     ***New Common Stock / Management Incentive Plan***

The Plan contemplates the implementation of the Management Incentive Plan, which will be included with the Plan Supplement and will reserve up to 15% of the fully diluted New Common Stock, or the non-equity equivalent thereof, for distribution to officers, directors and employees of the Reorganized Debtors, to be determined by the Holdco Board.

## XVII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.     Introduction

The following discussion summarizes certain United States ("***U.S.***") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors and certain holders of Claims and Interests.  This summary is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the U.S. Treasury Regulations promulgated thereunder (the "***Regulations***"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "***IRS***"), all as in effect on the date hereof (collectively, "***Applicable Tax Law***").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not apply to holders of Claims or Interests that are not "United States persons" (as such phrase is defined in the Tax Code).  This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or Interests or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims or Interests who are themselves in bankruptcy).  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of Section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE:     TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS**

**DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

      B.        **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

      Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("***COD Income***") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, and (y) the issue price of any new indebtedness of the taxpayer issued and (z) fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order:  (a) net operating losses ("***NOLs***") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.  Because the Plan provides that the holder of the Secured Notes Claim will receive New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock and, if applicable, the issue price of the New Notes exchanged therefor.  This value cannot be known with certainty at this time. However, as a result of Confirmation, the Debtors expect that there will be material reductions in, or elimination of, NOLs, NOL carryforwards and other tax attributes.

### (i)    *Limitation of NOL Carry Forwards and Other Tax Attributes*

As of the end of their fiscal year in 2012, the Debtors have $137 million of NOLs, of which approximately $13 million are subject to annual limitations on use due to a prior ownership change. Following Confirmation, the Debtors anticipate that any remaining NOL carryover, capital loss carryover, tax credit carryovers and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "*Pre-Change Losses*") may be subject to limitation or elimination under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of the New Common Stock by Holdco pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000 or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.77% for March 2013). The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "*382(l)(5) Exception*"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the

effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.    If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors believe that it will be beneficial for them to qualify for, and utilize, the 382(1)(5) Exception.  However, as mentioned above, if the Debtors do utilize the 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtors' Pre-Change Losses would effectively be eliminated.

It is possible that the Debtors will not qualify for the 382(l)(5) Exception.  Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence.  In either case, the Debtors expect that their use of the Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### (ii)    Alternative Minimum Tax

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income ("***AMTI***") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  The effect of this rule could cause the Reorganized Debtors to owe a modest amount of federal and state income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income.  Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

38

C.    **Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims and Interests**

The following discussion assumes that the Debtors will undertake the restructuring transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the restructuring transactions.

(i)    *Consequences to Holders of Class 3 Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Secured Notes Claims, the holder of the Secured Notes Claim shall receive (i) a Pro Rata distribution of the New Notes calculated in respect of the aggregate amount of all Allowed DIP Facility Claims and the Secured Notes Claim and (ii) 100% of the New Common Stock.  For the avoidance of doubt, the Secured Notes Claim shall not include the Secured Notes Deficiency Claim, which claim shall be treated as a General Unsecured Claim.

Whether the holder of such Secured Notes Claim recognizes gain or loss as a result of the exchange of its claim for the New Common Stock depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Secured Notes Claim surrendered are treated as a "security" for the reorganization provisions of the Tax Code.

(a)    Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.  The Allowed Secured Notes Claim had an initial term of approximately five years, and it is therefore unclear whether the debt underlying the Allowed Secured notes Claim will be treated as "securities" or not.  The New Notes have an initial term of approximately eleven years, and the Debtors expect to take the position that the debt underlying the New Notes are "securities."

(b)    Treatment of a Holder of an Allowed Secured Notes Claim if the Exchange of its Claim is not Treated as a Reorganization

If a debt instrument constituting a surrendered Secured Notes Claim is not treated as a "security" for U.S. federal income tax purposes, a holder of such a claim should be treated as exchanging its Allowed Secured Notes Claim for the New Notes and the New Common Stock in a fully taxable exchange.  A holder of an Allowed Secured Notes Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the issue price (as determined under the applicable Treasury regulations) of the New Notes and the fair market value of the New Common Stock, in each case to the extent not allocable to accrued but untaxed interest, and (ii) the holder's adjusted tax basis in its Allowed Secured Notes Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature

39

of the Claim in such holder's hands, whether the Claim was purchased at a discount and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Allowed Secured Notes Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the New Notes or the New Common Stock received in exchange for its Allowed Secured Claim is allocable to accrued but untaxed interest, the holder may recognize ordinary income. See the discussions of "accrued interest" and "market discount" below. A holder's tax basis in the New Notes and the New Common Stock should equal its fair market value. A holder's holding period for the New Notes and the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

> (c)     Treatment of a Holder of an Allowed Senior Notes Claim if the Exchange of its Claim is Treated as a Reorganization

If a debt instrument constituting a surrendered Allowed Senior Notes Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of such holder's Claim for the New Common Stock should be treated as a recapitalization, and therefore a reorganization, under Tax Code Section 368(a)(1)(E). In such case, a holder should not recognize loss with respect to the exchange and should not recognize gain except to the extent that a portion of the New Common Stock and the New Notes received is allocable to accrued but untaxed interest (see discussion below, "Accrued Interest"). Such holder's tax basis in its New Notes and New Common Stock should be equal to the holder's tax basis in the Allowed Senior Notes Claim surrendered therefor (allocated between the New Notes and the New Common Stock based on their relative fair market values), and a holder's holding period for its New Notes and New Common Stock should include the holding period for the surrendered Allowed Senior Notes Claim; *provided* that the tax basis of any New Notes or New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such New Notes and New Common Stock should not include the holding period of the surrendered Allowed Senior Notes Claim.

> (d)     Dividends on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. To the extent that a holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the holder's basis in its shares. Any such distributions in excess of the holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

> (e)     Sale, Redemption or Repurchase of New Common Stock

Unless a non-recognition provision applies, holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

**THE TAX CONSEQUENCES OF THE PLAN AND TO THE HOLDERS OF ALLOWED SENIOR NOTES CLAIMS ARE HIGHLY UNCERTAIN. HOLDERS OF SENIOR NOTES CLAIMS SHOULD CONSULT THEIR TAX ADVISORS REGARDING WHETHER SUCH CLAIMS COULD BE TREATED AS "SECURITIES" FOR U.S. FEDERAL INCOME TAX PURPOSES.**

(ii)     *Consequences to Holders of Class 4 Claims*

Pursuant to the Plan, except to the extent that a holder of an Allowed General Unsecured Claim, including for the avoidance of doubt the Secured Notes Deficiency Claim, agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed General Unsecured Claim, each holder of such Allowed General Unsecured Claim shall receive a Pro Rata distribution of the General Unsecured Claims Recovery Pool; *provided*, *however*, that on the Effective Date of the Plan, the Secured Lender will be deemed to waive the Secured Notes Deficiency Claim and its rights to participate in and/or receive any distribution from the General Unsecured Claims Recovery Pool.

A holder of an Allowed General Unsecured Claim will be treated as exchanging such Claim for its Pro Rata distribution in a taxable exchange under section 1001 of the Tax Code. Accordingly, each holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value the holder's Pro Rata distribution of the General Unsecured Claims Recovery Pool received in exchange for its Allowed General Unsecured Claim and (2) such holder's adjusted basis, if any, in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed General Unsecured Claim in such holder's hands, whether such Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to such Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Allowed General Unsecured Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the holder's Pro Rata Distribution received in exchange for its Allowed General Unsecured Claim is allocable to accrued but untaxed interest, the holder may recognize ordinary income. See the discussions of "accrued interest" and "market discount" below.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR GENERAL UNSECURED CLAIMS.**

(iii)     *Accrued Interest*

To the extent that any amount received by a holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the holder as ordinary interest income (to the extent not already taken into income by the holder). Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously

included in the holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### *(iv)* *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### *(v)* *Limitation on Use of Capital Losses*

A holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate holder may carry over unused capital losses

42

and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

<div align="center">

*(vi)* ***Information Reporting and Back-up Withholding***

</div>

Payments in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding. Backup withholding of taxes will generally apply to Payments in respect of an Allowed Claim under the Plan if the holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

PHIL1 2761470v.1

## RECOMMENDATION

In the opinion of the Debtors and the Consenting Parties, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors and the Consenting Parties recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 19, 2013

Respectfully submitted,

Conexant Systems, Inc.,
on behalf of itself and each of the other Debtors

By:     */s/ Sailesh Chittipeddi*
Name:  Sailesh Chittipeddi, Ph.D.
Title:   President and Chief Executive Officer

COUNSEL:

*/s/ Domenic E. Pacitti*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:       (302) 426-1189
Facsimile:       (302) 426-9193

- and -

Morton Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:       (215) 569-2700
Facsimile:       (215) 568-6603

- and -

Paul M. Basta (admitted *pro hac vice*)
Joshua A. Sussberg (admitted *pro hac vice*)
Christopher T. Greco (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

*Co-Counsel to the Debtors*
*and Debtors in Possession*