**<u>Exhibit B</u>**

**Restructuring Support Agreement**

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "***Agreement***"),[1] is entered into as of February 26, 2013, by and among: (i) Conexant Systems, Inc., ("***Conexant***"), on behalf of itself and certain of its affiliates and subsidiaries (collectively, the "***Company***"); (ii) QP SFM Capital Holdings Ltd. (the "***Consenting Secured Lender***") and its affiliates, as the sole holder of the $175 million 11.25% Senior Secured Notes issued by the Company due 2015 (the "***Senior Secured Notes***"); (iii) Golden Gate Private Equity, Inc. and its affiliates and subsidiaries (collectively, "***Golden Gate***"); and (iv) August Capital and its affiliates and subsidiaries, as holders of the equity of the Company (collectively, "***August Capital***" and together with Golden Gate, the "***Sponsors***"). The Sponsors, the Company and the Consenting Secured Lender are collectively referred to herein as the "***Consenting Parties***". The Consenting Parties are each sometimes referred to herein individually as a "***Party***" and collectively, as the "***Parties***."

## WHEREAS:

A.     Before the date hereof, the Company, the Consenting Secured Lender and the Sponsors have engaged in discussions to consummate a restructuring of the Company's indebtedness and other obligations in accordance with the terms of this Agreement, the Restructuring Term Sheet attached hereto as **Exhibit A**, the chapter 11 plan of reorganization (the "***Plan***") attached hereto as **Exhibit B** and the DIP Credit Agreement attached hereto as **Exhibit C** (the transactions described in this Agreement, the Restructuring Term Sheet, the Plan and the DIP Credit Agreement collectively constitute the "***Restructuring***"). Each of the Restructuring Term Sheet, the Plan and the DIP Credit Agreement is incorporated herein by reference and made part of this Agreement.[2]

B.     The Restructuring will be consummated through the commencement of cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

C.     This Agreement, the Restructuring Term Sheet, the Plan and the DIP Credit Agreement set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement and support the Restructuring.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1     **Definitions**.

The following terms shall have the following definitions:

"363 Sale" has the meaning set forth in Section 5.2 hereof.

---

[1]     Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in Article 1 hereof.

[2]     This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan (or any other plan of reorganization) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

"<u>363 Triggering Event</u>" means the receipt of a notice by the Company from the Consenting Secured Lender notifying the Company of the occurrence of any of the events set forth in <u>Section 5.1</u> herein, as determined by the Consenting Secured Lender, any of which may be waived by the Consenting Secured Lender.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership, limited liability company or other ownership interests, by contract or otherwise) of such Person.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Agreement Effective Date</u>" means the date on which the Company shall have executed and delivered counterpart signature pages to the other Parties hereto and such other Parties shall have executed and delivered to the Company such Party's counterpart signature pages of this Agreement.

"<u>Ballot</u>" means the ballot distributed with the Disclosure Statement for voting on the Plan.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§101 et seq.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"<u>Chapter 11 Cases</u>" means the voluntary cases to be commenced by the Company (and certain of its subsidiaries) pursuant to chapter 11 of the Bankruptcy Code.

"<u>Commencement Date</u>" means the date on which the Company commences Chapter 11 Cases.

"<u>Company</u>" has the meaning set forth in the preamble hereof.

"<u>Confirmation Order</u>" means the order entered by the Bankruptcy Court confirming the Plan, including all exhibits, schedules, appendices and related documents, each in form and substance acceptable to the Consenting Secured Lender.

"<u>Consenting Secured Lender</u>" has the meaning set forth in the preamble hereof; and any holder of a Claim who takes the actions required of a transferee in accordance with Section 6 hereof.

"<u>Cure Period</u>" has the meaning set forth in <u>Section 4.1</u> herein.

"<u>Debtors</u>" means, individually or collectively, Conexant and each of its four United States domestic direct and indirect subsidiaries which commence a Chapter 11 Case under the Bankruptcy Code.

"DIP Credit Agreement" means that certain debtor-in-possession credit agreement providing a priming, senior secured, super-priority debtor-in-possession, delayed-draw credit financing (the "DIP Facility") in the aggregate principal amount of $15,000,000 to the Debtors, which shall, subject to entry of the Interim DIP Order or the Final DIP Order, as applicable, be entered into by and between the Debtors and the Consenting Secured Lender, which is attached hereto as **Exhibit C**.

"Disclosure Statement" means the disclosure statement in respect of the Plan.

"Effective Date" has the meaning set forth in the Plan.

"Final DIP Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing or such other proceedings as approved by the Bankruptcy Court, which order shall be in form and substance acceptable to the Consenting Secured Lender, and which has not been reversed, vacated, rescinded or stayed, together with all extensions, modifications and amendments thereto, in form and substance acceptable to the Consenting Secured Lender, which, among other matters but not by way of limitation, authorizes the Debtors to execute, deliver and perform their obligations under the DIP Credit Agreement.

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"Interim DIP Order" means the order of the Bankruptcy Court, which shall be in form and substance acceptable to the Consenting Secured Lender, entered in the Chapter 11 Case after an interim hearing, which, among other matters but not by way of limitation, authorizes the Debtors to, on an interim basis, execute, deliver and perform their obligations under the DIP Credit Agreement.

"Milestones" has the meaning set forth in Section 5.1(c) hereof and are included on **Exhibit A** attached hereto.

"Outside Date" means July 1, 2013, unless such date is extended by written agreement of the Consenting Secured Lender.

"Party" or "Parties" has the meaning set forth in the preamble hereof.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any other legal entity or association.

"Plan" means the chapter 11 plan of reorganization to be filed in the Chapter 11 Cases, which is attached hereto as **Exhibit B**.

"Plan Supplement" shall have the meaning ascribed to such term in the Plan.

"Release" refers to the provisions included in Section 3 of this Agreement.

"Reorganized Conexant" means the Company, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

"Reorganized Debtors" means, collectively, each of the Debtors or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date.

"Restructuring" has the meaning set forth in clause A of the recitals hereto (as defined the in Plan).

"Restructuring Term Sheet" means that certain term sheet, including all exhibits attached thereto, containing material terms and provisions of the Restructuring that are incorporated into the Plan or that may be effectuated pursuant to a credit bid submitted by the Consenting Secured Lender in a 363 Sale in the event of a 363 Triggering Event, a copy of which is attached hereto as **Exhibit A**, and incorporated by reference and made a part of this Agreement.

"Revocation Event" has the meaning set forth in Section 4.1 herein.

"Revocation Notice" has the meaning set forth in Section 4.1 herein.

"Sale Order" means the Final Order approving the 363 Sale, which order shall be in form and substance acceptable to the Consenting Secured Lender.

"Senior Secured Notes Claim" means any Secured Claim (as defined in the Plan) derived from or based upon the Senior Secured Notes.

"Senior Secured Notes Deficiency Claim" means any Claim derived from or based upon, or arising from the Senior Secured Notes other than a Senior Secured Notes Claim.

2    **Support of the Restructuring**.

2.1    Commitment of Consenting Secured Lender.

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated in accordance with its terms, and unless compliance is waived in writing by the Company, the Consenting Secured Lender agrees that it will:

(a)    support, and use reasonable best efforts to take all actions necessary or reasonably requested by the Company to facilitate the solicitation, confirmation and consummation of the Plan, which Plan shall include the Release included in Section 3 herein and Article VIII of the Plan;

(b)    vote all Claims, including the Senior Secured Note Claim and the Senior Secured Note Deficiency Claim, in favor of the Plan in accordance with the procedures set forth in the solicitation materials, and timely return a duly-executed Ballot in connection therewith;

(c)    not effectuate any Transfer in contravention of the provisions set forth in Section 6 hereof;

(d)    perform its obligations under this Agreement in a manner consistent with the terms set forth in the Restructuring Term Sheet during the period between the

Commencement Date and a decision by the Bankruptcy Court on approval of the Plan;

(e)     use its reasonable best efforts to support entry of the Confirmation Order by the dates set forth in this Agreement;

(f)     not directly or indirectly (i) seek, solicit, support, encourage, or vote its Claims or other claims or interests (including, for the avoidance of doubt, any claims or interests on behalf of any equity interests in any of the Debtors) or consent to, encourage, or participate in any discussions regarding the negotiation or formulation of any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Debtors other than pursuant to the Plan; (ii) take any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Plan, including engaging in any legal proceeding to object to, or interfere with, acceptance or implementation of the Restructuring in accordance with the Plan; (iii) pursue or initiate or have initiated on its behalf, any litigation or proceeding of any kind to foreclose on any assets serving as collateral for the Senior Secured Notes; or (iv) otherwise support any plan or sale process proposed by any entity other than the Debtors following the entry of an order in the Chapter 11 Cases terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code that is inconsistent with this Agreement, the Restructuring Term Sheet and the Plan; and

(g)     in the event of a 363 Triggering Event (that has not been rescinded or otherwise waived by the Consenting Secured Lender), use reasonable best efforts to agree on the terms of an appropriate wind-down budget and to facilitate the expedient consummation of the Restructuring pursuant to the 363 Sale, including negotiating terms of an asset purchase agreement to govern the 363 Sale and bid procedures (x) consenting to the 363 Sale and (y) attending the auction and submitting one or more credit bids in an amount to be determined by the Consenting Secured Lender, and shall not, directly or indirectly: (i) engage in any legal proceeding to object or otherwise cause the Bankruptcy Court not to approve the implementation of the Restructuring pursuant to the 363 Sale; (ii) pursue or initiate or have initiated on its behalf, any litigation or proceeding of any kind to foreclose on any collateral with respect to the Senior Secured Notes or the DIP Credit Agreement, as applicable; or (iii) encourage any Person to undertake any action set forth in clauses (i) and (ii) herein.

2.2     <u>Commitment of the Sponsors</u>.

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated in accordance with its terms, and unless compliance is waived in writing by the Company and the Consenting Secured Lender, each of the Sponsors agrees that it will:

(a)     support, and use reasonable best efforts to take all actions necessary or reasonably requested by the Company to facilitate the solicitation, confirmation and consummation of the Plan, which Plan shall include the Release included in <u>Section 3</u> herein and Article VIII of the Plan;

(b)     not effectuate any Transfer in contravention of <u>Section 2.2(g)</u> hereof;

(c)     perform its obligations under this Agreement in a manner consistent with the terms set forth in the Restructuring Term Sheet during the period between the Commencement Date and a decision by the Bankruptcy Court on approval of the Plan;

(d)     use its reasonable best efforts to support entry of the Confirmation Order by the dates set forth in this Agreement;

(e)     not directly or indirectly (i) consent to, encourage, or participate in any discussions regarding the negotiation or formulation of any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Debtors other than pursuant to the Plan; (ii) take any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Plan, including engaging in any legal proceeding to object to, or interfere with, acceptance or implementation of the Restructuring in accordance with the Plan; or (iii) otherwise support any plan or sale process proposed by any entity other than the Debtors following the entry of an order in the Chapter 11 Cases terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code that is inconsistent with this Agreement, the Restructuring Term Sheet and the Plan;

(f)     in the event of a 363 Triggering Event (that has not been rescinded or otherwise waived by the Consenting Secured Lender), support, and use its reasonable best efforts to take all actions necessary or reasonably requested by the Company or the Consenting Secured Lender to facilitate the consummation of the 363 Sale; and

(g)     not take any action that will impair any of the Company's tax attributes, including the utilization of a worthless stock deduction or transfer of ownership interests on or before the earlier of (i) the Effective Date of the Plan or (ii) December 31, 2013.

2.3     <u>Commitment of the Company</u>.

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated in accordance with its terms, and unless compliance is waived in writing by the Consenting Secured Lender and the Sponsors, the Company agrees that it will:

(a)     support, and take all actions necessary to facilitate the solicitation, confirmation and consummation of the Plan, which Plan shall include the Release included in <u>Section 3</u> herein and Article VIII of the Plan;

(b)     perform its obligations under this Agreement in accordance with the terms hereof and as set forth in the Restructuring Term Sheet and the Plan during the period between the Commencement Date and the Effective Date of the Plan;

(c)     use its reasonable best efforts to support entry of the Confirmation Order by the dates set forth in this Agreement;

(d)     not directly or indirectly (i) consent to, encourage, or participate in any discussions regarding the negotiation or formulation of any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Debtors other than pursuant to the Plan; or (ii) take any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Plan, including engaging in any legal proceeding to object to, or interfere with, acceptance or implementation of the Restructuring in accordance with this Agreement, the Restructuring Term Sheet and the Plan;

(e)     in the event of a 363 Triggering Event (that has not been rescinded or otherwise waived by the Consenting Secured Lender), support, and take all actions necessary or reasonably requested by the Consenting Secured Lender to facilitate the consummation of the 363 Sale including, without limitation, negotiate the terms of an asset purchase agreement with the Consenting Secured Lender, bid procedures to govern the section 363 Sale process, and such other documents necessary or appropriate to implement such 363 Sale process; and

(f)     obtain any and all required regulatory and/or third-party approvals, if any, for the Restructuring embodied in this Agreement, the Restructuring Term Sheet and the Plan.

Nothing in this Agreement shall, or shall be deemed to, prohibit any Party or its Affiliates, or their respective officers or representatives, from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, including, but not limited to asserting or seeking the allowance of any claims, counterclaims and defenses, solely if such appearance and the positions advocated in connection therewith: (i) are not inconsistent with this Agreement, the Restructuring Term Sheet and the Plan (or 363 Sale, if applicable); or (ii) are for the purposes of contesting whether any matter, fact or thing, is a breach of, or inconsistent with the Agreement (including any of the Exhibits attached hereto).

3     **Release**.

3.1     Mutual Release Between the Consenting Secured Lender and the Sponsors.

(a)     On the Agreement Effective Date, and subject in all respects to Section 4 herein, (x) the Consenting Secured Lender, on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals (collectively, the "***Consenting Secured Lender Releasing Parties***"), expressly, unconditionally, generally and individually and collectively releases, acquits and discharges (i) each Sponsor and (ii) each Sponsor's respective predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors,

attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals of each Sponsor and (y) each Sponsor, on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates (except the Company), managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals (collectively, the "*Sponsor Releasing Parties*," and together with the Consenting Secured Lender Releasing Parties, the "*Releasing Parties*") expressly, unconditionally, generally and individually and collectively releases, acquits and discharges the other Sponsor and the Consenting Secured Lender and each such party's respective predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals from any and all claims obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Company, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Company and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Releasing Party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Company, the Company's restructuring, the purchase, sale or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim or interest that is affected by or classified in the Plan, the business or contractual arrangements between the Company and the Consenting Secured Lender or the Sponsors, the restructuring of claims and interests before or during the Restructuring, the negotiation, formulation or preparation of the Plan, the Plan Supplement (if applicable), any Disclosure Statement or related agreements, any asset purchase agreement, instruments or other documents and any other act or omission, transaction, agreement, event or other occurrence relating to the Company taking place on or before the execution of this Agreement, except for any proven claim of actual fraud, as determined by a Final Order.

(b)     In connection with their agreement to the foregoing release, the Consenting Secured Lender and the Sponsors knowingly and voluntarily waive and relinquish any and all provisions, rights and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF**

**KNOWN BY HIM OR HER MUST HAVE MATERIALLY
AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

(c)     Each of the Consenting Secured Lender and the Sponsors knowingly grants the Release notwithstanding that the Consenting Secured Lender or each of the Sponsors may hereafter discover facts in addition to, or different from, those which either the Consenting Secured Lender or each of the Sponsors now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each of the Consenting Secured Lender and the Sponsors expressly waives any and all rights that such Party may have under any statute or common law principle which would limit the effect of the Release to those claims actually known or suspected to exist as of before the Agreement Effective Date.

(d)     In connection with each of the Consenting Secured Lender's and Sponsors' release of the claims as provided in Section 3.1(a), in the event that any third party, debtor in possession, trustee, creditor, estate, creditors' committee, successor in interest or similar entity or their respective successors in interest are successful in pursuing any actual or threatened claim, cause of action, or litigation against any Party released from such claims pursuant to the Release, each of the Consenting Secured Lender and the Sponsors, on behalf of themselves and their respective heirs, executors, administrators, successors and assigns, agree that they shall not recover any funds received, awarded, or arising from settlement, judgment or other resolution of such actual or threatened claim, cause of action or litigation, and shall assign and hold in trust any such recoveries to and for any Party released from such claims pursuant to the Release. The Consenting Secured Lender hereby represents to each Sponsor, and each Sponsor represents to the other Sponsor and the Consenting Secured Lender that it: (i) has not assigned any claims or possible claims against any such Party; (ii) except as expressly set forth herein, fully intends to release all claims against such Parties, including unknown and contingent claims; and (iii) has consulted with counsel with respect to the execution and delivery of the Release provided in Section 3.1(a) and has been fully apprised of the consequences hereof.  Furthermore, the Consenting Secured Lender further covenants not to sue and agrees not to institute or cause to be instituted any litigation, lawsuit or action against any Sponsor, and each of the Sponsors further covenants not to sue and agrees not to institute or cause to be instituted any litigation, lawsuit or action against the other Sponsor or the Consenting Secured Lender, with respect to the matters addressed in the Release.

(e)     Each of the Consenting Secured Lender and the Sponsors hereby represents and warrants that it has access to adequate information regarding the terms of this Agreement, the scope and effect of the Release, and all other matters encompassed by this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement.  Each of the Consenting Secured Lender and the Sponsors further represents and warrants that it has not relied upon any other Party to this Agreement in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement.

4       **Revocation of Release**.

4.1     Revocation Notice.

At any time prior to the Effective Date of the Plan, consummation of a 363 Sale or dismissal or conversion of the Chapter 11 Cases, the Release provided in Section 3.1 shall be deemed revoked if any Party receives a notice from any other Party (each, a "**Revocation Notice**") of the occurrence of a "Revocation Event" (as defined herein) and the recipient or recipients of the Revocation Notice fail to cure such Revocation Event within five (5) business days of receipt of such Revocation Notice (the "**Cure Period**") or such Revocation Notice is not otherwise rescinded; *provided, however*, that in the event the recipient or recipients of a Revocation Notice dispute either the occurrence of a Revocation Event or the failure of such recipient or recipients to cure the Revocation Event within the Cure Period, such Party or Parties shall have ten (10) days from the expiration of the Cure Period to seek a determination by the Bankruptcy Court as to whether a Revocation Event occurred and was not cured within the Cure Period.

4.2     For purposes of this Agreement, a "Revocation Event" means any of the following:

(a)     any releasing Party in Section 3.1(a) breaches any representation, warranty, covenant, or other provision of this Agreement or the Restructuring Term Sheet *provided*, *however*, and for the avoidance of doubt, a breaching Party is not entitled to invoke this provision as a Revocation Event;

(b)     termination by the Company of this Agreement pursuant Section 5.2(c)(ii); or

(c)     the Company breaches its obligations under Section 2.3(a)-(e) of this Agreement.

4.3     Revocation of the Release in Section 3 before the Effective Date of the Plan, consummation of a 363 Sale or dismissal or conversion of the Chapter 11 Cases shall result in a full and complete restoration of any and all claims released pursuant to Section 3 of this Agreement and such Release shall be *void ab initio*, and nothing herein shall thereafter impair or otherwise waive the rights of any Party to assert such claims, including, and without prejudice to, any claims or causes of action waived or otherwise released and such claims, liabilities, or causes of action shall be restored to their prior status.

4.4     For the avoidance of doubt, the occurrence of a 363 Triggering Event or any other Termination Event in Section 5 shall not impact the Release set forth in Section 3 unless such 363 Triggering Event or other Termination Event also constitutes a Revocation Event pursuant to Section 4.1 hereof, in which case Sections 4.1 and 4.2 shall control.

## 5     **Triggering Events/Termination**.

5.1     363 Triggering Events.

The occurrence of any of the following events shall be "**363 Triggering Events**" for purposes of this Agreement, as determined by the Consenting Secured Lender, any of which may be waived by the Consenting Secured Lender:

(a)     The Company fails to commence the Chapter 11 Cases on or before March 1, 2013;

(b)    The Interim DIP Order is not entered by the Bankruptcy Court within five (5) calendar days after the Commencement Date;

(c)    the Company fails to achieve, comply with or proceed in accordance with any of the "Milestones" set forth on **Exhibit A** to the Restructuring Term Sheet by the dates specified therein;

(d)    the withdrawal, amendment, modification of, or the filing of a pleading by the Company seeking to amend or modify the Plan, related Disclosure Statement, or any other related document in a material manner that is inconsistent with this Agreement, the Restructuring Term Sheet or any related definitive documentation without the consent of the Consenting Secured Lender, including, for the avoidance of doubt, any proposed amendment or modification of the Plan that would increase the size of the Unsecured Creditor Distribution;

(e)    it is determined that the allowed amount of all administrative, priority or other secured claims asserted against the Debtors exceeds any of the Admin Cap, Priority Cap or Other Secured Claim Cap (each as defined in the Restructuring Term Sheet), respectively, and one or more administrative or priority claimants objects to or otherwise contests its treatment under the Plan;

(f)    a material breach by the Company of any of its obligations under this Agreement or related definitive documentation or failure by the Company to satisfy the terms and conditions necessary to consummate the Restructuring in any respect, and any such breach or failure by the Company is not cured by the earlier of three (3) business days after receipt of written notice from the Consenting Secured Lender or, to the extent applicable, any applicable cure period provided for under the agreements governing the Restructuring;

(g)    the filing of any motion or other request for relief by the Consenting Secured Lender, the Company and/or one or more Sponsors, or the granting of any motion or other request for relief by any other non-party, seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code or (iii) appointment of a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(h)    the Company's exclusive right to file a plan under section 1121 of the Bankruptcy Code is terminated pursuant to a Final Order or expires; or

(i)    the occurrence of an "Event of Default" as defined under the DIP Credit Agreement or other document governing the DIP Facility, which has not been cured by the Company within any applicable grace or cure period or waived by the DIP Lender.

5.2    <u>Implementation of 363 Sale Upon Occurrence of a 363 Triggering Event</u>.

(a)    <u>Effect of 363 Triggering Event</u>.  Upon the receipt of notice of the occurrence of a 363 Triggering Event, until any notice of such 363 Triggering Event is rescinded by the Consenting Secured Lender, the Consenting Secured Lender shall no longer have any obligation to the Company to support the Plan, however, each of

the Parties shall remain obligated to support a 363 Sale pursuant to Sections 2.1 and 2.3 herein, as applicable.

(b)     <u>Company's Obligations After Occurrence of 363 Triggering Event</u>.  If a 363 Triggering Event occurs and is not waived by the Consenting Secured Lender, the Company agrees that it will not pursue confirmation of the Plan and will instead commence an auction process pursuant to section 363 of the Bankruptcy Code (a "***363 Sale***"), in connection with which the Consenting Secured Lender would serve as the stalking horse bidder. The auction process would be run in accordance with customary bid procedures acceptable to the Consenting Secured Lender, which will contemplate a sale hearing 45 days after the date on which a 363 Triggering Event occurs.  The Parties shall use reasonable best efforts to cause any order entered by the Bankruptcy Court approving a sale of the Company's assets to the Consenting Secured Lender, to the extent available under applicable law, to include the Release provisions provided herein and the Restructuring Term Sheet as among the Consenting Secured Lender, the Sponsors and the Company, it being understood that the Parties' respective obligations under this Agreement shall not be terminated or waived if the Bankruptcy Court declines to include the Release in any such order.

(c)     <u>Company Termination Events</u>.  The Company may terminate this Agreement as to all Parties upon five (5) Business Days' prior written notice, upon the occurrence of any of the following events: (i) breach by the Consenting Secured Lender or any of the Sponsors of any of the representations, warranties or covenants set forth in this Agreement that would have a material adverse impact on the Company or the consummation of the Restructuring, that remains uncured for a period of five (5) Business Days after the receipt by the Consenting Secured Lender or such Sponsor, as applicable, of notice of such breach; (ii) the board of directors of the Company determines in good faith that proceeding with the Restructuring as contemplated in this Agreement would be a breach of their fiduciary duties; or (iii) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order preventing consummation of a material portion of the Restructuring.

(d)     <u>Consenting Secured Lender Termination Events.</u>  Subject in all respects to Section 4 of this Agreement, the Consenting Secured Lender may terminate this Agreement as to all Parties upon five (5) Business Days' prior written notice, upon the occurrence of any of the following events:  (i) the failure of the Company to meet the milestones set forth on Exhibit A to the Restructuring Term Sheet; (ii) the failure of the Company to conduct the 363 Sale (if applicable) in accordance with bid procedures acceptable to the Consenting Secured Lender; (iii) the breach by the Company or any of the Sponsors of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement; (iv) the entry of an order (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (c) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; (v) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order preventing consummation of a material portion of the

12

Restructuring; (vi) the amendment, modification, or filing of a pleading by the Company seeking to amend, modify or withdraw the Plan, or any documents relating thereto, in a manner not acceptable to the Consenting Secured Lender; (vii) the Company files any motion or pleading that is not consistent with this Agreement, the Restructuring Term Sheet or the Plan and such motion or pleading has not been withdrawn prior to the early of (a) three business days of the Company receiving written notice from the Consenting Secured Lender that such motion or pleading is inconsistent with the Agreement, the Restructuring Term Sheet or the Plan and (b) entry of an order of the Bankruptcy Court approving such motion; (viii) the entry of any order by the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the Restructuring Term Sheet or the Plan (unless otherwise agreed to by the Parties); or (ix) 11:59 pm (eastern time) on the Outside Date.

(e)     Termination of Parties' Obligations.  Subject in all respects to Sections 3 and 4.4 of this Agreement, unless terminated earlier pursuant to the terms of this Agreement, the Parties' obligations to the Company and each other under this Agreement shall terminate on the earlier of (i) the Effective Date of the Plan; (ii) entry of the Sale Order; subject to the last sentence of Subsection 5.2(b) hereof; (iii) the entry of an order (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (c) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; and (iv) 11:59 p.m. (eastern time) on the Outside Date.

6      **Transfer of Claims**.  Notwithstanding anything to the contrary herein, each of the Consenting Secured Lender and Sponsors agrees that, for so long as this Agreement has not been terminated in accordance with its terms, such Party shall not sell, assign, transfer, convey or otherwise dispose of, directly or indirectly (each, a "***Transfer***"), all or any of its Claims (or any right related thereto and including any voting rights associated with such Party's Claims) related to the Senior Secured Notes unless the transferee thereof (i)  agrees in an enforceable writing to assume and be bound by all terms of this Agreement and the Restructuring Term Sheet, and to assume all rights and obligations of the respective transferring Party under this Agreement accruing from and after the date of such assignment in a form substantially similar to the "Form of Joinder" attached hereto as **Exhibit D** and (ii) promptly delivers such writing to the Company (by email to joshua.sussberg@kirkland.com and christopher.greco@kirkland.com with a copy to mstamer@akingump.com and mlahaie@akingump.com) (each such transferee becoming, upon the Transfer, a "Consenting Secured Lender" hereunder). The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor. By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Consenting Secured Lender hereunder shall be deemed to constitute obligations in favor of the relevant transferee. Any Transfer of any Claim that does not comply with the procedure set forth in this Section 6 or impairs the Company's tax attributes shall be deemed void *ab initio*, it being understood that the Sponsors have agreed pursuant to the terms of Section 2.2(g) hereof, among other things, not to transfer any ownership interests in the Company before December 31, 2013.

7      **Representations and Warranties**.

Each Party hereby represents and warrants to the other Parties that the following statements are true and correct as of the date hereof:

(a)     It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)     The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c)     The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or governmental authority or regulatory body.

(d)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e)     The Consenting Secured Lender, as of the date of this Agreement:

        (i)     is the beneficial owner of the principal amount of Senior Secured Note Claims and Senior Secured Note Deficiency Claims, as applicable, or is the nominee, investment manager or advisor for one or more beneficial holders thereof, and has voting power or authority or discretion with respect to, such claims including, without limitation, to vote, exchange, assign and transfer such claims;

        (ii)    holds its Claim(s) free and clear, other than pursuant to this Agreement, of any claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind that would adversely affect in any way such Consenting Secured Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

        (iii)   acknowledges that no representations, express or implied, are being made with respect to the Company, or any securities being acquired in connection with the Plan, or otherwise, other than those expressly set forth herein or in the DIP Credit Agreement, Plan or Plan Supplement.

8       **Cooperation**. The Debtors shall provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court (including the Plan, Disclosure Statement or related documents) to counsel for the Consenting Secured Lender and the Sponsors at least

three days prior to the date when the Company intends to file such documents, and all such documents shall be in form and substance acceptable to the Consenting Secured Lender.

9       **Entire Agreemen**t.  This Agreement, including the Restructuring Term Sheet, the Plan, the DIP Credit Agreement and any other exhibits, schedules and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

10      **Reservation of Rights**.  Each of the Parties acknowledges and agrees that (a) this Agreement is being executed in connection with negotiations concerning the Restructuring of the Company and in contemplation of the Chapter 11 Case filings by the Company, and (b) the rights granted in this Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court.  If the transactions contemplated herein are not consummated, or if this Agreement terminates for any reason prior to the Effective Date, the Parties hereto fully reserve any and all of their rights.

11      **Waiver**. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of a dispute among the Parties. If the transactions contemplated herein are not consummated, or following the occurrence of the Outside Date, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.

12      **Representation by Counsel**. Each Party acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

13      **Counterparts**. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

14      **Amendments**. Except as otherwise provided herein, this Agreement, the Plan and the Restructuring Term Sheet may not be modified, amended or supplemented, or any provisions herein or therein waived, without the prior written consent of the Company, the Consenting Secured Lender and the Sponsors, *provided, however*, that the prior written consent of the Sponsors shall be required solely in the event of any proposed modification, amendment, supplement or waiver that has an adverse effect on the Sponsors' respective rights (a) to the Release in Section 3 prior to a Revocation Event (if any) or (b) under Section 4.  Where the consent of a Party is required under this Section 14, such consent shall not be unreasonably withheld by such Party. Notwithstanding the foregoing, the Parties may modify, amend or supplement the Plan consistent with Article X of the Plan.

15      **Headings**. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

16      **Specific Performance**. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach,

including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

17      **Governing Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

18      **Notices**. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by electronic mail transmission with first class mail confirmation to the Parties at the following addresses or email addresses:

        If to the Company:

        Conexant Systems, Inc.
        4000 MacArthur Blvd.
        Newport Beach, California  92660
        Attention: Sailesh Chittipeddi, CEO
        E-mail address: sailesh.chittipeddi@conexant.com

        with a copy to (which shall not constitute notice):

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, New York 10022
        Facsimile: (212) 446-4900
        Attention: Joshua A. Sussberg, Esq.
                Christoper T. Greco, Esq.
        E-mail address: joshua.sussberg@kirkland.com, christoper.greco@kirkland.com

        If to the Consenting Secured Lender:

        To the addresses and email addresses set forth on the signature pages hereto.

        with a copy to (which shall not constitute notice):

        Akin Gump Strauss Hauer & Feld LLP
        One Bryant Park, Bank of America Tower
        New York, NY  10036-6745
        Attention:  Michael Stamer, Esq.

Meredith Lahaie, Esq.
Facsimile: (212) 872-1002
E-mail address: mstamer@akingump.com
mlahaie@akingump.com

If to Golden Gate Private Equity, Inc.:

To the addresses and email addresses set forth on the signature pages hereto.

with a copy to (which shall not constitute notice):

DLA Piper
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
Attention: Chris Dickerson, Esq.
Jeremy Hall, Esq.
Facsimile: (312) 630-5310
E-mail address: chris.dickerson@dlapiper.com, jeremy.hall@dlapiper.com

19      **No Third-Party Beneficiaries**. The terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective successors and permitted assigns (including any Person that becomes a Consenting Secured Lender pursuant to Section 6 hereof), and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**CONEXANT SYSTEMS, INC.**

By: _____
Name:  Carl Mills
Title:  Chief Financial Officer

**BROOKTREE BROADBAND HOLDING, INC.**

By: _____
Name:  Carl Mills
Title:  Chief Financial Officer

**CONEXANT CF, LLC**
By:  Conexant Systems, Inc., its Sole Member

By: _____
Name:  Carl Mills
Title:  Chief Financial Officer

**CONEXANT, INC.**

By: _____
Name:  Carl Mills
Title:  Chief Financial Officer

**CONEXANT SYSTEMS WORLDWIDE, INC.**

By: _____
Name:  Carl Mills
Title:  Chief Financial Officer

[Signature Page to Restructuring Support Agreement]

**QP SFM CAPITAL HOLDINGS LTD.**

By:
Title: JAY SCHOENFARBER
ATTORNEY-IN-FACT

[Signature Page to Restructuring Support Agreement]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**GOLDEN GATE PRIVATE EQUITY, INC.**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**AUGUST CAPITAL**

By: _____
Name: ANDREW RAPPAPORT
Title: Member

**<u>Exhibit A</u>**

Restructuring Term Sheet

## CONEXANT SYSTEMS, INC.
## RESTRUCTURING TERM SHEET

### *FEBRUARY 27, 2013*

This term sheet (the "**Term Sheet**") sets forth the principal terms of a proposed restructuring (the "**Restructuring**") of the existing indebtedness and other obligations of Conexant Systems, Inc. and certain of its affiliates and subsidiaries. Subject to completion of definitive documentation, the Restructuring will be consummated by commencing cases under chapter 11 (the "**Chapter 11 Cases**") of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). This Term Sheet has the support of the Company, the Secured Lender (as defined below) and the Sponsors.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN AND OTHERWISE BE SATISFACTORY TO THE SECURED LENDER, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DOCUMENTATION.

| Transaction Overview | |
|---|---|
| Parties | <ul><li>Conexant Systems, Inc. and certain of its affiliates and subsidiaries (collectively, the "**Company**" or the "**Debtors**");</li><li>QP SFM Capital Holdings Ltd., as the sole holder of the $175 million 11.25% Senior Secured Notes due 2015 (the "**Secured Lender**");</li><li>The Bank of New York Mellon Trust Company, N.A. as Trustee and Collateral Trustee pursuant to the Indenture for the 11.25% $175 million Senior Secured Notes due 2015 (the "**Agent**"); and</li><li>Golden Gate Private Equity, Inc. and August Capital, as holders of the common shares of Conexant Holdings, Inc. (together, the "**Sponsors**," and together with the Company, the Secured Lender and the Agent, the "**Parties**").</li></ul> |
| Implementation Through Plan | The Restructuring will be effectuated through the commencement of chapter 11 cases and the consummation of a chapter 11 plan of reorganization (the "**Plan**"); *provided, however,* and solely in the event that one or more 363 Triggering Events (as defined below) occurs and is not waived by the Secured Lender, in its sole discretion, the Restructuring will be effectuated through a sale pursuant to section 363 of the Bankruptcy Code. |
| Corporate Structure | On or prior to the Effective Date and at the election of the Secured Lender, Conexant Systems, Inc. (at such time, "**HoldCo**") shall organize a new corporate subsidiary ("**Conexant OpCo**") and contribute to such subsidiary all of its operating assets used to conduct its active businesses, subject to such subsidiary contemporaneously assuming HoldCo's liabilities (to the extent not discharged pursuant to the Plan). HoldCo shall otherwise retain the stock of its subsidiaries and any other assets necessary or desirable for it to function as a holding company of the Debtors and the reorganized Debtors (other than |

| | reorganized HoldCo) and its non-Debtor subsidiaries going forward, and shall take such further actions necessary or requested by the Secured Lender to implement any of the foregoing prior to or as of the Effective Date |
|---|---|
| DIP Facility | The Company and QP SFM Capital Holdings Ltd. (the "**DIP Lender**") will enter into that certain debtor-in-possession credit agreement attached as **Exhibit C** to the Restructuring Support Agreement (the "**RSA**") entered into as of February 26, 2013, by and among (i) the Company, (ii) QP SFM Capital Holdings Ltd and its affiliates as the sole holder of the Secured Notes (as defined below), and (iii) the Sponsors (the "**DIP Facility**"). |
| **Classification and Treatment of Claims and Interests** | |
| Treatment of Administrative, Priority and Other Secured Claims | It shall be a condition to effectiveness of the Plan that the amount of (a) allowed administrative claims incurred but not yet paid (excluding fees of professionals retained in the chapter 11 cases) shall not exceed the aggregate of $17.5 million (the "**Admin Cap**"), (b) allowed non-tax priority claims shall not exceed an aggregate of $1 million (the "**Priority Cap**") and (c) allowed secured claims (other than the Secured Notes Claim) shall not exceed an aggregate of $1 million (the "**Other Secured Claim Cap**"). In addition, the Plan shall provide that distributions made thereunder on account of administrative, priority and other secured claims (excluding fees of professionals retained in the chapter 11 cases) shall not exceed the Admin Cap, Priority Cap or Other Secured Claim Cap, respectively.<br><br>All secured claims shall receive one of the following treatments to be determined by the applicable Debtor, with the consent of the Secured Lender: (i) payment in full in cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing any such allowed secured claim; or (iii) other treatment such that the allowed secured claim shall be rendered not impaired. |
| Treatment of DIP Facility | In full and final satisfaction of the claims arising under the DIP Facility (the "**DIP Claims**"), the DIP Lender shall be entitled to receive its pro rata share of the Secured Claim Pool.<br><br>The "**Secured Claim Pool**" means the pool from which distributions shall be made on account of the DIP Claims and the Secured Notes Claim (as defined below), which pool shall be funded with 100% of the new common stock of HoldCo (the "**New Common Stock**"). |
| Treatment of $175,000,000.00, 11.25% Senior Secured Notes (the "**Secured Notes**") held by the Secured Lender | In full and final satisfaction of the portion of the $194,523,300 claim held by the Secured Lender that is determined to be secured pursuant to section 506 of the Bankruptcy Code (in the context of confirmation of the Plan) (the "**Secured Notes Claim**"), the Secured Lender shall be entitled to receive (i) 100% of the new unsecured notes to be issued by HoldCo (the "**New Notes**", the terms of which shall be set forth on **Exhibit B** hereto and (ii) its pro rata share of the Secured Claim Pool. For the avoidance of doubt, the Secured Notes Claim shall not include the unsecured deficiency claim (the "**Secured Notes Deficiency Claim**"), which unsecured deficiency claim shall be treated as a General Unsecured Claim (as defined below). |
| Treatment of General Unsecured Claims | Each holder of a general unsecured claim (each, a "**General Unsecured Claim**"), including the Secured Notes Deficiency Claim and any claims arising from the rejection of a non-residential lease or executory contract, in full and final satisfaction of the General Unsecured Claims, shall receive a pro rata share of $2.0 million (the "**Unsecured Creditor Distribution**"); *provided, however*, that if the class of General Unsecured Claims votes to accept the plan pursuant to section 1126 of the Bankruptcy Code, the Secured Lender shall be deemed to waive its right to participate in the Unsecured Credit Distribution. |

2

| | |
|---|---|
| Treatment of Intercompany Claims and Interests | All claims held by one Debtor against another Debtor (each, an "***Intercompany Claim***"), or interests held by one Debtor in another Debtor, will be paid, adjusted, reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined by the reorganized Debtors with the consent of the Secured Lender. |
| Treatment of Existing Equity | Holders of Existing Equity will not receive a recovery under the Plan. |
| **Additional Provisions** | |
| New Working Capital Facility | On the effective date of the Restructuring, the reorganized Debtors may enter into a new working capital facility to fund working capital expenses and other general corporate purposes on terms and conditions acceptable to the Secured Lender.  The New Working Capital Facility may be provided by the Secured Lender or a third-party lender. |
| Management Incentive Plan | Following the effective date of the Restructuring, the reorganized Debtors shall implement a management incentive plan ("***MIP***") for up to 15% of the equity in the reorganized Company, or the non-equity equivalent thereof.  The terms of the MIP shall be determined by the new board of directors. |
| Emergence Bonus Plan | On the effective date of the Restructuring, the reorganized Debtors will pay emergence bonuses to certain members of the senior management team and employees in an amount of up to $1.5 million and on terms to be agreed upon between the Company and the Secured Lender. |
| Releases | "***Released Parties***" means each of: (a) the Debtors; (b) the Secured Lender; (c) the Agent; (d) the DIP Lender and DIP Facility agent; (e) the Sponsors; and (f) with respect to the entities in clauses (a) through (e), such entity's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accounts, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals. <br><br> **Releases by the Debtors.** <br><br> On the effective date of the Plan and to the fullest extent authorized by applicable law, the Released Parties will be expressly, unconditionally, generally and individually and collectively released, acquitted and discharged by the Debtors and their estates from any and all actions, claims obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that the Debtors, the reorganized Debtors, the Debtors' estates or their affiliates (whether individually or collectively) or on behalf of the holder of any claim or Interest or other entity, ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Company, the Company's restructuring, the purchase, sale or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or  contractual arrangements between the Company and any Released Party, the restructuring of claims and interests before or during the restructuring, the negotiation, formulation or preparation of the Plan, the plan supplement (if applicable), any disclosure statement or related agreements, any assert purchase agreement, instruments or other documents or any other act or omission, transaction, agreement, event or |

3

| | |
|---|---|
| | other occurrence relating to the Company taking place on or before the confirmation date of the Plan or consummation of a sale pursuant to section 363 of the Bankruptcy Code, except for any claims and causes of action for actual fraud.

**Releases by Holders of Claims and Interests.**

On the effective date of the Plan and to the fullest extent authorized by applicable law, each holder of a claim or an interest in the Company shall be deemed to have expressly, unconditionally, generally and individually and collectively, released, acquitted and discharged the Company (including the Company's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accounts, investment bankers, consultants, representatives, management companies, fund advisors and other professionals) and the Released Parties from any and all actions, claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Company, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that such holder (whether individually or collectively) ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Company, the Company's restructuring, the chapter 11 cases, the purchase, sale or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between the Company and any Released Party, the restructuring of claims and Interests before or during the restructuring, including the negotiation, formulation or preparation of the Plan, the disclosure statement, or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the Company taking place on or before the confirmation date of the Plan or consummation of a sale pursuant to Section 363 of the Bankruptcy Code, except for any claims and causes of action for actual fraud. |
| Corporate Governance | The identity of the members of the board of directors of HoldCo and the subsidiary boards (including the board of directors of Conexant OpCo) and all necessary corporate governance documents will be included in the supplement to the Plan.  All members of the board of directors of HoldCo and the subsidiary boards shall be selected by the Secured Lender.  The subsidiary boards, including the board of directors of Conexant OpCo, shall include the chief executive officer.   All corporate governance documents shall be acceptable to the Secured Lender in its sole discretion. |
| Executory Contracts and Unexpired Leases | Subject to Secured Lender consent, the Company reserves the right to assume and/or reject certain executory contracts and unexpired leases.  All executory contracts and unexpired leases not expressly assumed shall be deemed rejected pursuant to the Plan. |
| Tax | The Restructuring shall be structured so as to preserve the Company's net operating losses and any other valuable tax attributes.  The Sponsors will take no action to impair any of the Company's tax attributes including, without limitation, the taking of a worthless stock deduction or any transfer of its stock. |
| International Subsidiaries | The Restructuring contemplated by this Term Sheet shall be structured so as to preserve international assets and comply with applicable foreign laws and in a manner acceptable to the Secured Lender. |

| | |
|---|---|
| Professional Fees | Payment through the effective date of the Restructuring of all reasonable fees and expenses of the professionals (including Kirkland & Ellis LLP, as counsel to the Company; Alvarez & Marsal, as financial and restructuring advisor to the Company; Akin Gump Strauss Hauer & Feld, counsel to the Secured Lender, and The Blackstone Group, financial advisor to the Secured Lender) incurred in connection with the negotiation and consummation of the transactions contemplated by this Term Sheet. |
| Waiver of Chapter 5 Causes of Action | The Restructuring, if consummated pursuant to a chapter 11 plan of reorganization, shall contain a waiver on behalf of the Debtors and their estates of all causes of action arising under chapter 5 of the Bankruptcy Code, including preference and fraudulent transfer claims, unless otherwise reserved in the plan supplement, which plan supplement shall be acceptable to the Secured Lender in its sole discretion.  If a 363 Triggering Event shall have occurred and not have been waived by the Secured Lender, then, in the stalking horse bid submitted by or on behalf of the Secured Lender, all such causes of action arising under chapter 5 of the Bankruptcy Code shall be acquired by the entity formed by the Secured Lender to effect such stalking horse bid and released on the consummation of such transaction. |
| Tail Coverage | In connection with the Restructuring, the Company will secure tail coverage liability insurance for the Company's directors and officers reasonably acceptable to the Secured Lender.  After the effective date of the Plan or the consummation of a sale pursuant to Bankruptcy Code section 363, the reorganized Debtors shall not terminate or otherwise reduce the coverage under any such tail coverage liability insurance then in effect and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the effective date of the Plan or consummation of a sale pursuant to Bankruptcy Code section 363 shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the effective date of the Plan. |
| **363 Restructuring Alternative** | |
| Implementation Through 363 Sale | If a 363 Triggering Event (as defined below) occurs and is not waived by the Secured Lender, in its sole discretion, the Company agrees that it will not pursue confirmation of the Plan and will instead commence a 363 auction process, in connection with which the Secured Lender would serve as the stalking horse bidder.  The auction process would be run in accordance with customary bid procedures acceptable to the Secured Lender in its sole discretion, which would contemplate a sale hearing approximately 45 days after the date on which a 363 Triggering Event occurs.  Any Bankruptcy Court order approving a sale of the Company to the Secured Lender shall include the release provisions provided herein as among the Secured Lender, the Company and the Sponsors.<br><br>In the event that the Secured Lender's credit bid is approved following a 363 Triggering Event, (a) the Company will be acquired by the newly-formed entity that will be owned by the Secured Lender and (b) the Secured Lender and the Company will use reasonable best efforts to agree on the terms of an appropriate wind-down budget. |
| 363 Triggering Events | A "363 Triggering Event" shall mean the receipt of a notice by the Company from the Secured Lender notifying the Company of the occurrence of any of the following events, as determined by the Secured Lender, any of which may be waived by the Secured Lender:<br>• the Company fails to commence chapter 11 cases on or before March 1, 2013;<br>• An interim order approving the DIP Facility is not entered by the |

5

Bankruptcy Court within five (5) calendar days after the commencement date of the chapter 11 cases;

- the Company fails to achieve, comply with or proceed in accordance with any of the "Milestones" set forth on **Exhibit A** attached hereto by the dates specified therein;
- the withdrawal, amendment, modification of, or the filing of a pleading by the Company seeking to amend or modify the Plan, related disclosure statement, or any other related document in a manner that is inconsistent with this Term Sheet or any related definitive documentation without the consent of the Secured Lender including, for the avoidance of doubt, any proposed amendment or modification of the Plan that would increase the size of the Unsecured Creditor Distribution;
- it is determined that the amount of allowed administrative and other priority claims asserted against the Debtors exceeds any of the Admin Cap, Priority Cap or Other Secured Claim Cap, and one or more administrative or priority claimants objects to or otherwise contests its treatment under the Plan;
- the breach by the Company of any of its obligations under this Term Sheet or related definitive documentation or failure by the Company to satisfy the terms and conditions necessary to consummate the Restructuring in any respect, and any such breach or failure by the Company is not cured by the earlier of 3 business days after receipt of written notice from the Secured Lender or, to the extent applicable, any applicable cure period provided for under the agreements governing the Restructuring;
- the filing of any motion or other request for relief by any of the Parties, or the granting of any motion or other relief by any other non-party, seeking (i) to voluntarily dismiss any of the chapter 11 cases, (ii) conversion of any of the chapter 11 cases to chapter 7 of the Bankruptcy Code or (iii) appointment of a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the chapter 11 cases;
- the Company's exclusive right to file a plan under section 1121 of the Bankruptcy Code is terminated pursuant to a final order or expires; or
- the occurrence of an "Event of Default" as defined under the DIP Facility, which has not been cured by the Company within any applicable grace or cure period or waived by the DIP Lender.

6

**Exhibit A**

**Plan Milestones**

1.      File plan of reorganization and disclosure statement on the Petition Date.

2.      Disclosure statement hearing within 45 days thereafter (subject to Bankruptcy Court's availability).

3.      Confirmation Hearing within 7 days after the plan objection deadline (subject to Bankruptcy Court's availability).

4.      Confirmation order entered within 85 days of the commencement date.

5.      Effective date of the plan of reorganization within 120 days of the commencement date.

**Exhibit B**

Terms of New Notes to be issued by Holdco

| | |
|---|---|
| **Issuer:** | HoldCo |
| **Debt:** | Senior Unsecured Notes (the "<u>New Notes</u>") |
| **Principal Amount**: | $76,000,000 |
| **Maturity**: | 11 years |
| **Guarantors**: | The New Notes shall not be guaranteed by any subsidiary or other affiliate of HoldCo including, for the avoidance of doubt, Conexant OpCo. |
| **Interest Rate**: | 11.25% PIK or cash.  Interest to be paid semi-annually.  Company can elect to pay cash interest or accrue interest in kind ("<u>PIK</u>") during the current period; Company may also elect to pay down cumulative interest from previous PIK elections in cash. |

**Exhibit B**

Plan of Reorganization

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| CONEXANT SYSTEMS, INC., *et al.*,[1] | ) |
|  | ) Case No. 13-_____ ( ) |
|  | ) |
| Debtors. | ) |
|  | ) Joint Administration Requested |
|  | ) |

**JOINT PLAN OF REORGANIZATION OF CONEXANT SYSTEMS, INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Paul M. Basta (*pro hac vice* admission pending)
Joshua A. Sussberg (*pro hac vice* admission pending)
Christopher T. Greco (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:       (302) 426-1189
Facsimile:       (302) 426-9193

- and -

Morton Branzburg (*pro hac vice* admission pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:       (215) 569-2700
Facsimile:       (215) 568-6603

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*
Dated:  February 28, 2013

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Conexant Systems, Inc. (9439); Conexant CF, LLC (6434); Brooktree Broadband Holding, Inc. (5436); Conexant, Inc. (8218); and Conexant Systems Worldwide, Inc. (0601).  The Debtors' main corporate address is 4000 MacArthur Blvd., Newport Beach, California 92660.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
GOVERNING LAW ...................................................................................................................1

    A.     Defined Terms ..........................................................................................................1
    B.     Rules of Interpretation .............................................................................................9
    C.     Computation of Time .............................................................................................10
    D.     Governing Law .......................................................................................................10
    E.     Reference to Monetary Figures ..............................................................................10
    F.     Reference to the Debtors or the Reorganized Debtors ...........................................10

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS ............................10

    A.     Administrative Claims ............................................................................................11
    B.     DIP Claims .............................................................................................................12
    C.     Priority Tax Claims ................................................................................................12
    D.     Statutory Fees .........................................................................................................12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................................12

    A.     Classification of Claims and Interests ...................................................................12
    B.     Summary of Classification .....................................................................................13
    C.     Treatment of Claims and Interests .........................................................................13
    D.     Special Provision Governing Claims that are Not Impaired ...................................15
    E.     Acceptance or Rejection of the Plan ......................................................................15
    F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................16
    G.     Subordinated Claims ..............................................................................................16

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................................16

    A.     New Notes...............................................................................................................16
    B.     New Working Capital Facility ...............................................................................16
    C.     Restructuring Transactions .....................................................................................16
    D.     Sources of Consideration for Plan Distributions ....................................................17
    E.     Corporate Existence ...............................................................................................18
    F.     Vesting of Assets in the Reorganized Debtors .......................................................18
    G.     Cancellation of Existing Securities ........................................................................18
    H.     Corporate Action ....................................................................................................18
    I.     New Certificates of Incorporation and New By-Laws ............................................19
    J.     Directors and Officers of Holdco and the Reorganized Debtors.............................19
    K.     Effectuating Documents; Further Transactions......................................................19
    L.     Management Incentive Program ..............................................................................20
    M.     Emergence Bonus Plan ...........................................................................................20
    N.     Payment of Certain Professional Fees....................................................................20
    O.     Exemption from Certain Taxes and Fees ...............................................................20
    P.     D&O Liability Insurance Policies ..........................................................................20
    Q.     Preservation of Causes of Action ...........................................................................21

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................21

    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases ...........21
    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases..............21
    C.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ..........21
    D.     Insurance Policies ..................................................................................................22
    E.     Modifications, Amendments, Supplements, Restatements or Other Agreements....22
    F.     Reservation of Rights..............................................................................................22

i

G.     Nonoccurrence of Effective Date ................................................................23
H.     Contracts and Leases Entered Into After the Petition Date .........................23

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..............................................23

A.     Timing and Calculation of Amounts to Be Distributed................................23
B.     Disbursing Agent .........................................................................................23
C.     Rights and Powers of Disbursing Agent .....................................................23
D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ....24
E.     Section 1145 Exemption ..............................................................................25
F.     Compliance with Tax Requirements ............................................................25
G.     Allocations ...................................................................................................25
H.     No Postpetition Interest on Claims ..............................................................25
I.     Setoffs and Recoupment ..............................................................................26
J.     Claims Paid or Payable by Third Parties .....................................................26

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS ........................................................................................................26

A.     Allowance of Claims....................................................................................26
B.     Claims Administration Responsibilities.......................................................26
C.     Estimation of Claims ...................................................................................27
D.     Adjustment to Claims Without Objection ....................................................27
E.     Time to File Objections to Claims ...............................................................27
F.     Disallowance of Claims ...............................................................................27
G.     Amendments to Claims ................................................................................28
H.     No Distributions Pending Allowance ...........................................................28
I.     Distributions After Allowance .....................................................................28

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS .............28

A.     Compromise and Settlement of Claims, Interests and Controversies ...........28
B.     Discharge of Claims and Termination of Interests .......................................28
C.     Release of Liens ..........................................................................................29
D.     Releases by the Debtors ...............................................................................29
E.     Releases by Holders .....................................................................................29
F.     Liabilities to, and Rights of, Governmental Units........................................30
G.     Exculpation ..................................................................................................30
H.     Injunction ....................................................................................................30
I.     Term of Injunctions or Stays .......................................................................31

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN.............................................................................................................................32

A.     Conditions Precedent to Confirmation.........................................................32
B.     Conditions Precedent to the Effective Date .................................................32
C.     Waiver of Conditions ...................................................................................32
D.     Effect of Failure of Conditions ....................................................................32

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .....................33

A.     Modification and Amendments.....................................................................33
B.     Effect of Confirmation on Modifications.....................................................33
C.     Revocation or Withdrawal of Plan ...............................................................33

K&E 24948483

ARTICLE XI. RETENTION OF JURISDICTION ....................................................................................33

ARTICLE XII. MISCELLANEOUS PROVISIONS ...................................................................................35

    A.     Immediate Binding Effect ...................................................................................................35
    B.     Additional Documents ........................................................................................................35
    C.     Statutory Committee and Cessation of Fee and Expense Payment ....................................35
    D.     Reservation of Rights .........................................................................................................35
    E.     Successors and Assigns .......................................................................................................35
    F.     Notices ................................................................................................................................36
    G.     Entire Agreement ...............................................................................................................36
    H.     Exhibits ...............................................................................................................................36
    I.     Severability of Plan Provisions ..........................................................................................37
    J.     Votes Solicited in Good Faith ............................................................................................37
    K.     Closing of Chapter 11 Cases ..............................................................................................37
    L.     Conflicts .............................................................................................................................37

K&E 24948483

## INTRODUCTION

Conexant Systems, Inc. ("***Conexant***") and its debtor affiliates, as debtors and debtors in possession (each, a "***Debtor***" and, collectively, the "***Debtors***"), propose this joint plan of reorganization (the "***Plan***")[2] for the resolution of the Claims against and Interests in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement between and among the Debtors, the DIP Lender, the Secured Lender and the Equity Sponsors. This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, unless otherwise explained herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information and projections of future operations, as well as a summary and description of this Plan.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

*A.      Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.      "***Accrued Professional Compensation***" means, at any given time, all accrued, contingent and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330, 331 or 1103 of the Bankruptcy Code or otherwise rendered allowable before the Effective Date by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by Final Order, (a) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) after applying any retainer that has been provided to such Professional. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.      "***Administrative Claim***" means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code; and (c) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

3.      "***Administrative Claims Bar Date***" means the date by which all requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, which date shall be 20 days after entry of the Confirmation Order.

4.      "***Administrative Claims Cap***" means $17.5 million, which shall be the maximum amount of Allowed Administrative Claims, excluding Priority Non-Tax Claims, Priority Tax Claims and Fee Claims, incurred but not yet paid as of the Effective Date.

---

[2]      Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

1

5.    *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    *"Allowed"* means with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is scheduled by the Debtors as neither disputed, contingent nor unliquidated and for which no contrary proof of claim has been filed; (b) a Claim that is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline.  Except for any Claim that is expressly Allowed herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

7.    *"Assumed Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, subject to the Secured Lender's consent, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Article V and which shall be included in the Plan Supplement.

8.    *"Avoidance Actions"* means any and all Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

9.    *"Bankruptcy Code"* means chapter 11 of title 11 of the United States Code.

10.    *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

11.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

12.    *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

13.    *"Cash"* means the legal tender of the United States of America.

14.    *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.   Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

15.    *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 13-_____ (    ).

16.    *"Claim"* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

17.    "*Claims Bar Date*" means the date or dates to be established by the Bankruptcy Court by which Proofs of Claim must be Filed.

18.    "Claims Objection Deadline" means the later of (a) 180 days after the Effective Date or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

19.    "*Claims Register*" means the official register of Claims maintained by the Notice, Claims and Balloting Agent.

20.    "*Class*" means a class of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

21.    "*Conexant*" means Conexant Systems, Inc., the direct or indirect parent of each of the other Debtors.

22.    "*Conexant OpCo*" means a new corporate subsidiary in which Holdco will hold 100% of the Interests.

23.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A having been satisfied or waived pursuant to Article IX.C.

24.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

25.    "*Confirmation Hearing*" means the confirmation hearing held by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

26.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

27.    "*Consummation*" means the occurrence of the Effective Date.

28.    "*Creditors' Committee*" means the statutory committee of unsecured creditors, if any, appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

29.    "*Cure Claim*" means a Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

30.    "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

31.    "*D&O Liability Insurance Policies*" means all insurance policies for directors', managers' and officers' liability maintained by the Debtors as of the Petition Date, including (a) the director and officer liability coverage provided through Arch Insurance Company (Policy No. PCD0043841-01), which provides coverage from April 30, 2012 through April 30, 2013, (b) excess director and officer liability coverage provided through ACE Insurance Company (Policy No. DOX G25588915 001), which provides coverage from April 30, 2012 through April 30, 2013 and (c) any tail coverage (*i.e.*, director and officer insurance coverage that extends beyond the end of the policy period) under a directors' and officers' liability insurance policy for the current and former directors, officers and managers, which policy shall be reasonably acceptable to the Secured Lender.

3

32.    "***Debtor***" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

33.    "***Debtors***" means, collectively:    (a) Conexant;  (b) Brooktree Broadband Holding, Inc.; (c) Conexant CF, LLC; (d) Conexant, Inc.; and (e) Conexant Systems Worldwide, Inc.

34.    "***DIP Facility***" means that superpriority secured debtor-in-possession credit facility, comprised of a delayed draw term loan in the amount of $15 million.

35.    "***DIP Facility Agent***" means QP SFM Capital Holdings Ltd., in its respective capacity as administrative agent under the DIP Facility Credit Agreement, together with its respective successors and assigns in such capacity.

36.    "***DIP Facility Claim***" means any Claim derived from, based upon, relating to or arising from the DIP Facility Credit Agreement.

37.    "***DIP Facility Credit Agreement***" means the agreement governing the DIP Facility, dated as of March 1, 2013 among the Debtors, the DIP Agent and the DIP Lender (as amended, restated, supplemented or otherwise modified from time to time), as well as any other documents entered into in connection therewith.

38.    "***DIP Facility Lender***" means QP SFM Capital Holdings Ltd., in its capacity as lender under the DIP Facility Credit Agreement.

39.    "***DIP Order***" means any interim order (or orders) and the final order of the Bankruptcy Court, each in form and substance acceptable to the DIP Lender, authorizing*, inter alia,* the Debtors to enter into the DIP Facility Credit Agreement and incur postpetition obligations thereunder.

40.    "***Disbursing Agent***" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan; *provided, however*, that (a) the Secured Notes Trustee shall make any distributions solely on account of the Secured Notes Claim and (b) the Creditors' Committee's shall appoint a designee to make any distributions solely on account of the Allowed General Unsecured Claims.

41.    "***Disclosure Statement***" means the *Disclosure Statement for the Joint Plan of Reorganization of Conexant Systems, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 28, 2013 as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law.

42.    "***Disputed***" means, with respect to any Claim or Interest, any Claim or Interest that is (a) disputed under the Plan, or subject, or potentially subject, to a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (b) improperly asserted, by the untimely or otherwise improper filing of a Proof of Claim as required by order of the Bankruptcy Court or (c) that is disallowed pursuant to section 502(d) of the Bankruptcy Code.  A Claim or Administrative Claim that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution until it is no longer a Disputed Claim.

43.    "***Distribution Date***" means, with respect to a Claim that is Allowed as of the Effective Date, the date that is as soon as practicable after the Effective Date.

44.    "***Distribution Record Date***" means the date that is the Confirmation Date.

45.    "***Effective Date***" means the date selected by the Debtors in consultation with the Secured Lender that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective

Date have been met or waived pursuant to Article IX.B and Article IX.C and (b) no stay of the Confirmation Order is in effect.

46.      "*Emergence Bonus Plan*" means that certain bonus plan to be implemented pursuant to section 1129(a)(4) of the Bankruptcy Code that will provide for emergence bonuses to certain members of the Debtors' senior management team and employees in an aggregate amount of up to $1.5 million, the recipients and terms of which will be included in the Plan Supplement and shall be otherwise acceptable to the Secured Lender.

47.      "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

48.      "*Equity Sponsors*" means Golden Gate Private Equity, Inc. and August Capital, each as holders of the common shares of Conexant Holdings, Inc.

49.      "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.      "*Exculpated Claim*" means any Claim related to any act or omission derived from, based upon, related to or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the Plan (including any term sheets related thereto) or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Consummation and the administration and implementation of the Plan, including (a) the Restructuring Support Agreement; (b) the issuance of the New Common Stock, (c) the execution, delivery and performance of the New Working Capital Facility, if any, (d) the execution, delivery and performance of the New Notes Indenture and (e) the distribution of property or any other consideration under the Plan or any other agreement.

51.      "*Exculpated Party*" means each of:  (a) the Debtors; (b) the Secured Lender; (c) the Secured Notes Trustee; (d) the DIP Facility Lender; (e) the DIP Facility Agent; (f) the Equity Sponsors; (g) the members of Creditors' Committee; and (h)  with respect to the entities in clauses (a) through (g), such entity's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accounts, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

52.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

53.      "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

54.      "*Fee Claim*" means a Claim for Accrued Professional Compensation.

55.      "*Fee Claims Escrow Account*" means the account established pursuant to Article II.A.2(b).

56.      "*File*" or "*Filed*" means file or filed with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

57.      "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

58.     *"General Unsecured Claim"* means any Unsecured Claim, including the Secured Notes Deficiency Claim and any claim arising from the rejection of a non-residential lease or executory contract, which is not an Intercompany Claim.

59.     *"General Unsecured Claims Recovery Pool"* means $2.0 million in Cash to be paid into a bank account identified by the Disbursing Agent for General Unsecured Claims to be held in trust for the benefit of holders of Allowed General Unsecured Claims and to be distributed in accordance with the provisions of Article III.C.4; *provided, however*, that neither the Debtors nor the Reorganized Debtors shall bear any costs of administering or distributing the General Unsecured Claims Recovery Pool, including, for the avoidance of doubt, the costs of objecting to and/or resolving General Unsecured Claims, and any such costs shall be incurred by the Disbursing Agent for General Unsecured Claims and reimbursed from the General Unsecured Claims Recovery Pool.

60.     "*Governmental Claim*" means any Claim filed by a Governmental Unit, as such term is defined in section 101(27) of the Bankruptcy Code.

61.     "*Governmental Claims Bar Date*" means the date that is 180 days after the Petition Date by which Proofs of Claim must be Filed by Governmental Units.

62.     *"Holdco"* means either (a) Conexant, or any successor thereto, by merger, consolidation or otherwise on or after the Effective Date or (b) any other parent company that is formed on or after the Effective Date that will directly or indirectly hold 100 percent of the Interests in Conexant OpCo pursuant to any actions taken pursuant to Article IV.C hereof.

63.     *"Holdco Board"* means the initial board of directors, board of managers or equivalent governing body of Holdco.

64.     *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

65.     *"Intercompany Claim"* means any Claim held by a Debtor or non-Debtor Affiliate against another Debtor or non-Debtor Affiliate.

66.     *"Intercompany Interest"* means an Interest in a Debtor or non-Debtor Affiliate held by another Debtor or non-Debtor Affiliate.

67.     *"Interests"* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

68.     *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. ____].

69.     *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

70.     *"Lien" me*ans a lien as defined in section 101(37) of the Bankruptcy Code.

71.     *"Management Incentive Program"* means that certain post-Effective Date incentive program providing for up to 15% of the fully distributed and fully diluted New Common Stock, or the non-equity equivalent thereof, to be reserved for distribution to officers, directors and employees of the Reorganized Debtors, the terms of which shall be determined by the Holdco Board.

72.     *"New Boards"* mean, collectively, the Holdco Board and the New Subsidiary Boards.

73.     *"New By-Laws"* means the form of the by-laws or limited liability company agreement, as applicable, of each of the Reorganized Debtors, which form shall be included in the Plan Supplement, and shall be acceptable to the Secured Lender.

74.     *"New Certificates of Incorporation"* means the form of the certificates of incorporation or certificates of formation of each of the Reorganized Debtors, which form shall be included in the Plan Supplement, and shall be acceptable to the Secured Lender.

75.     *"New Common Stock"* means the new equity interests of Holdco authorized pursuant to the Plan and to be issued on the Effective Date.

76.     *"New Notes"* means a new unsecured notes in the amount of $76 million to be issued by Holdco on the Effective Date pursuant to the New Notes Indenture.

77.     *"New Notes Indenture"* means the indenture, dated as of the Effective Date, which will govern the New Notes.

78.     **"New Subsidiary Boards"** means the initial board of directors, board of managers or equivalent governing body of each Reorganized Debtor (other than Holdco).

79.     *"New Working Capital Facility"* means a new working capital facility that may be entered into by Holdco to fund working capital expenses and other general corporate purposes on terms and conditions acceptable to the Secure Lender.

80.     "*Notice, Claims and Balloting Agent*" means BMC Group, Inc.

81.     *"Ordinary Course Professional Order"* means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. [___]].

82.     *"Other Secured Claim"* means any Secured Claim that is not a DIP Facility Claim or a Secured Notes Claim.

83.     *"Other Secured Claims Cap"* means $1 million, which shall be the maximum amount of Allowed Other Secured Claims incurred but not yet paid as of the Effective Date.

84.     *"Person"* means a person as such term as defined in section 101(41) of the Bankruptcy Code.

85.     *"Petition Date"* means February 28, 2013, the date on which each of the Debtors commenced the Chapter 11 Cases.

86.     *"Plan"* means this *Joint Plan of Reorganization of Conexant Systems, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference.

87.     *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be Filed by the Debtors in form and substance acceptable to the Secured Lender no later than seven (7) days before the Confirmation Hearing on notice to parties in interest, and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement, including the following:  (a) the New By-Laws; (b) the New Certificates of Incorporation; (c) the Rejected Executory Contract and Unexpired Lease List (d) the Assumed Executory Contract and Unexpired Lease List; (e) a list of retained Causes of Action, if any; (f) the identification of any Disbursing Agent other than the Reorganized Debtors; (g) the identity of the members of the New Boards; (h) the material terms of the Emergence Bonus Plan; (i) the material terms of the New Notes Indenture; and (j) the material terms of the New Working Capital Facility, if any.  Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (j).  The Debtors shall

have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date with the consent of the Secured Lender.

88.     *"Priority Non-Tax Claims"* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

89.     *"Priority Non-Tax Claims Cap"* means $1 million, which shall be the maximum amount of Allowed Priority Non-Tax Claims incurred but not yet paid as of the Effective Date.

90.     *"Priority Tax Claim"* means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

91.     *"Professional"* means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

92.     *"Proof of Claim"* means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

93.     *"Pro Rata"* means the proportion that (a) an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class or (b) Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

94.     *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

95.     *"Rejected Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors, with the consent of the Secured Lender, or the Reorganized Debtors, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Reorganized Debtors pursuant to the provisions of Article V and which shall be included in the Plan Supplement.

96.     *"Rejection Claim"* means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

97.     *"Released Party"* means each of:  (a) the Debtors; (b) the Secured Lender; (c) the Secured Notes Trustee; (d) the DIP Facility Lender; (e) the DIP Facility Agent; (f) the Equity Sponsors; (g) the members of the Creditors' Committee; and (h) with respect to the entities in clauses (a) through (g), such entity's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accounts, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

98.     *"Reorganized Debtors"* means the Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

99.     *"Restructuring Support Agreement"* means the agreement, effective as of February 26, 2013 among the Debtors, the Secured Lender and the Equity Sponsors, pursuant to which such parties agreed (subject to certain conditions specified therein) to support this Plan.

100.     *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified or supplemented from time to time.

101.    *"Secured"* means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

102.    *"Secured Claims Recovery Pool"* means the pool from which distributions shall be made on account of DIP Facility Claims and the Secured Notes Claim, which pool shall be funded with 100 percent of the New Common Stock.

103.    *"Secured Lender"* means QP SFM Capital Holdings Ltd. as holder under the Secured Notes Indenture.

104.    *"Secured Notes Claim"* means a Secured Claim in the amount of $80,000,000.00 million derived from, based upon, relating to or arising from the Secured Notes Indenture, which, for the avoidance of doubt, shall exclude the Secured Notes Deficiency Claim.

105.    *"Secured Notes Deficiency Claim"* means an Unsecured Claim in the amount of $114,523,300.78 million derived from, based upon, relating to or arising from the Secured Notes Indenture, which, for the avoidance of doubt, shall exclude the Secured Notes Claim.

106.    *"Secured Notes Indenture"* means the Indenture dated as of March 10, 2010, with respect to the 11.25% Senior Secured Notes Due 2015, among Conexant Systems, Inc., as issuer and, Brooktree Broadband Holding, Inc, Conexant, Inc. and Conexant Systems Worldwide, Inc., each as guarantors, the Secured Notes Trustee and the Secured Lender (as amended, restated, supplemented or otherwise modified from time to time).

107.    *"Secured Notes Trustee"* means The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee and collateral trustee under the Secured Notes Indenture.

108.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as amended, together with the rules and regulations promulgated thereunder.

109.    *"Securities Exchange Act"* means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78nn, as amended.

110.    *"Security"* means a security as defined in section 2(a)(1) of the Securities Act.

111.    *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

112.    *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

113.    *"Unsecured Claim"* means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court.

114.    *"U.S. Trustee"* means the United States Trustee for the District of Delaware.

115.    *"Voting Deadline"* means 4:00 p.m. (prevailing Eastern Time) on [May 9], 2013.

B.    *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender

9

shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule or exhibit, as it may thereafter be amended, modified or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.      Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or province of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.      Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *Administrative Claims*

1.    <u>Administrative Claims</u>

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a holder of an Allowed Administrative Claim and the applicable Debtor(s) (with the consent of the Secured Lender) agree to less favorable treatment with respect to such holder, each holder of an Allowed Administrative Claim shall either be paid (a) in full in Cash if such Claims do not exceed the Administrative Claims Cap or (b) a Pro Rata share of $17.5 million if such Claims are Allowed in an amount in excess of the Administrative Claims Cap, to the extent no holder of such Claims objects to such treatment.  Such Claims shall be paid on the earlier of (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date and (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; *provided*, *however*, that Allowed Administrative Claims that arise postpetition in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, and subject to the budget set forth in the DIP Facility Credit Agreement.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

2.    <u>Professional Compensation</u>

(a)    *Fee Claims*

Professionals asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 30 days after the Effective Date; *provided*, *however*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professional Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.  To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

(b)    *The Fee Claims Escrow Account*

On the Effective Date, the Debtors shall establish and fund the Fee Claims Escrow Account in an amount equal to all Fee Claims outstanding as of the Effective Date (including unbilled estimated amounts).  Amounts held in the Fee Claims Escrow Account shall not constitute property of the Reorganized Debtors.  The Fee Claims Escrow Account may be an interest-bearing account.  In the event there is a remaining balance in the Fee Claims Escrow Account following (a) payment to all holders of Fee Claims under the Plan and (b) the closing of the Chapter 11 Cases, such remaining amount, if any, shall be returned to the Reorganized Debtors.

(c)    *Post-Confirmation Date Fees and Expenses*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors through and including the Effective Date.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

3.    Administrative Claim Bar Date

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed on or before the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 45 days after the Effective Date.

B.    DIP Claims

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement, including principal, interest, fees and expenses.  On the Effective Date, except to the extent that a holder of an Allowed DIP Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed DIP Claim, each holder of such Allowed DIP Claim shall receive its Pro Rata share of the Secured Claims Recovery Pool calculated in respect of the aggregate amount of Allowed DIP Facility Claims and the Secured Notes Claim.

C.    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors (with the consent of the Secured Lender), one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

D.    Statutory Fees

On the Distribution Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, Conexant OpCo shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors until the entry of a final decree in such Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    Classification of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  All Claims and Interests, except for Administrative Claims, DIP Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.   A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied before the Effective Date.

*B.*     *Summary of Classification*

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, unless otherwise explained herein, the classifications set forth in Classes 1 to 7 shall be deemed to apply to each Debtor, as applicable. Conexant is the only Debtor that possesses a Class 7 with respect to Interests in Conexant.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Notes Claim | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 7 | Interests in Conexant | Impaired | Deemed to Reject |

*C.*     *Treatment of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.     <u>Class 1 - Priority Non-Tax Claims</u>

(a)     *Classification*:  Class 1 consists of Priority Non-Tax Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each holder of such Allowed Priority Non-Tax Claim shall be paid (a) in full in Cash if such Claims do not exceed the Priority Non-Tax Claims Cap or (b) a Pro Rata share of $1 million if such Claims exceed the Priority Non-Tax Claims Cap, to the extent no holder of such Claims objects to such treatment.  Allowed Priority Non-Tax Claim shall be paid on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*: Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

2.     <u>Class 2 - Other Secured Claims</u>

(a)     *Classification:*  Class 2 consists of Other Secured Claims.

(b)     *Treatment:*  Except to the extent that a holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim, each holder of such Allowed Other Secured Claim shall receive one of the following treatments, as determined by the applicable Debtor (with the consent of the Secured Lender):  (i) either (a) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, if such Claims do not exceed the Other Secured Claims Cap or (b) a Pro Rata share of $1 million if such Claims exceed the Other Secured Claims Cap,

13

to the extent no holder of such Claims objects to such treatment; (ii) delivery of the collateral securing any such allowed secured claim; or (iii) other treatment such that the allowed secured claim shall be rendered Unimpaired.

(c)    *Voting:*  Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 - Secured Notes Claim

(a)    *Classification:*  Class 3 consists of the Secured Notes Claim.

(b)    *Allowance:*   The Secured Notes Claim shall be Allowed in the total amount of $80,000,000.00.

(c)    *Treatment:*  In exchange for full and final satisfaction, settlement, release and discharge of the Secured Notes Claim, the holder of such Allowed Secured Notes Claim shall receive (i) 100% of the New Notes and (ii) its Pro Rata distribution of the Secured Claims Recovery Pool, calculated in respect of the aggregate amount of all Allowed DIP Facility Claims and the Secured Notes Claim.  For the avoidance of doubt, the Secured Notes Claim shall not include the Secured Notes Deficiency Claim, which claim shall be treated as a General Unsecured Claim.

(d)    *Voting*:  Class 3 is Impaired by the Plan.  Therefore, the holder of the Class 3 Secured Notes Claim is entitled to vote to accept or reject the Plan.

4.    Class 4 - General Unsecured Claims

(a)    *Classification:*  Class 4 consists of General Unsecured Claims.

(b)    *Treatment:*  Except to the extent that a holder of an Allowed General Unsecured Claim, including for the avoidance of doubt the Secured Notes Deficiency Claim, agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed General Unsecured Claim, each holder of such Allowed General Unsecured Claim shall receive a Pro Rata distribution of the General Unsecured Claims Recovery Pool; *provided*, *however*, that if the Class of General Unsecured Claims votes to accept the Plan pursuant to section 1126 of the Bankruptcy Code, the Secured Lender shall be deemed to waive the Secured Notes Deficiency Claim and its right to participate in the General Unsecured Claims Recovery Pool.

(c)    *Voting:*  Class 4 is Impaired by the Plan.  Therefore, holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 - Intercompany Claims

(a)    *Classification:*  Class 5 consists of Intercompany Claims.

(b)    *Treatment:*  To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as is practicable, Intercompany Claims will be paid, adjusted, reinstated in full or in part, or cancelled or discharged in full or in part, in each case, to the extent determined by the Reorganized Debtors with the consent of the Secured Debtors.  No distribution shall be made on account of Intercompany Claims; *provided, however,* that the Debtors, with the consent of the Secured Lender, and the Reorganized Debtors will be entitled to transfer funds between and among themselves and their non-Debtor Affiliates

as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices.

(c)    *Voting:*  Class 5 is Unimpaired by the Plan, and each holder of a Class 5 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 - Intercompany Interests

(a)    *Classification:*  Class 6 consists of Intercompany Interests.

(b)    *Treatment*:  To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as is practicable, Intercompany Interests will be adjusted or reinstated in full or in part, or cancelled or discharged in full or in part, in each case, to the extent determined by the Reorganized Debtors with the consent of the Secured Lender.

(c)    *Voting*:  Class 6 is Unimpaired by the Plan, and each holder of a Class 6 Intercompany Interests is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 6 Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.    Class 7 - Interests in Conexant

(a)    *Classification:*  Class 7 consists of Interests in Conexant.

(b)    *Treatment:*  Holders of Interests in Conexant shall not receive any distribution on account of such Interests.  On the Effective Date, Interests in Conexant shall be cancelled and discharged.

(c)    *Voting:*  Class 7 is Impaired and each holder of Class 7 Interests in Conexant is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Class 7 Interests in Conexant are not entitled to vote to accept or reject the Plan.

D.    *Special Provision Governing Claims that are Not Impaired*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are not Impaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are not Impaired.

E.    *Acceptance or Rejection of the Plan*

1.    Voting Classes.

Classes 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.    Presumed Acceptance of the Plan

Classes 1 and 2 are Unimpaired under the Plan, and the holders in such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  Additionally, holders in Class 5 and

15

Class 6 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders in Class 5 and Class 6 for each of the Debtors are proponents of the Plan.

       3.      <u>Presumed Rejection of Plan</u>

Class 7 is Impaired and shall receive no distribution under the Plan. The holders in Class 7 are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

*F.*      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

*G.*      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.*      *New Notes*

The New Notes shall (a) be in the principal amount of $76 million, (b) have an interest rate of 11.25% per annum to be paid semi-annually on a cash or pay in kind basis at Holdco's election and (c) have a maturity date of 11 years from the Effective Date.

*B.*      *New Working Capital Facility*

The Reorganized Debtors may enter into the New Working Capital Facility to fund working capital expenses and other general corporate purposes on terms and conditions acceptable to the Secured Lender, the material terms of which will be set forth in the Plan Supplement, as applicable.

*C.*      *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (4) the creation of a new holding company consistent with the terms of the Plan; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

Without limiting the foregoing, on or prior to the Effective Date and at the election of the Secured Lender, Holdco shall organize Conexant OpCo and contribute to such subsidiary all of its operating assets used to conduct its active businesses, subject to such subsidiary contemporaneously assuming Holdco's liabilities (to the extent not discharged pursuant to the Plan). Holdco shall otherwise retain the stock of its subsidiaries and any other assets necessary or desirable for it to function as a holding company of the Debtors and the Reorganized Debtors (other than Holdco) and its non-Debtor subsidiaries going forward, and shall take such further actions necessary or requested by the Secured Lender to implement any of the foregoing prior to or as of the Effective Date.

D.    *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall make distributions under the Plan as follows:

1.    Issuance and Distribution of New Common Stock

The issuance of the New Common Stock by Holdco, including the reservation of up to 15% of the fully distributed and fully diluted New Common Stock in connection with the Management Incentive Program, if applicable, is authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests.

On the Effective Date, an initial number of shares of New Common Stock representing 100% of the New Common Stock shall be distributed to the Secured Claims Recovery Pool for issuance to holders of DIP Facility Claims and the Class 3 Secured Notes Claim, as applicable.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

2.    Issuance of the New Notes

On the Effective Date Holdco will issue the New Notes. Confirmation shall be deemed approval of the New Notes (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by Holdco in connection therewith) and Holdco is authorized to execute and deliver those documents necessary or appropriate to issuing the New Notes, including the New Notes Indenture, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule, vote, consent, authorization or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate issuance of the New Notes.

3.    Issuance of the General Unsecured Claims Recovery Pool

On the Effective Date the Reorganized Debtors will distribute $2.0 million in Cash into the General Unsecured Claims Recovery Pool to be held in trust for the benefit of holders of Allowed General Unsecured Claims. Neither the Debtors nor the Reorganized Debtors shall bear any costs of administering or distributing the General Unsecured Claims Recovery Pool, including, for the avoidance of doubt, the costs of objecting to and/or resolving General Unsecured Claims, and any such costs shall be incurred by the Disbursing Agent for General Unsecured Claims and reimbursed from the General Unsecured Claims Recovery Pool.

4.    Cash on Hand and the New Working Capital Facility

On the Effective Date, available cash-on-hand of the Reorganized Debtors (including proceeds of the converted DIP Facility) and proceeds from the New Working Capital Facility, if any, will be used to fund any outstanding payments, obligations or expenses required to consummate the Plan.

E.      *Corporate Existence*

Upon the Effective Date, Holdco will issue 100 percent of the New Common Stock and issue 100 percent of the New Notes.  Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise, with the consent of the Secured Lender.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial or federal law).

F.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances, except for Liens securing the New Working Capital Facility, if any.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Existing Securities*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:  (1) the obligations of the Debtors under the DIP Facility Credit Agreement, the Secured Notes Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their non-Debtor Affiliates, and the Reorganized Debtors and their non-Debtor Affiliates shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of enabling holders of Allowed Claims to receive distributions under the Plan as provided herein; *provided*, *further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.  On and after the Effective Date, all duties and responsibilities of the DIP Facility Agent under the DIP Facility Credit Agreement and the Secured Notes Trustee under the Secured Notes Indenture, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

H.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including:  (1) distribution of the New Common Stock; (2) selection of the directors and officers for the Reorganized Debtors and Holdco; (3) implementation of the

K&E 24948483

restructuring transactions contemplated by this Plan, as applicable; (4) reservation of up to 15% of the fully distributed and fully diluted New Common Stock or the non-equity equivalent thereof pursuant to the Management Incentive Program; (4) entry into the New Notes Indenture; (5) entry into the New Working Capital Facility, if any; (6) implementation of the Emergence Bonus Plan; and (7) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.

I.    *New Certificates of Incorporation and New By-Laws*

On or immediately before the Effective Date, Holdco and the Reorganized Debtors will file their respective New Certificates of Incorporation, which shall be in form and substance acceptable to the Secured Lender, with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces or countries of incorporation in accordance with the corporate laws of the respective states, provinces or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities. On or after the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states, provinces or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

J.    *Directors and Officers of Holdco and the Reorganized Debtors*

As of the Effective Date, the term of the current members of the Debtors' boards of directors of shall expire, and the initial boards of directors, including the Holdco Board and the New Subsidiary Boards, as well as the officers of Holdco and each of the Reorganized Debtors shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of Holdco and each Reorganized Debtor.

The directors of the Holdco Board and the New Subsidiary Boards shall be selected by the Secured Lender. The New Subsidiary Boards shall include the Chief Executive Officer as a director. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the initial Holdco Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws and other constituent documents of the Reorganized Debtors.

K.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, Holdco and the Reorganized Debtors, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, the New Notes and the New Working Capital Facility, if any, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

K&E 24948483

L.      *Management Incentive Program*

The Reorganized Debtors will implement a Management Incentive Program, which shall reserve up to 15% of the fully distributed and fully diluted New Common Stock, or the non-equity equivalent thereof, to be reserved for distribution to officers, directors and employees of the Reorganized Debtors, on terms to be determined by the Holdco Board.

M.      *Emergence Bonus Plan*

On the Effective Date, pursuant to section 1129(a)(4) of the Bankruptcy Code, the Debtors will pay emergence bonuses to certain members of the senior management team and employees in an aggregate amount of up to $1.5 million, the recipients and terms of which will be included in the Plan Supplement and shall be acceptable to the Secured Lender.

N.      *Payment of Certain Professional Fees*

On the Effective Date, the Debtors shall pay all reasonable and documented fees and expenses of (a) Akin Gump Strauss Hauer & Feld LLP, counsel to the Secured Lender (b) local co-counsel to the Secured Lender, (c) The Blackstone Group, financial advisor to the Secured Lender, (d) the Secured Notes Trustee and (e) counsel to the Secured Notes Trustee.

O.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

P.      *D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

Before the Petition Date, the Debtors obtained reasonably sufficient tail coverage (*i.e.*, D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers.  After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under such tail coverage liability insurance in effect and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan or consummation of a sale pursuant to section 363 of the Bankruptcy Code shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

*Q.*      *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly retained in the list of retained Causes of Action included in the Plan Supplement, all Causes of Action shall be waived, relinquished, exculpated, released, compromised or settled in accordance with Article VIII hereof, including, for the avoidance of doubt, all Avoidance Actions.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume Filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases List or Rejected Executory Contract and Unexpired Leases List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

*B.*      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII hereof.**

*C.*      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease as reflected on the Assumed Executory Contracts and Unexpired Lease List shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized

Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  At least 7 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors before the Effective Date.   Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount; *provided, however*, the Debtors, with the consent of the Secured Lender, shall have the right to alter, amend, modify or supplement the Assumed Executory Contracts and Unexpired Lease List or Rejected Executory Contracts and Unexpired Lease List, as applicable, as identified in the Plan Supplement, through and including the Effective Date.   To the extent that the Debtors, with the consent of the Secured Lender, alter, amend, modify or supplement the lists of Executory Contracts and Unexpired Lease included in the Plan Supplement, the Debtors will provide notice to each counterparty to an affected Executory Contract or Unexpired Lease within five days of such decision.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.     *Insurance Policies*

All of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.   On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

E.     *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

F.     *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed or Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, with the consent of the Secured Lender, or Reorganized Debtors, as applicable, shall have 28 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Deadline.

B.    *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.    *Rights and Powers of Disbursing Agent*

1.    <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors; *provided, however*, that neither the Debtors nor the Reorganized Debtors shall bear any costs of administering or distributing the General Unsecured

Claims Recovery Pool, including, for the avoidance of doubt, the costs of objecting to and/or resolving General Unsecured Claims, and any such costs shall be incurred by the Disbursing Agent for General Unsecured Claims and reimbursed from the General Unsecured Claims Recovery Pool.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

   1.      Delivery of Distributions

      (a)      Delivery of Distributions to Secured Notes Trustee

Except as otherwise provided in the Plan, all distributions to the holder of Secured Notes Claim shall be governed by the Secured Notes Indenture and shall be deemed completed when made to the Secured Notes Trustee, who shall be deemed to be the holder of the Secured Notes Claim for purposes of distributions to be made hereunder.  The Secured Notes Trustee shall hold or direct such distributions for the benefit of the holder of the Allowed Secured Notes Claim.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Trustee shall arrange to deliver such distributions to or on behalf of such holder of the Allowed Secured Notes Claim.

      (b)      Delivery of Distributions to DIP Facility Agent

Except as otherwise provided in the Plan, all distributions to the holder of the DIP Facility Claims shall be governed by the DIP Facility Credit Agreement and shall be deemed completed when made to the DIP Facility Agent, who shall be deemed to be the holder of the DIP Facility Claims for purposes of distributions to be made hereunder.  The DIP Facility Agent shall hold or direct such distributions for the benefit of the holder of the Allowed DIP Facility Claims.  As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Facility Agent shall arrange to deliver such distributions to or on behalf of such holder of the Allowed DIP Facility Claims.

      (c)      Delivery of Distributions to Disbursing Agent for General Unsecured Claims

Except as otherwise provided in the Plan, all distributions to holders of Allowed General Unsecured Claims shall be deemed completed when made to the Disbursing Agent for General Unsecured Claims, who shall be deemed to be the holder of all General Unsecured Claims for purposes of distributions to be made hereunder.  The Disbursing Agent for General Unsecured Claims shall have the authority to administer the General Unsecured Claims Recovery Pool with respect to General Unsecured Claims, including objecting to and/or resolving General Unsecured Claims.  To the extent that Class 4—General Unsecured Claims votes to accept the Plan pursuant to section 1126 of the Bankruptcy Code, the Secured Lender shall be deemed to waive the Secured Notes Deficiency Claim and its right to participate in the General Unsecured Claims Pool.

      (d)      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors or the Disbursing Agent, as appropriate: (1) to the signatory set forth on any of the Proofs of Claim Filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, has not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

24

2.      Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $50 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claims against the Reorganized Debtors or their property.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

E.      *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of the New Common Stock as contemplated by Article IV.D of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the U.S. by the recipients thereof, subject to  the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in Holdco's New Certificate of Incorporation.

F.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

G.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the DIP Order, the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

K&E 24948483

I.      *Setoffs and Recoupment*

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the holder of such Claim.

J.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the

26

Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

C.      Estimation of Claims

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

F.      Disallowance of Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit (or assume the agreement(s) providing such employee benefit are assumed under the Plan), without any further notice to or action, order or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

K&E 24948483

G.    *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders, and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502

of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

D.      *Releases by the Debtors*

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASED PARTIES WILL BE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS AND THEIR ESTATES FROM ANY AND ALL ACTIONS, CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE DEBTORS' ESTATES OR THEIR AFFILIATES (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR  CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE RESTRUCTURING, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE PLAN SUPPLEMENT, ANY DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD.

E.      *Releases by Holders*

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, EACH HOLDER OF A CLAIM OR AN INTEREST IN THE DEBTORS SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY, RELEASED, ACQUITTED AND DISCHARGED THE DEBTORS (INCLUDING THE DEBTORS' PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, SHAREHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS) AND THE RELEASED PARTIES FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR

HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH HOLDER (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE RESTRUCTURING, INCLUDING THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD.

F.      *Liabilities to, and Rights of, Governmental Units*

Nothing in the Plan or Confirmation Order shall discharge, release, or preclude:  (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability.  Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

G.      *Exculpation*

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, OBLIGATION, CAUSE OF ACTION OR LIABILITY FOR ANY EXCULPATED CLAIM, EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.  THE DEBTORS AND THE REORGANIZED DEBTORS (AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS AND ATTORNEYS) HAVE PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

H.      *Injunction*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII HEREOF, THE DEBTORS AND HOLDERS OF CLAIMS OR INTERESTS SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT,

K&E 24948483

CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E, DISCHARGED PURSUANT TO ARTICLE VIII.B, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

I.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

A.    *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that all provisions, terms and conditions hereof are approved in the Confirmation Order.

B.    *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order (a) shall have been duly entered and be a Final Order and (b) shall include a finding by the Bankruptcy Court that the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code and (c) shall be in form and substance otherwise acceptable to the Secured Lender.

2.    Any amendments, modifications or supplements to the Plan (including the Plan Supplement), if any, shall be acceptable to the Secured Lender.

3.    All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

4.    The amount of (a) Allowed Administrative Claims, excluding Fee Claims, shall not exceed and aggregate of $17.5 million, (b) Allowed Non-Tax Priority Claims shall not exceed an aggregate of $1 million, and (c) Allowed Other Secured Claims shall not exceed an aggregate of $1 million, unless otherwise agreed to by the Secured Lender.

5.    The Debtors shall enter into the New Notes Indenture and the conditions precedent to funding under the New Notes Indenture shall have been satisfied or waived.

6.    The Debtors shall enter into the New Working Capital Facility, if applicable, and the conditions precedent to funding under the New Working Capital Facility shall have been satisfied or waived.

C.    *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in Article IX may be waived by the Debtors, with the consent of the Secured Lender, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.    *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other Entity in any respect.

K&E 24948483

**ARTICLE X.**
**MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, and subject to the consent of the Secured Lender, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), and subject to the consent of the Secured Lender, each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any holder or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any holder or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or

33

Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

4.      ensure that distributions to holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Article VI.J.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement or the Confirmation Order;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

K&E 24948483

20.    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in connection with and under the Plan, including under Article VIII;

22.    enforce all orders previously entered by the Bankruptcy Court; and

23.    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.B and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, which agreements and documents shall be in form and substance acceptable to the Secured Lender. The Debtors or Reorganized Debtors, as applicable, and all holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders before the Effective Date.

E.    *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

35

*F.*    *Notices*

To be effective, all notices, requests and demands to or upon the Debtors or the Secured Lender shall be in writing (including by facsimile transmission). Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

> **If to the Debtors**:
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention: Joshua A. Sussberg, Esq.
> Facsimile: (212) 446-6460
> E-mail address: joshua.sussberg@kirkland.com
>
> - and -
>
> Klehr Harrison Harvey Branzburg LLP
> 919 Market Street, Suite 1000
> Wilmington, Delaware 19801-3062
> Attention: Domenic E. Pacitti, Esq.
> Facsimile: (302) 426-9193
> E-mail Address: dpacitti@klehr.com
>
> **If to the Secured Lender**:
> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> Bank of America Tower
> New York, New York 10036
> Facsimile: (212) 872-1002
> Attention: Michael S. Stamer, Esq.
> E-mail address: mstamer@akingump.com

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*G.*    *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

*H.*    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims and balloting agent at http://www.bmcgroup.com/conexant or the Bankruptcy Court's website at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

*I.*　　*Severability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.　Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.　The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) non-severable and mutually dependent.

*J.*　　*Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the Securities offered and sold under the Plan or any previous plan.

*K.*　　*Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

*L.*　　*Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control.

*[Remainder of page intentionally left blank.]*

K&E 24948483

Dated: February 28, 2013
      Wilmington, Delaware

                    CONEXANT SYSTEMS, INC., on behalf of itself and each of the
                    other Debtors

                    By:      */s/ Sailesh Chittipeddi*
                    Name:   Sailesh Chittipeddi
                    Title:     President and Chief Executive Officer

COUNSEL:

*/s/ Joshua A. Sussberg*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:     (302) 426-1189
Facsimile:      (302) 426-9193

- and –

Morton Branzburg (*pro hac vice* admission pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-2700
Facsimile:      (215) 568-6603

- and -

Paul M. Basta (*pro hac vice* admission pending)
Joshua A. Sussberg (*pro hac vice* admission pending)
Christopher T. Greco (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit C</u>**

DIP Credit Agreement

**$15,000,000**

**SENIOR SECURED SUPER-PRIORITY DEBTOR IN POSSESSION**

**CREDIT AGREEMENT Dated as of March [__], 2013**

**among CONEXANT SYSTEMS, INC.,**

**a Debtor and Debtor in Possession,**

**as the Borrower,**

**THE OTHER CREDIT PARTIES SIGNATORY HERETO,**

**each a Debtor and Debtor in Possession,**

**as Credit Parties,**

**and**

**QP SFM CAPITAL HOLDINGS LTD.,**

**as the Lender**

# TABLE OF CONTENTS

Page

1.   AMOUNT AND TERMS OF CREDIT ..................................................6
  1.1   Credit Facilities...................................................................6
  1.2   Procedure for Loan Borrowing ..............................................7
  1.3   Prepayments and Commitment Reduction..................................7
  1.4   Priority and Application of Payments ......................................8
  1.5   Use of Proceeds...................................................................8
  1.6   Interest and Applicable Margins ............................................8
  1.7   Cash Management Systems ....................................................9
  1.8   [Reserved]..........................................................................9
  1.9   Receipt of Payments ............................................................9
  1.10  Loan Account and Accounting .............................................10
  1.11  Indemnity ........................................................................11
  1.12  Access .............................................................................11
  1.13  Taxes ..............................................................................12
  1.14  363 Sale Amendment..........................**Error! Bookmark not defined.**

2.   CONDITIONS PRECEDENT .........................................................14
  2.1   Conditions to Closing .........................................................14
  2.2   Conditions to Borrowing all Term Loans ................................16

3.   REPRESENTATIONS AND WARRANTIES......................................17
  3.1   Corporate Existence; Compliance with Law ............................17
  3.2   Executive Offices, Collateral Locations, FEIN ........................17
  3.3   Corporate Power, Authorization, Enforceable Obligations .........17
  3.4   Financial Statements and Projections .....................................18
  3.5   Material Adverse Effect; Burdensome Restrictions; Default .......19
  3.6   Ownership of Property; Real Estate; Liens..............................19
  3.7   Labor Matters....................................................................19
  3.8   Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ........19
  3.9   Government Regulation .......................................................20
  3.10  Margin Regulations............................................................20
  3.11  Taxes ..............................................................................20
  3.12  Compliance with ERISA......................................................20
  3.13  No Litigation ....................................................................21
  3.14  Intellectual Property...........................................................21
  3.15  Full Disclosure .................................................................21
  3.16  Insurance ..........................................................................21
  3.17  Deposit Accounts ...............................................................21
  3.18  Secured, Super-Priority Obligations .....................................22

4.   FINANCIAL STATEMENTS AND INFORMATION ...........................23
  4.1   Reports and Notices ...........................................................23

5.      AFFIRMATIVE COVENANTS ..................................................................23
        5.1     Maintenance of Existence and Conduct of Business ..........................23
        5.2     Payment of Charges ..........................................................................23
        5.3     Books and Records ............................................................................24
        5.4     Insurance; Damage to or Destruction of Collateral ...........................24
        5.5     Compliance with Laws ......................................................................25
        5.6     Intellectual Property ..........................................................................25
        5.7     Environmental Matters.......................................................................25
        5.8     Milestones ..........................................................................................26
        5.9     Further Assurances..............................................................................26
        5.10    Additional Guaranties and Collateral Documents ............................26
        5.11    Financial Consultant ..........................................................................26
        5.12    ERISA/Labor Matters ........................................................................26
        5.13    Use of Proceeds ..................................................................................27
        5.14    Cash Management Systems .................................................................27
        5.15    Post-Closing Requirements ................................................................27

6.      NEGATIVE COVENANTS ........................................................................27
        6.1     Mergers, Subsidiaries, Etc. ................................................................27
        6.2     Investments; Term Loans and Advances ............................................27
        6.3     Indebtedness........................................................................................28
        6.4     Affiliate Transactions.........................................................................29
        6.5     Capital Structure and Business ...........................................................29
        6.6     Formation of New Entities; Investments in Joint Ventures ..................30
        6.7     Liens....................................................................................................30
        6.8     Sale of Stock and Assets .....................................................................31
        6.9     ERISA .................................................................................................31
        6.10    Financial Covenants ...........................................................................31
        6.11    Line of Business .................................................................................31
        6.12    Sale-Leasebacks..................................................................................31
        6.13    Restricted Payments............................................................................32
        6.14    Change of Corporate Name or Location; Change of Fiscal Year .........32
        6.15    No Impairment of Intercompany Transfers .........................................32
        6.16    Limitation on Negative Pledge Clauses...............................................32
        6.17    No Speculative Transactions...............................................................33
        6.18    Expenditures .......................................................................................33

7.      TERM .......................................................................................................33
        7.1     Termination .........................................................................................33
        7.2     Survival of Obligations Upon Termination of Financing Arrangements ..............33

8.      EVENTS OF DEFAULT; RIGHTS AND REMEDIES........................................33
        8.1     Events of Default ................................................................................33
        8.2     Remedies .............................................................................................36
        8.3     Waivers by Credit Parties ...................................................................36

9.      GUARANTY ............................................................................................37

9.1    Guaranty of Obligations of the Borrower ...............................................37
9.2    Demand the Lender.......................................................................................38
9.3    Enforcement of Guaranty.............................................................................38
9.4    Waiver ...........................................................................................................38
9.5    Benefit of Guaranty......................................................................................39
9.6    Modification of Obligations, Etc .................................................................39
9.7    Subordination of Subrogation, Etc..............................................................40
9.8    Election of Remedies ...................................................................................40
9.9    Reinstatement; Stay of Acceleration...........................................................40
9.10    Information ...................................................................................................41
9.11    Taxes ............................................................................................................41
9.12    Maximum Liability ......................................................................................41
9.13    Contribution .................................................................................................41
9.14    Liability Cumulative ....................................................................................42

10.    SECURITY ..............................................................................................................42
10.1    Security ........................................................................................................42
10.2    Perfection of Security Interests...................................................................44
10.3    Rights of Lender; Limitations on Lender Obligations.................................45
10.4    Covenants of the Credit Parties with Respect to Collateral ........................47
10.5    Performance by the Lender of the Credit Parties Obligations .....................51
10.6    Limitation on the Lender's duty in Respect of Collateral............................51
10.7    Remedies; Rights Upon Default ..................................................................51
10.8    The Lender's Appointment as Attorney-in-Fact..........................................58
10.9    Modifications ...............................................................................................59

11.    ASSIGNMENT AND PARTICIPATIONS................................................................59
11.1    Assignment and Participations....................................................................59
11.2    The Lender's Reliance, Etc..........................................................................60
11.3    Setoff............................................................................................................60

12.    SUCCESSORS AND ASSIGNS ..............................................................................61
12.1    Successors and Assigns................................................................................61

13.    MISCELLANEOUS .................................................................................................61
13.1    Complete Agreement; Modification of Agreement .....................................61
13.2    Amendments and Waivers ...........................................................................61
13.3    Costs and Expenses......................................................................................62
13.4    No Waiver ....................................................................................................62
13.5    Remedies......................................................................................................63
13.6    Severability ..................................................................................................63
13.7    Conflict of Terms.........................................................................................63
13.8    Confidentiality..............................................................................................63
13.9    GOVERNING LAW .....................................................................................63
13.10    Notices .........................................................................................................64
13.11    Section Titles ...............................................................................................66
13.12    Counterparts .................................................................................................66

13.13   WAIVER OF JURY TRIAL..............................................................................66
13.14   Press Releases and Related Matters ................................................................66
13.15   [Reserved] .......................................................................................................67
13.16   Advice of Counsel............................................................................................67
13.17   No Strict Construction .....................................................................................67

## INDEX OF APPENDICES

| | | |
|---|---|---|
| Annex A (Recitals) | - | Definitions |
| Annex B (Section 1.7) | - | Cash Management Systems |
| Annex C (Section 2.1(e)) | - | Closing Checklist |
| Annex D (Section 4.1(a)) | - | Financial Statements and Projections -- Reporting |
| Annex E (Section 4.1(b)) | - | Collateral Reports |
| Annex F (Section 5.8) | - | Milestones |
| Annex G (Section 6.10) | - | Financial Covenants |
| Annex H (Section 13.10) | - | Notice Addresses |
| Annex I (from Annex A - Commitments Definition) | - | Commitments as of Closing Date |
| Annex J (from Annex A - Permitted Investments Definition) | | Investments Guidelines |
| | | |
| Exhibit 1.1 | - | Form of Note |
| Exhibit 1.2 | - | Form of Notice of Borrowing |
| Exhibit 2 | - | Initial Budget |
| Exhibit 10.8 | - | Form of Power of Attorney |
| Disclosure Schedule 3.1 | - | Type of Entity; State of Organization |
| Disclosure Schedule 3.2 | - | Executive Offices, Collateral Locations, FEIN |
| Disclosure Schedule 3.6 | - | Real Estate and Leases: |
| Part 1 | - | Owned Real Estate |
| Part 2 | - | Material Real Estate Contracts |
| Part 3 | - | Leases Affecting Owned Real Estate |
| Disclosure Schedule 3.8 | - | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Disclosure Schedule 3.11 | - | Tax Matters |
| Disclosure Schedule 3.12 | - | Employee Benefit Plans |
| Disclosure Schedule 3.14 | - | Intellectual Property |
| Disclosure Schedule 3.16 | - | Insurance: |
| Part 1 | - | Insurance Policies |
| Part 2 | - | Those Insurance Policies which relate to Collateral |
| Disclosure Schedule 3.17 | - | Deposit Accounts |

Disclosure Schedule 5.1          -     Trade Names
Disclosure Schedule 5.15         -     Post-Closing Requirements
Disclosure Schedule 6.2          -     Existing Investments
Disclosure Schedule 6.3          -     Existing Indebtedness
Disclosure Schedule 6.7          -     Existing Liens
Disclosure Schedule 6.14         -     Locations of Collateral
Disclosure Schedule 6.15         -     Restrictions on Intercompany Transfers
Disclosure Schedule 6.16         -     Limitations on Negative Pledge Clauses
Disclosure Schedule 10.1         -     Commercial Tort Claims
Disclosure Schedule 10.4         -     Pledged Collateral
    Part 1   -     Pledged Shares
    Part 2   -     Pledged Indebtedness

This SENIOR SECURED SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of March [__], 2013, by and among CONEXANT SYSTEMS, INC., a Delaware corporation, as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code (as defined below) (the "Borrower"); the other Credit Parties signatory hereto, each as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code; and QP SFM CAPITAL HOLDINGS LTD., as Lender (including any successor or assignee to the extent permitted under Section 11.1, the "Lender");

WHEREAS, on [__], 2013, (the "Petition Date"), the Borrower and each of the other Credit Parties filed a voluntary petition for relief (collectively, the "Cases") under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Borrower and the other Credit Parties are continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lender provide senior secured super-priority term loan facilities of up to $15,000,000 in order to fund the continued operation of the Credit Parties businesses as debtors and debtors in possession under the Bankruptcy Code;

WHEREAS, the Lender is willing to make available to the Borrower such post-petition loans and other extensions of credit upon the terms and subject to the conditions set forth herein;

WHEREAS, each of the Guarantors has agreed to guaranty the obligations of the Borrower hereunder, and each of the Credit Parties has agreed to secure its obligations to the Lender hereunder with, inter alia, security interests in, and liens on, all of its property and assets, whether real or personal, tangible or intangible which constitute Collateral, now existing or hereafter acquired or arising, all as more fully provided herein; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Annex A shall govern. All Annexes, Schedules, Exhibits and other attachments (collectively, "Appendices") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1.    AMOUNT AND TERMS OF CREDIT

1.1    Credit Facilities.

(a) Term Loan.

6

(i)      The Lender agrees, upon the terms and subject to the conditions herein set forth, to make term loans (each a "Term Loan" and collectively, the "Term Loans") to the Borrower at any time and from time to time during the period commencing on the date hereof and ending on the Maturity Date in an aggregate principal amount not to exceed the Commitment, in each case, in accordance with the terms of the Budget.

(b)      [Reserved].

(c)      The aggregate outstanding principal balance of the Term Loans shall be due and payable in full in immediately available funds on the Maturity Date, if not sooner paid in full. No payment with respect to the Term Loans may be reborrowed.

(d)      [Reserved].

(e)      The Term Loans shall, upon the request of the Lender pursuant to Section 1.10, be evidenced by promissory notes substantially in the form of Exhibit 1.1 (each a "Note" and collectively the "Notes"), and, upon such request as provided in Section 1.10, the Borrower shall execute and deliver each Note to the Lender. Each Note shall represent the obligation of the Borrower to pay the amount of the Term Loans, together with interest thereon as prescribed in Section 1.6.

1.2      Procedure for Loan Borrowing.   The Borrower shall have given the Lender written notice by E-Fax or e-mail substantially in the form of Exhibit 1.2 (a "Notice of Borrowing") (which notice must be received by the Lender prior to 12:00 P.M., New York City time, three (3) Business Days prior to the requested Borrowing Date), specifying (a) the amount to be borrowed, (b) the requested Borrowing Date and (c) instructions for remittance of the applicable Term Loans to be borrowed.  The Term Loans will be made available to the Borrower at such account as is designated in writing to the Lender by the Borrower.

1.3      Prepayments and Commitment Reduction.

(a)      Voluntary Prepayments. The Borrower may at any time on at least three (3) Business Days' prior written notice to the Lender, voluntarily prepay all or part of the Term Loans without premium or penalty; provided that any such prepayment shall be in a minimum amount of $500,000 and integral multiples of $500,000 in excess of such amount (or, if less, the outstanding amount of the Term Loans or any other amount approved by the Lender); provided, further, that any such prepayment shall be applied as directed by the Borrower.

(b)      Mandatory Prepayments.

(i)      Except as provided under Section 1.3(c), upon receipt by any Credit Party of Net Cash Proceeds in excess of $150,000 in the aggregate arising from an Asset Sale or Property Loss Event, the Borrower shall promptly (no later than three Business Days after the date on which such Net Cash Proceeds are received) prepay the Term Loans in an amount equal to 100% of such Net Cash Proceeds; provided, however, that such prepayment obligation may be waived by the Lender in its sole discretion.

(ii)    Upon receipt by any Credit Party of any Net Cash Proceeds from any issuance of Indebtedness (other than Debt permitted under <u>Section 6.3</u> hereof), the Borrower shall promptly (no later than three Business Days after the date on which such Net Cash Proceeds are received) prepay the Term Loans in an amount equal to 100% of such cash proceeds.

(c)    <u>Application of Net Cash Proceeds</u>. Any Net Cash Proceeds or cash proceeds described in clauses (b)(i) or (ii) received by the Borrower or any other Credit Party or the Lender under any Loan Document (except as otherwise expressly provided herein or therein) shall be applied pursuant to <u>Section 1.4</u>.

(d)    [Reserved].

(e)    <u>Mandatory Commitment Reduction</u>.  The Commitment shall automatically and permanently terminate on the Maturity Date.

(f)    <u>No Implied Consent</u>. Nothing in this <u>Section 1.3</u> shall be construed to constitute the Lender's consent to any transaction that is not permitted by other provisions of this Agreement or the other Loan Documents.

1.4    <u>Priority and Application of Payments</u>.  So long as no Event of Default has occurred and is continuing, payments matching specific scheduled or required payments then due shall be applied to those scheduled or required payments.  As to any other payment and as to all payments made when an Event of Default has occurred and is continuing or following the Maturity Date, the Borrower hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of the Borrower, and the Borrower and each Secured Party hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply any and all such payments against the Obligations as follows: first, to reimbursable costs and expenses of the Lender then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Term Loans; third, to prepay the remaining principal amount of the Term Loans, until the Term Loans shall have been paid in full; and fourth, to all other Obligations then due and payable to the Lender.

1.5    <u>Use of Proceeds</u>.  The Borrower shall utilize the proceeds of the Term Loans solely (i) to pay interest, fees and expenses in connection with this Term Loan and the Cases, make critical vendor payments, provide working capital for, and for other general corporate purpose of, the Credit Parties, and to make any other payments permitted by the Bankruptcy Code or the Interim Order  or Final Order, in each case in accordance with the Budget and (ii) to pay the costs and expenses of the Lender in accordance with the Budget.

1.6    <u>Interest and Applicable Margins</u>.

(a)    The Borrower shall pay interest to the Lender on the principal amount of Term Loans outstanding (if any), in arrears on each applicable Interest Payment Date, at Adjusted LIBOR plus 7.00%.

(b)    If any payment on any Obligation becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and,

with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of interest shall be made by the Lender on the basis of a 360 day year, in each case, for the actual number of days occurring in the period for which such interest is payable. Each determination by the Lender of interest rates hereunder shall be presumptive evidence of the correctness of such rates.

(d)     So long as an Event of Default has occurred and is continuing, (i) the interest rates applicable to the Obligations shall be increased by two percentage points (2%) per annum above the rates of interest otherwise applicable to the Obligations hereunder (the "Default Rate"), and (ii) all other outstanding Obligations shall bear interest at the Default Rate. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

(e)     Notwithstanding anything to the contrary set forth in this Section 1.6, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Lender is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. In no event shall the total interest received by the Lender pursuant to the terms hereof exceed the amount that the Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate.

1.7     Cash Management Systems.  On or prior to the date that is 30 Business Days after the Closing Date (or such longer period as the Lender may agree), the Borrower will establish and will maintain until the Termination Date, the cash management systems described in Annex B (the "Cash Management Systems").

1.8     [Reserved].

1.9     Receipt of Payments.  The Borrower shall make each payment under this Agreement not later than 2:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to the Collection Account.  For purposes of computing interest as of any date, all payments shall be deemed received on the Business Day on which immediately available funds therefor are received in the Collection Account prior to 2:00 p.m. New York time on the applicable date; provided that any payment which is received in the Collection Account later than 2:00 p.m. New York time shall be deemed received on such date for purposes of determining whether an Event of Default has occurred (provided, that such amounts shall be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon).

     1.10   <u>Loan Account and Accounting</u>.  The Lender shall maintain a loan account (the "<u>Loan Account</u>") on its books to record the Term Loans, all payments made by the Borrower with respect to the Term Loans, and all other debits and credits as provided in this Agreement with respect to the Term Loans or any other Obligations with respect to the Term Loans.  All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on the Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to the Lender by the Borrower; <u>provided</u>, that any failure to so record or any error in so recording shall not limit or otherwise affect the Borrower's duty to pay the Obligations with respect to the Term Loans. The Lender shall render to the Borrower a monthly accounting of transactions with respect to the Term Loans setting forth the balance of the Loan Account for the immediately preceding month. The Lender may elect, by notice to the Borrower, to have the Term Loans be evidenced by a Note issued to the Lender. If no such Note is requested, the Lender may rely on the Loan Account as evidence of the amount of Obligations with respect to the Term Loan from time to time owing to it. Unless the Borrower notifies the Lender in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) days after the date thereof, each and every such accounting shall be presumptive evidence of all matters reflected therein. Only those items expressly objected to in such notice shall be deemed to be disputed by the Borrower.

1.11    Indemnity. Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless each of the Lender and its Affiliates, and each such Person's respective officers, directors, employees, advisors, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities, reasonable and documented out-of-pocket costs and expenses (including attorneys fees and disbursements of one counsel for the Lender (and any special or local counsel) and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of the financing contemplated hereby or the use or the proposed use of proceeds thereof under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents, and associated with Electronic Transmissions or E-Systems as well as failures caused by the Borrower's equipment, software, services or otherwise used in connection therewith (collectively, "Indemnified Liabilities"); provided, that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from any Indemnified Person's gross negligence or willful misconduct as determined by a final and non-appealable order of a court of competent jurisdiction. NEITHER THE LENDER NOR ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF THE LENDER SHALL BE RESPONSIBLE OR LIABLE TO ANY CREDIT PARTY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH CREDIT PARTY, ANY OF SUCH CREDIT PARTY'S SUBSIDIARIES OR ANY OTHER PERSON, FOR INDIRECT, PUNITIVE, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES.

1.12    Access.

(a)    Each Credit Party shall, during normal business hours, from time to time upon reasonable prior notice as frequently as Lender reasonably determines to be appropriate: (i) provide the Lender and any of its officers, employees and agents access to its officers and employees, and with prior notice and the opportunity to be present, counsel or other advisors of each Credit Party; (ii) permit the Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from any Credit Party's Books and Records (subject to requirements under any confidentiality agreements, if applicable); and (iii) permit the Lender, and any of its officers, employees and agents, to have access to properties, facilities and to the Collateral and to inspect, audit, review, evaluate, conduct field examinations and make test verifications and counts of the Accounts, Inventory and other Collateral of any Credit Party (subject to requirements under any confidentiality agreements, if applicable). Each Credit Party shall make available to the Lender and its counsel reasonably promptly originals or copies of all Books and Records (subject to requirements under any confidentiality agreements, if applicable) that the Lender may reasonably request. Each Credit Party shall deliver any document or instrument necessary for the Lender, as it may from time to time request, to obtain records from any service bureau or other Person that maintains records for such Credit Party and shall maintain supporting documentation on media, including computer tapes and discs owned by such Credit Party.

(b)     If an Event of Default has occurred and is continuing, each such Credit Party shall provide such access as set forth in clause (a) above to the Lender at all times and without advance notice. Furthermore, the Borrower shall provide the Lender with access, with prior notice and opportunity for the Borrower to be present, to its suppliers, service providers (including independent public accountants) and customers.

1.13    Taxes.

(a)     All payments made by the Borrower to the Lender under or in connection with this Agreement shall be made without any setoff or other counterclaim, and shall be free and clear of and without deduction or withholding for or on account of any present or future Taxes now or hereafter imposed by any Governmental Authority or other authority, except to the extent that any such deduction or withholding is compelled by law.  As used herein, the term "Taxes" shall include all income, excise and other taxes of whatever nature (other than Excluded Taxes) as well as all levies, imposts, remittances, duties, charges, or fees of whatever nature.  If the Borrower is compelled by law to make any deductions or withholdings on account of any Taxes (including any foreign withholding), the Borrower will:

(i)     pay such additional amounts (including, without limitation, any penalties, interest or expenses) as may be necessary in order that the net amount received by the Lender after such deductions or withholdings (including any required deduction or withholding on such additional amounts) shall equal the amount the Lender would have received had no such deductions or withholdings been made; and

(ii)     pay to the relevant authorities the full amount required to be so withheld or deducted (including with respect to such additional amounts); and

(iii)     promptly forward to the Lender an official receipt or other documentation satisfactory to the Lender evidencing such payment to such authorities.

If any Taxes otherwise payable by the Borrower pursuant to the foregoing are directly asserted against the Lender, the Lender may pay such taxes and the Borrower promptly shall reimburse such the Lender to the full extent otherwise required under this Section 1.13.

(b)     In addition, the Borrower shall pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made by the Borrower hereunder or under any other Loan Documents or from the execution, delivery or registration of, performing under, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "Other Taxes").

(c)     The Borrower shall indemnify the Lender for and hold it harmless against the full amount of any Indemnified Taxes and Other Taxes (including, without limitation, taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 1.13(c)) imposed on or paid or remitted by the Lender and any liability (including penalties, interest and reasonable expenses) arising therefrom or with respect thereto. This indemnification shall be made within 30 days from the date the Lender makes written demand therefor with appropriate supporting documentation.

12

(d)     Within 30 days after the date of any payment of Taxes imposed in connection with this Agreement, the Borrower shall furnish to the Lender, at its address referred to in Section 13.10, the original or a certified copy of a receipt evidencing such payment to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Lender. In the case of any payment hereunder or any other documents to be delivered hereunder by or on behalf of the Borrower through an account or branch outside the United States or by or on behalf of the Borrower by a payor that is not a United States person, if the Borrower determines that no Taxes are payable in respect thereof, the Borrower shall furnish, or shall cause such payor to furnish, to the Lender, at such address, an opinion of counsel reasonably acceptable to the Lender stating that such payment is exempt from Taxes. For purposes of this subsection (d) and subsection (e), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the IRC.

(e)     If the Lender is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement, the Lender shall deliver to the Borrower, to the extent the Lender is legally entitled to do so, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as may reasonably be requested by the Borrower to permit such payments to be made without such withholding Tax or at a reduced rate; provided that the Lender shall not have any obligation under this paragraph (e) with respect to any withholding Tax imposed by any jurisdiction other than the United States if in the reasonable judgment of the Lender such compliance would subject the Lender to any material unreimbursed cost or expense or would otherwise be prejudicial to the Lender in any material respect.

(f)     If a payment made to the Lender hereunder or under any Loan Documents would be subject to U.S. federal withholding Tax imposed by FATCA if the Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the IRC, as applicable), the Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that the Lender has complied with the Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  If any form or document referred to in this subsection (f) (other than FATCA documentation) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the Closing Date by IRS Form W-8BEN or W-8ECI or the related certificate described above, that the Lender reasonably considers to be confidential, the Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information, except directly to a governmental authority or other Person subject to a reasonable confidentiality agreement. In addition, upon the written request of the Borrower, the Lender shall provide any other certification, identification, information, documentation or other reporting requirement if (i) delivery thereof is required by a change in the law, regulation, administrative practice or any applicable tax treaty as a precondition to exemption from or a reduction in the rate of deduction or withholding; (ii) the Lender is legally entitled to make delivery of such item; and (iii) delivery of such item will not result in material

additional costs unless the Borrower shall have agreed in writing to indemnify Lender for such costs.

(g)    If the Lender claims any additional amounts payable pursuant to this Section 1.13, the Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Funding Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the judgment of the Lender, be otherwise disadvantageous to the Lender.

(h)    If the Lender determines, in its sole discretion, that it has actually and finally received a refund of any Taxes paid or reimbursed by the Borrower pursuant to subsection (a) or (c) above in respect of payments under this Agreement or the other Loan Documents, the Lender shall pay to the Borrower, with reasonable promptness following the date on which it actually receives such refund, an amount equal to such refund, net of all out-of-pocket expenses in securing such refund; provided, that the Borrower, upon the request of the Lender, agrees to repay the amount paid (with interest and penalties) over to the Lender in the event the Lender is required to repay such amount to such governmental authority.  This Section 1.13(h) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Borrower or any other person.

1.14    363 Sale Amendment .  If (a) any 363 Triggering Event has occurred and is continuing pursuant to the terms of the Restructuring Support Agreement and (b) the Consenting Secured Lender has commenced a 363 Sale pursuant to Section 5.2(b) of the Restructuring Support Agreement, the parties hereto shall in good faith negotiate and enter into a written amendment of this Agreement (the "363 Sale Amendment") in form and substance acceptable to the Lender in its sole discretion, which 363 Sale Amendment shall include, without limitation, additional milestones relating to the 363 Sale auction process and additional Events of Default based on the occurrence of any default under the applicable asset purchase agreement.

## 2.    CONDITIONS PRECEDENT

2.1    Conditions to Closing.  This Agreement, including the obligation of the Lender to make the Term Loans, shall not become effective until the date (the "Closing Date") on which each of the following conditions precedent is satisfied or duly waived in writing in accordance with Section 13.2:

(a)    Commencement of the Cases. The Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall be reasonably satisfactory in form and substance to the Lender.

(b)    DIP Motion. Not later than the Petition Date, the Credit Parties shall have filed a motion to the Bankruptcy Court, in form and substance satisfactory to the Lender, seeking approval of the Loan Documents.

(c)    Interim Order. Not later than [___], 2013, the Interim Order shall have been entered by the Bankruptcy Court.  The Interim Order shall have been entered on such prior

notice to such parties as may be satisfactory to the Lender (it being agreed that the notice of the DIP Motion is satisfactory notice).

(d)    <u>Compliance with Interim Order</u>. The Credit Parties shall be in compliance in all respects with the Interim Order or, to the extent it has been entered, the Final Order.  The Interim Order or, to the extent it has been entered, the Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated except the consent of the Lender.

(e)    <u>Loan Documents</u>. Subject to Section 5.15, this Agreement, the Loan Documents, such documents, instruments, agreements and legal opinions listed on <u>Annex C</u>, shall have been executed and delivered by all parties thereto.

(f)    <u>Financial Statements, Budgets and Reports</u>.  The Lender shall have received (i) the Initial Budget, which Initial Budget shall be in form and substance satisfactory to the Lender (it being understood that the Initial Budget attached hereto is satisfactory to the Lender) and (ii) an unaudited consolidated balance sheet for each month through the month ending January 2013 and the related statements of income, cash flow and stockholders' equity for each such month.

(g)    <u>Approvals</u>. The Lender shall have received (i) satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution and delivery of this Agreement and the other Loan Documents and such consents and approvals shall be in full force and effect, (ii) satisfactory evidence that the Credit Parties have obtained all material governmental and third party approvals or waivers necessary in connection with the performance and consummation of this Agreement and the other Loan Documents and the continuing operations of the Borrower and its Subsidiaries shall have been obtained and be in full force and effect, or (iii) an officer's certificate in form and substance reasonably satisfactory to the Lender affirming that no such consents or approvals are required.

(h)    <u>Payment of Costs and Expenses</u>. All costs and expenses (including, without limitation, reasonable legal fees) required to be paid to the Lender under the Loan Documents shall have been paid to the extent due.

(i)    <u>[Reserved]</u>.

(j)    <u>Cash Management Order</u>.  A cash management order encompassing cash management arrangements satisfactory to the Lender shall be in full force and effect.

(k)    <u>[Reserved]</u>.

(l)    <u>No Material Adverse Effect</u>. Since June 29, 2012, there shall not have been any Material Adverse Effect.

(m)    <u>No Action, Suit, Litigation</u>. Other than the Cases, there shall exist no action, suit, investigation, litigation, or proceeding pending (or, to the knowledge of the Borrower or any other Credit Party, threatened) in any court or before any arbitrator or governmental instrumentality, which could reasonably be expected to result in a Material Adverse Effect.

(n)     [Reserved].

(o)     [Reserved].

(p)     Lien Searches.  The Lender shall have received UCC and other lien searches (including tax liens and judgments) conducted in the jurisdictions in which the Borrower and the Guarantors are incorporated satisfactory to the Lender (dated as of a date reasonably satisfactory to the Lender).  The Lender shall hold perfected security interests in and Liens (having the priority provided for herein and in the Interim Order or, to the extent it has been entered, the Final Order) upon the Collateral.

(q)     [Reserved].

(r)     Restructuring Support Agreement.  The applicable parties shall have entered into the Restructuring Support Agreement.

2.2     Conditions to Borrowing all Term Loans.  The Lender shall not be obligated to make Term Loans requested to be made by it pursuant to Section 1.1(a) unless each of the following conditions precedent is satisfied or provided for in a manner reasonably satisfactory to the Lender, or duly waived in writing in accordance with Section 13.2:

(a)     Orders. The Interim Order, and, if the Final Order has been entered, the Final Order, as the case may be, shall have been entered by the Bankruptcy Court and shall not have been vacated, stayed, reversed, rescinded, modified or amended without the Lender's consent and shall otherwise be in full force and effect.

(b)     Notice of Borrowing.  The Lender shall have received a Notice of Borrowing.

(c)     Budget. Such borrowing shall be made in compliance with the most recently delivered Budget in effect at such time.

(d)     Representations and Warranties. All representations and warranties in this Agreement or any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifications set forth therein), as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifications set forth therein) as of such earlier date.

(e)     No Default. No Default or Event of Default under this Agreement or any other Loan Document shall exist or shall arise immediately thereafter.

(f)     No Violation of Law or Injunction.  The consummation of the transactions contemplated hereby shall not, after giving effect to such transactions, (i) violate any applicable law, statute, rule or regulation or (ii) conflict with, or result in a default or event of default under, any Material Contract entered into or assumed after the commencement of the Cases.

16

The acceptance by the Borrower of the proceeds of any Term Loan upon the request of the Borrower shall be deemed to constitute, as of the date thereof, a representation and warranty by the Borrower that the conditions in this Section 2.2 have been satisfied.

3.    **REPRESENTATIONS AND WARRANTIES**

To induce the Lender to make the Term Loans, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to the Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

3.1    Corporate Existence; Compliance with Law. Each Credit Party (a) is a corporation, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or organization set forth in Disclosure Schedule 3.1; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (c) subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), has the requisite power and authority to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted, except where the failure to do so would not result in losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (d) has all licenses, permits, consents or approvals from or by, and has made all filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct, except where the failure to do so would not result in losses or liabilities which could reasonably be expected to have a Material Adverse Effect; and (e) is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

3.2    Executive Offices, Collateral Locations, FEIN. As of the Closing Date, each Credit Party's name as it appears in official filings in its state of incorporation or organization, state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and the location as of the Closing Date of each Credit Party's chief executive office, principal place of business and location and the warehouses and premises at which any Collateral (except for Collateral in transit or out for repair) valued in excess of $500,000 is located as of the Closing Date are set forth in Disclosure Schedule 3.2, and none of such Collateral has been kept at any location other than the locations listed on Disclosure Schedule 3.2 within four (4) months preceding the Closing Date (or since its acquisition if less than four (4) months prior to the Closing Date). In addition, Disclosure Schedule 3.2 lists the federal employer identification number and organizational number of each Credit Party as of the Closing Date.

3.3    Corporate Power, Authorization, Enforceable Obligations. Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the execution, delivery and performance by each Credit Party of the Loan Documents to which it is a party and

the creation of all Liens provided for therein: (a) are within such Person's corporate, limited partnership or limited liability company power, as applicable; (b) have been duly authorized by all necessary corporate or limited liability company action; (c) do not contravene any provision of such Person's charter, bylaws or operating agreement as applicable; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority to which such Credit Party is subject; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any material lease, material agreement or other material instrument entered into or assumed by such Person after the commencement of the Cases to which such Person is a party or by which such Person or any of its property is bound; (f) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Lender, pursuant to the Loan Documents and the Interim Order and the Final Order; and (g) do not require the consent or approval of any Governmental Authority or any other Person, except (i) those referred to in Section 2.1(g) all of which which will have been duly obtained, made or complied with on or prior to the Closing Date (such consents and approvals to be in form and substance reasonably satisfactory to the Lender), (ii) any consents, notices or approvals pursuant to the Federal Assignment of Claims Act of 1940 or any applicable state, county or municipal law restricting the assignment of any Accounts for which the Account Debtor is the United States government or a political subdivision thereof or any state, county or municipality or department, agency or instrumentality thereof and (iii) those of the Bankruptcy Court.  Each of the Loan Documents have been duly executed and delivered by each Credit Party that is a party thereto and, subject to the entry of the Interim Order (or the Final Order, when applicable), each such Loan Document shall constitute a legal, valid and binding obligation of such Credit Party enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.4    <u>Financial Statements and Projections</u>.  Except for the Projections, all Financial Statements concerning the Borrower and its Subsidiaries that are referred to below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the consolidated financial position of the Borrower and its Subsidiaries as at the dates thereof and the consolidated results of their operations and cash flows for the periods then ended.

(a)    <u>Financial Statements</u>. The following Financial Statements have been delivered on the date hereof:

(i)    The unaudited consolidated balance sheet at September 30, 2012 of the Borrower and its Subsidiaries and the related consolidated statements of operations, cash flows and shareowners (deficit) equity for the Fiscal Year then ended.

(ii)    The unaudited consolidated balance sheet at June 29, 2012 of the Borrower and its Subsidiaries and the related consolidated statements of operations and cash flows for the three (3) months then ended.

(b)    <u>Projections.</u> The Projections delivered to Lender prior to the date hereof are based on assumptions believed by the Borrower to be reasonable at the time such Projections were delivered in light of conditions and facts known to the Borrower as of the date thereof (it being understood that projections by their nature are inherently uncertain, the Projections are not a guaranty of future performance, and actual results may differ materially from the Projections).

3.5    <u>Material Adverse Effect; Burdensome Restrictions; Default</u>.  Since the date of the Borrower's Form 10-Q for the three-month period ended June 29, 2012, no event has occurred, that alone or together with other events, could reasonably be expected to have a Material Adverse Effect.

3.6    <u>Ownership of Property; Real Estate; Liens</u>.

(a)    Each Credit Party warrants that it has good legal and valid title to, or legal and valid leasehold interests in, or right to use, all of its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business at such properties or to utilize such properties for their intended purpose as currently conducted.

(b)    The real estate listed in Part 1 of <u>Disclosure Schedule 3.6</u> constitutes all of the real property owned by any Credit Party (together with any real property owned thereafter by any Credit Party in fee title, "<u>Owned Real Estate</u>"). The leases and other agreements listed in <u>Part 2</u> of <u>Disclosure Schedule 3.6</u> (as updated from time to time) constitute all of the Material Real Estate Contracts.  Each Credit Party owns good fee simple title to all of its Owned Real Estate except for minor defects in title that do not interfere with its ability to conduct its business at such properties for their intended purpose as currently conducted.  The Borrower and each Credit Party has valid and enforceable leasehold interests in all of its material leased real estate (such material leased real estate of the Credit Parties, together with the Owned Real Estate, being herein collectively referred to as "<u>Real Estate</u>").  There are no purchase options, rights of first refusal or similar contractual rights that exist with respect to the Owned Real Estate, except as disclosed in <u>Part 1</u> of <u>Disclosure Schedule 3.6</u>.  None of the properties and assets of any Credit Party are subject to any Liens other than Liens permitted by <u>Section 6.7</u>.  All material permits required to have been issued or appropriate to enable the Owned Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect, except for such permits of which the failure of the Credit Parties to hold or maintain would not reasonably be expected to have a Material Adverse Effect.

3.7    <u>Labor Matters</u>.  No strikes are pending against any Credit Party, except those that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect on the operations of such Credit Party.

3.8    <u>Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness</u>. Except as set forth in <u>Disclosure Schedule 3.8</u>, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person. As of the Closing Date, all of the issued and outstanding Stock of each Credit Party (other than the Borrower) is owned by each of the Stockholders and in the amounts set forth in <u>Disclosure Schedule 3.8</u>. Except as set forth in

<u>Disclosure Schedule 3.8</u>, there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party (other than the Borrower) may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any Stock or other equity securities of its Subsidiaries.

3.9     <u>Government Regulation</u>.  No Credit Party is required to register as an investment company as such term is defined in the Investment Company Act of 1940. The making of the Term Loans by Lender to the Borrower, the application of the proceeds thereof and repayment thereof will not violate any provision of any such statute or any rule, regulation or order issued by the Commission, the violation of which would reasonably be expected to result in a Material Adverse Effect.

3.10    <u>Margin Regulations</u>.  No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "<u>Margin Stock</u>"). None of the proceeds of the Term Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Term Loans or other extensions of credit under this Agreement to be considered a purpose credit within the meaning of Regulations T, U or X of the Federal Reserve Board.

3.11    <u>Taxes</u>.  Except as provided on <u>Disclosure Schedule 3.11</u>, (and except as otherwise permitted by the Bankruptcy Court and the Bankruptcy Code) all Federal and other material tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by any Credit Party have been filed with the appropriate Governmental Authority, all such returns, reports and statements are true and correct and, subject to the automatic stay, all Charges due and payable by such Credit Party (whether or not shown on any returns, reports or statements) have been or will be timely paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof, excluding Charges or other amounts being contested in accordance with <u>Section 5.2(b)</u>. Proper and accurate amounts have been withheld by each Credit Party from amounts paid to its respective employees for all periods in compliance in all material respects with all applicable federal, state, local and foreign laws and such withholdings have been or will be timely paid, subject to the automatic stay, to the respective Governmental Authorities.

3.12    <u>Compliance with ERISA</u>.  Each employee benefit plan (as defined under ERISA) of each Credit Party is in full compliance with all applicable requirements of ERISA and the IRC, as amended, no steps have been taken to terminate any such plan and no contribution failure has occurred with respect to any such plan sufficient to give rise to a lien under ERISA, except in each case as could not be reasonably expected to result in a Material Adverse Effect. Except as set forth on Schedule 3.12, no such employee benefit plan is a Title IV Plan or a Multiemployer Plan.  No condition exists or event or transaction has occurred with respect to any such plan which might result in the incurrence by any Credit Party of any liability, fine or penalty which would reasonably be expected to result in a Material Adverse Effect.

20

3.13    <u>No Litigation</u>.  Other than the Cases, no unstayed action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of any officer of such Credit Party, threatened in writing against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "<u>Litigation</u>") that, individually or in the aggregate, (a) challenges any Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder (excluding the filing of an objection by any party in interest to this Agreement or the transactions contemplated hereunder) or (b) could reasonably be expected to have a Material Adverse Effect.

3.14    <u>Intellectual Property</u>.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Credit Party owns or has rights to use all Intellectual Property necessary to continue to conduct its business as now conducted by it or presently proposed to be conducted by it, and each U.S. registered Patent, U.S. registered Trademark, U.S. registered Copyright and U.S. License that, in the case of U.S. Licenses, is necessary in the conduct of the Credit Parties' business and is materially difficult to replace, and in each case, in effect on the Closing Date is listed, together with application or registration numbers, as applicable, in <u>Disclosure Schedule 3.14</u>. To the knowledge of each Credit Party, each Credit Party conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and, except as set forth in <u>Schedule 3.14</u>, no material claim or litigation regarding any of the foregoing is pending or threatened other than, in each case, as cannot reasonably be expected to affect the Loan Documents and the transactions contemplated herein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.15    <u>Full Disclosure</u>.  No information contained in this Agreement, any of the other Loan Documents, Financial Statements or Collateral Reports or other written reports from time to time prepared by any Credit Party and delivered hereunder or any written statement prepared by any Credit Party and furnished by or on behalf of any Credit Party to the Lender pursuant to the terms of this Agreement (other than any Projections and other forward looking statements) contains or will contain, when taken as a whole, any untrue statement of a material fact or omits or will omit to state a material fact, when taken as a whole, necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made and as of the date when made. Projections from time to time delivered hereunder are or will be based upon the estimates and assumptions stated therein, all of which the Borrower believed at the time of delivery to be reasonable in light of the conditions and facts known to the Borrower as of such delivery date (it being understood that projections by their nature are inherently uncertain, such Projections are not a guaranty of future performance and actual results may differ materially from those set forth in such Projections).

3.16    <u>Insurance</u>.  Part 1 of <u>Disclosure Schedule 3.16</u> lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, as well as a summary of the scope and term of each such policy. Part 2 of <u>Disclosure Schedule 3.16</u> identifies those insurance policies which relate to the Collateral.

3.17    <u>Deposit Accounts</u>.  <u>Disclosure Schedule 3.17</u> (as updated from time to time) lists all banks and other financial institutions at which any Credit Party maintains deposit or other

21

accounts in the United States, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held and the complete account number therefor.

3.18   Secured, Super-Priority Obligations.

(a)   Subject to the Carve-Out, on and after the Closing Date, the provisions of the Loan Documents and the Interim Order and, to the extent entered, the Final Order are effective to create in favor of the Lender legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Interim Order and, to the extent entered, the Final Order) in all right, title and interest in the Collateral, enforceable against each Credit Party that owns an interest in such Collateral.

(b)   All Obligations shall at all times:

(i)   Pursuant to subsection 364(c)(1) of the Bankruptcy Code, be entitled to joint and several Super-Priority Claims in the Cases having priority over all administrative expenses of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code;

(ii)   Pursuant to subsection 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority Lien on the Collateral to the extent that such Collateral is not subject to valid, perfected and non-avoidable Liens as of the commencement of the Cases;

(iii)   pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior Lien on all Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable Liens in favor of third parties in existence at the time of the commencement of the Cases (other than property that is subject to the existing Liens that secure the obligations under the Senior Secured Notes, which Liens shall be primed by the Liens securing the obligations under the Loan Documents in accordance with the terms of this Agreement) (the "Existing Liens"); and

(iv)   pursuant to Bankruptcy Code section 364(d), be secured by a perfected first-priority priming Lien on the Senior Secured Notes Collateral (the "Primed Liens"), all of which Primed Liens shall be primed by and made subject and subordinate with respect to the Senior Secured Notes Collateral to the perfected first priority senior Liens to be granted to the Lender, which senior priming Liens in favor of the Lender shall also prime any Liens granted after the commencement of the Cases to provide adequate protection in respect of any of the Primed Liens;

subject in each case only to the Carve-Out.  Notwithstanding the foregoing, no portion of the Carve-Out or proceeds of the Term Loans may be used in connection with the investigation (including, without limitation, discovery proceedings), initiation or prosecution of any claims, causes of action, objections or other litigation against the Lender, including, but not limited to, (i) with respect to raising any defense to the validity, perfection, priority, extent, or enforceability of the obligations under the Loan Documents including the Liens with respect thereto and (ii) with respect to pursuing any potential claims against the Lender (or its predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors) asserting or alleging any claims including, but not limited to, "lender liability"-type claims or causes of action, causes of actions

under chapter 5 of the Bankruptcy Code (including under section 502(d) of the Bankruptcy Code), or any other claims or causes of action under, or in any way otherwise relating to, the Loan Documents or the Loans.

(c)     The Interim Order, or if the Final Order has been entered, the Final Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed in any manner without the prior written consent of the Lender.

## 4.    FINANCIAL STATEMENTS AND INFORMATION

4.1    <u>Reports and Notices</u>.

(a)     The Borrower hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to the Lender, as required, the Financial Statements, notices, Projections, Budgets and other information at the times, to the Persons and in the manner set forth in <u>Annex D</u>.

(b)     The Borrower hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to the Lender, as required, the various Collateral Reports at the times, to the Persons and in the manner set forth in <u>Annex E</u>.

## 5.    AFFIRMATIVE COVENANTS

Each Credit Party agrees that from and after the Closing Date and until the Termination Date:

5.1    <u>Maintenance of Existence and Conduct of Business</u>.  Except as otherwise required by the Bankruptcy Code, each Credit Party shall (a) except as otherwise permitted by <u>Section 6.1</u> or <u>Section 6.8</u>, do or cause to be done all things to preserve and keep in full force and effect its legal existence, all rights, permits, licenses, approvals and privileges necessary in the conduct of its business, and its material rights and franchises, except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (b) at all times maintain, preserve and protect in all material respects all of its assets and properties (including all Collateral) used or useful and necessary in the conduct of its business, and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear and subject to any Property Loss Event) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices except where the failure to do so would not reasonably be expected to have a Material Adverse Effect or except as otherwise permitted in the applicable Loan Documents; and (d) transact business only in such corporate and trade names as are set forth in <u>Disclosure Schedule 5.1</u>.

5.2    <u>Payment of Charges</u>.

(a)     Unless payment thereof is precluded by the Cases and subject to <u>Section 5.2(b)</u>, each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges (which in the case of contractual obligations, relating only to obligations arising after

the Petition Date), except where the failure to pay or discharge such Charges could not reasonably be expected to result in a Material Adverse Effect.

(b)    Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in Section 5.2(a); provided, that (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP; (ii) no Lien shall be imposed to secure payment of such Charges that is superior to any of the Liens securing payment of the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges (except in the case of where the failure to pay or discharge such Charges could not reasonably be expected to result in a Material Adverse Effect); (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest; and (iv) such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses and shall deliver to the Lender evidence reasonably acceptable to the Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Credit Party or the conditions set forth in this Section 5.2(b)) are no longer met.

5.3    Books and Records.  Each Credit Party shall keep its Books and Records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP. Upon reasonable request of the Lender, each Credit Party shall deliver any requested Chattel Paper or Instrument having an individual value in excess of $100,000 to the Lender (in each case, accompanied by instruments of transfer executed in blank), and shall, if requested by the Lender, mark any Chattel Paper or Instrument that has not been delivered to the Lender with a legend that provides that the writing and the obligations evidenced or secured thereby are subject to the security interest of the Lender.

5.4    Insurance; Damage to or Destruction of Collateral.

(a)    The Credit Parties shall, at their sole cost and expense, maintain or cause to be maintained, insurance at all times against such risks as is customary for companies of the same or similar size in the same or similar business and industry or as otherwise required in the Collateral Documents.  Such policies of insurance as in effect on the Closing Date are described, collectively, in Part 1 and Part 2 of Disclosure Schedule 3.16. The policies of insurance (or the loss payable and additional insured endorsements delivered to the Lender) described in Part 2 of Disclosure Schedule 3.16, which lists those policies as in effect on the Closing Date relating to the Collateral, shall contain provisions pursuant to which the insurer agrees to endeavor to provide thirty (30) days prior written notice to the Lender in the event of any non-renewal, cancellation or material adverse amendment of any such insurance policy (or ten days prior written notice in the case of cancellation for non-payment of premiums). If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required hereunder or to pay all premiums relating thereto, the Lender may, upon at least five Business Days prior written notice to the Borrower, at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums. The Lender shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor. By doing so, the Lender shall not be deemed to have waived any Default or Event of Default arising from any Credit Party's failure to maintain such insurance or pay any premiums therefor. All sums so disbursed,

including attorneys fees, court costs and other charges related thereto, shall be payable within five Business Days upon demand by the Borrower to the Lender and shall be additional Obligations hereunder secured by the Collateral.  Borrower may later cancel any such insurance purchased by the Lender, but only after providing the Lender with evidence that there has been obtained insurance as required hereunder.

(b)     The Borrower on behalf of each Credit Party shall, within the time set forth in Section 5.15, deliver to the Lender, in form and substance reasonably satisfactory to the Lender, with respect to the insurance policies required to be maintained hereunder, endorsements to (i) all risk property and business interruption insurance naming the Lender, as lender loss payee as its interests may appear; provided, that, with respect to business interruption insurance and subject to Section 1.3(b), so long as no Event of Default has occurred or is continuing, the Lender shall promptly release to the Borrower any insurance proceeds received in connection with such business interruption insurance or Property Loss Event, and (ii) all general liability and other liability policies naming the Lender, as an additional insured as its interests may appear. The Borrower on behalf of each Credit Party irrevocably makes, constitutes and appoints the Lender (and all officers, employees or agents designated by the Lender) as the Borrower's and each Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under such All Risk property policies of insurance, endorsing the name of the Borrower or such Credit Party on any check or other item of payment for the proceeds of such All Risk property policies of insurance and for making all determinations and decisions with respect to such All Risk property policies of insurance; provided, that such power of attorney shall only be exercised so long as an Event of Default has occurred and is continuing. The Lender shall have no duty to exercise any rights or powers granted to them pursuant to the foregoing power-of-attorney.  The Borrower shall promptly notify the Lender of any loss, damage, or destruction to the Collateral in the amount of $500,000 or more, whether or not covered by insurance. All Net Cash Proceeds from insurance required under the Loan Documents shall be applied in accordance with <u>Section 1.3.</u>

5.5     <u>Compliance with Laws</u>.  Each Credit Party shall comply with all federal, state, local and foreign laws and regulations applicable to it, including labor laws and Environmental Laws and Environmental Permits applicable to it, in each case, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

5.6     <u>Intellectual Property</u>.  Each Credit Party shall own or have rights to use all material Intellectual Property necessary to conduct its business.  Each Credit Party shall do or cause to be done all things necessary to preserve and keep in full force and effect at all times all material registered Patents, Trademarks, trade names, Copyrights and service marks necessary in the conduct of its business. Each Credit Party shall conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any manner which would reasonably be expected to result in a Material Adverse Effect.

5.7     <u>Environmental Matters</u>.  Except as otherwise required by the Bankruptcy Code, such Credit Party, each Credit Party shall and shall cause each Person within its control to: conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect.

5.8     Milestones.  The Credit Parties shall satisfy the Milestones on or prior to the dates set forth on Annex F.

5.9     Further Assurances.  Each Credit Party executing this Agreement agrees that it shall, at such Credit Party's expense and upon the reasonable request of the Lender, duly execute and deliver, or cause to be duly executed and delivered, to the Lender such further instruments and do and cause to be done such further acts as may be necessary in the reasonable opinion of the Lender, to carry out more effectively the provisions and purposes of this Agreement and each Loan Document.

5.10     Additional Guaranties and Collateral Documents.  The Credit Parties shall take any actions requested by the Lender to maintain, ensure, protect, evidence and/or demonstrate that the Liens and security interests granted by the applicable Collateral Documents, the Interim Order or, to the extent entered, the Final Order with the priority set forth in the Interim Order (or the Final Order, when applicable) in the Collateral are valid, perfected and enforceable under the Code or as otherwise required by the Collateral Documents, including (a) executing additional security agreements, mortgages, control agreements and other agreements or documents, (b) delivering such certificates, instruments, Stock, other debt Securities and other documents representing all Collateral required to be pledged and delivered under the Collateral Documents and (c) delivering opinions, surveys, appraisals and certificates.

5.11     Financial Consultant.  The Borrower shall continue to retain, on terms and conditions reasonably acceptable to the Lender and at the sole cost and expense of the Borrower, Alvarez and Marsal [(it being agreed and understood that the terms and conditions set forth in the Alvarez and Marsal engagement letters in effect on the Closing Date are reasonably acceptable to the Lender)] or such other business consultant as is reasonably acceptable to the Lender (the "Consultant") to, among other things, advise the Borrower in connection with the management and operation of its business and to assist the Borrower with preparation of the Budget and the other financial and collateral reporting required to be delivered to the Lender pursuant to this Agreement.  The Borrower shall cause the Consultant to consult with the Lender on a regular basis as requested by the Lender.  In the event the Consultant ceases for any reason to act in that capacity, the Borrower shall engage a successor Consultant reasonably acceptable to the  Lender within thirty days (or such later date agreed to by the Lender) of such event.

5.12     ERISA/Labor Matters.

The Credit Parties shall furnish the Lender each of the following:

(a)     promptly after the filing or receiving thereof, copies of all material reports and notices which any Credit Party files under ERISA with respect to any Title IV Plan with the IRS or the PBGC or the U.S. Department of Labor or which any Credit Party receives from such corporation or any other government agency, in each case other than in the ordinary course of business; and

(b)     promptly after the date that any Credit Party (i) commences or terminates negotiations with any collective bargaining agent for the purpose of materially changing any collective bargaining agreement; (ii) reaches an agreement with any collective bargaining agent

prior to ratification for the purpose of materially changing any collective bargaining agreement; (iii) ratifies any agreement reached with a collective bargaining agent for the purpose of materially changing any collective bargaining agreement; or (iv) becomes subject to a cooling off period under the auspices of the National Mediation Board, notification of the commencement or termination of such negotiations, a copy of such agreement or notice of such ratification or a cooling off period, as the case may be.

5.13    Use of Proceeds.  The proceeds of the Term Loans will be used by the Borrower and the other Credit Parties, (i) to pay interest, fees and expenses in connection with this Term Loan and the Cases (including, without limitation, payment of professional fees), make critical vendor payments, provide working capital for, and for other general corporate purpose of, the Credit Parties, and to make any other payments permitted by the Bankruptcy Code or the Interim Order  or Final Order, in each case in accordance with the Budget and (ii) to pay the costs and expenses of the Lender in accordance with the Budget.

5.14    Cash Management Systems.  From and after the date set forth in Section 1.7, the Borrower will establish and will maintain the Cash Management Systems until the Termination Date.

5.15    Post-Closing Requirements.  Within fifteen (15) Business Days (or such later date as the Lender may agree to in its sole discretion) after the Closing Date deliver such endorsements and insurance certificates required to be delivered under Section 2.1(e) and Section 5.4(b).

## 6.    NEGATIVE COVENANTS

Each Credit Party agrees that from and after the Closing Date until the Termination Date:

6.1    Mergers, Subsidiaries, Etc.  No Credit Party or a Subsidiary of a Credit Party will merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, or otherwise dispose of (in one transaction or in a series of transactions) the Stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or otherwise liquidate or dissolve, except that, (i) a Credit Party may merge into or consolidate with another Credit Party so long as (a) no Default or Event of Default exists and (b) to the extent involving the Borrower, the Borrower is the surviving entity in any transaction involving such Person and (ii) any Subsidiary of a Credit Party that is not a Credit Party may merge, consolidate, transfer, liquidate or dissolve with or into any other Subsidiary of a Credit Party, provided, that to the extent involving a Credit Party, the Credit Party is the surviving entity.

6.2    Investments; Term Loans and Advances.  No Credit Party or a Subsidiary of a Credit Party will make any Investment in any Person, except for:

(i)    any Investment (x) in a Credit Party, (y) by a Subsidiary of a Credit Party that is not a Credit Party in another Subsidiary that is not a Credit Party and (z) by a Credit Party in any Subsidiary that is not a Credit Party, provided that with respect to this subclause (z), such Investment must be permitted under the Budget;

(ii)      travel, relocation expenses and other ordinary course of business advances to officers and employees consistent with past practice;

(iii)      without limiting clause (i), other Investments not in excess of $50,000;

(iv)      hold Investments comprised of notes payable, or stock or other securities issued by Account Debtors to such Credit Party or the Subsidiary of any Credit Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(v)      cash or Investments in the form of Permitted Investments;

(vi)      (x) endorsements for collection or deposit in the ordinary course of business, (y) extensions of trade credit (other than to Affiliates of the Borrower) arising or acquired in the ordinary course of business and (z) Investments received in the settlements in the ordinary course of business of such extensions of trade credit;

(vii)      Investments constituting payment intangibles, chattel paper, Accounts, notes receivable and other items arising or acquired in the ordinary course of business;

(viii)      lease, utility and other similar deposits in the ordinary course of business that do not constitute prepayments of payables; and

(ix)      existing Investments outstanding on the Petition Date and set forth on Disclosure Schedule 6.2.

6.3      Indebtedness.

(a)      No Credit Party or a Subsidiary of a Credit Party will create, incur, assume or suffer to exist any Indebtedness except:

(i)      Indebtedness secured by purchase money security interests and Capital Leases (including in the form of sale-leaseback, synthetic lease or similar transactions) to the extent such Indebtedness was incurred to finance the acquisition or construction of any fixed or capital assets; provided, that (x) the amount of such Indebtedness does not exceed 100% of the purchase price or construction cost (including any capitalized interest and issuance fees) of the subject asset and (y) such Indebtedness in incurred to the extent permitted by the Budget;

(ii)      the Term Loans and the other Obligations;

(iii)      existing Indebtedness outstanding on the Petition Date described in Disclosure Schedule 6.3;

(iv)      Indebtedness consisting of intercompany loans and advances made among Credit Parties;

(v)    Indebtedness in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house transfers of funds (but subject to compliance with Section 5.14);

(vi)    Indebtedness consisting of take-or-pay obligations contained in supply agreements entered into in the ordinary course of business and consistent with past practices;

(vii)    Indebtedness to credit card processors in connection with credit card processing services incurred in the ordinary course of business and consistent with past practices;

(viii)    Indebtedness arising in the ordinary course of business, providing netting services with respect to intercompany Indebtedness permitted to be incurred and outstanding pursuant to this Agreement so long as such Indebtedness does not remain outstanding for more than three (3) Business Days from the date of its incurrence;

(ix)    Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(x)    Indebtedness consisting of letters of credit described in Disclosure Schedule 6.3 and any replacements or refinancings thereof;

(xi)    surety bonds, performance bonds or similar obligations in the ordinary course of business and consistent with past practices; and

(xii)    other unsecured Indebtedness incurred subsequent to the Closing Date in an aggregate amount not to exceed $100,000 outstanding at any time.

(b)    No Credit Party shall, directly or indirectly, voluntarily repay, redeem, purchase, defease or otherwise satisfy any Indebtedness, except for payments included in the Budget or otherwise approved by the Bankruptcy Court with the consent of the Lender.

6.4    Affiliate Transactions.  No Credit Party or a Subsidiary of a Credit Party will sell or transfer any property or assets to, or otherwise engage in any other transactions with any of its Affiliates other than the Credit Parties, other than (a) on terms and conditions no less favorable to such Credit Party than could be obtained on an arm's length basis from unrelated third parties, (b) reasonable and customary fees and compensation paid to, and indemnity provided on behalf of, officers, directors or employees of such Credit Party or Subsidiary, (c) Investments permitted pursuant to Section 6.2 and (d) any dividends, other distributions or payments permitted by Section 6.13.

6.5    Capital Structure and Business.  No Credit Party or a Subsidiary of a Credit Party will amend, modify or waive any of its rights under (a) any agreement relating to any Material Indebtedness, (b) its Organizational Documents or (c) any Material Contract, in each case to the extent any such amendment, modification or waiver is materially adverse to the Lender. No Credit Party or a Subsidiary of a Credit Party will terminate any Material Contract without the prior consent of the Lender.

6.6    Formation of New Entities; Investments in Joint Ventures.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, (a) form or acquire any Subsidiary or (b) make any Investment in a joint venture.

6.7    Liens.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, create, incur, assume or permit to exist any Lien on any property or assets, except:

(a)    Permitted Liens;

(b)    Liens created by the Loan Documents in favor of the Lender;

(c)    Liens in existence on the date hereof and summarized on Disclosure Schedule 6.7;

(d)    Liens created after the date hereof in connection with Capital Leases or purchase money Indebtedness, in each case, permitted in Section 6.3(a)(i); provided, that such Liens attach only to the assets (and the proceeds thereof) subject to such purchase money debt or Capital Lease and such Indebtedness is incurred within one hundred eighty (180) days following such purchase and does not exceed 100% of the purchase price of the subject assets;

(e)    other Liens securing Indebtedness permitted by Section 6.3(a)(v), 6.3(a)(viii) and 6.3(a)(x) (limited in the case of Indebtedness permitted under Section 6.3(a)(x) to assets securing such Indebtedness on the Petition Date);

(f)    [reserved];

(g)    any interest or title of a licensor, lessor or sublessor granted to others, but only to the extent permitted by any of the Collateral Documents;

(h)    Liens or deposits in favor of credit card processors securing obligations in connection with credit card processing services incurred in the ordinary course of business and consistent with past practices;

(i)    [reserved];

(j)    other Liens, other than Liens securing Indebtedness, so long as the value of the property subject to such Liens, and the obligations secured thereby, do not exceed, in the aggregate, $100,000 at any one time outstanding;

(k)    Liens created after the Closing Date in connection with operating leases (which in no event constitute Indebtedness) in the ordinary course of business and consistent with past practices; provided, that such Liens attach only to such lease or the assets subject to such lease (including other assets integral to the use thereof);

(l)    deposits securing Indebtedness permitted by Section 6.3(a)(ix);

(m)    the Carve-Out, solely to the extent set forth in the Interim Order and, to the extent entered, the Final Order; and

(n)     Adequate Protection Obligations.

6.8     <u>Sale of Stock and Assets</u>.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, sell, transfer, lease or dispose of any assets (any such disposition being an "<u>Asset Sale</u>", it being agreed that collections of accounts receivables and use or disposition of cash or Cash Equivalents shall not be deemed an Asset Sale) other than:

(a)     sales and other disposition of inventory in the ordinary course of business;

(b)     sales or dispositions of damaged, obsolete, uneconomical or worn out equipment no longer used or useful in the business of the Credit Parties;

(c)     [reserved];

(d)     sales or dispositions of assets (x) among the Credit Parties, (y) between a Subsidiary of a Credit Party that is not a Credit Party and another Subsidiary that is not a Credit Party and (z) between a Credit Party in any Subsidiary that is not a Credit Party, provided that with respect to this subclause (z), such disposition must be permitted under the Budget;

(e)     sales or dispositions of other assets in arm's-length transactions at Fair Market Value in an aggregate amount not to exceed $100,000 in the aggregate;

(f)     any Property Loss Event; and

(g)     transactions pursuant to <u>Sections 6.1</u>, <u>6.2</u> or <u>6.7</u> to the extent they would constitute a sale or a disposition.

The foregoing limitations are not intended to prevent any Credit Party or Subsidiary of a Credit Party from rejecting unexpired leases or executor contracts pursuant to Section 365 of the Bankruptcy Code in connection with the Cases.

6.9     <u>ERISA</u>.  No Credit Party or a Subsidiary of a Credit Party shall, or shall cause or permit any ERISA Affiliate to, cause or permit to occur (i) an event that results in the imposition of a Lien under Section 430 of the IRC or Section 303 or 4068 of ERISA or (ii) an ERISA Event (other than the Cases) to the extent such ERISA Event would reasonably be expected to result in taxes, penalties and other liability in excess of $100,000 in the aggregate.

6.10    <u>Financial Covenants</u>.  No Credit Party or a Subsidiary of a Credit Party will breach or fail to comply with any of the Financial Covenants.

6.11    <u>Line of Business</u>.  No Credit Party or a Subsidiary of a Credit Party will engage in any line of business different from the business conducted by the Credit Parties on the Closing Date.

6.12    <u>Sale-Leasebacks</u>.  No Credit Party or a Subsidiary of a Credit Party will engage in any sale-leaseback, synthetic lease or similar transaction involving any of its assets.

6.13    <u>Restricted Payments</u>.  No Credit Party or a Subsidiary of a Credit Party will make, directly or indirectly, any Restricted Payment, except

(a)    payments of principal of and interest on intercompany loans and advances between Credit Parties to the extent permitted by <u>Section 6.3</u>; and

(b)    dividends and distributions by Subsidiaries of the Borrower on a pro rata basis.

6.14    <u>Change of Corporate Name or Location; Change of Fiscal Year</u>.  No Credit Party shall (a) change its name as it appears in official filings in the state of its incorporation or other organization, (b) change, from such locations as set forth on <u>Disclosure Schedule 6.14</u>, its chief executive office, principal place of business, corporate offices or warehouses, maintenance facilities or other locations at which Collateral (except for Collateral in transit or out for repair) with book value in excess of $500,000, individually or in the aggregate, is held or stored, or the location of its records concerning such Collateral, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization, in each case, without at least fifteen (15) days prior written notice to the Lender (or such shorter time as permitted by Lender in its sole discretion); <u>provided</u>, that in the case of <u>clauses (b)</u> or (e), any such new location shall be in the continental United States.  No Credit Party shall change its fiscal year.

6.15    <u>No Impairment of Intercompany Transfers</u>. No Credit Party will directly or indirectly enter into or become contractually bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions by a Subsidiary or a Credit Party, the making or repayment of intercompany loans by a Subsidiary of a Credit Party to the Credit Party or the transfer of assets between and among the Credit Parties and their Subsidiaries; other than (a) prohibitions or restrictions existing on the Closing Date and listed on <u>Disclosure Schedule 6.15</u>, and any extension or renewal thereof on terms no less favorable to such Credit Party and (b) prohibitions or restrictions imposed by law or by this Agreement or any of the other Loan Documents, (c) customary restrictions and conditions contained in agreements relating to the sale of a subsidiary or any asset pending such sale, provided such restrictions and conditions apply only to the subsidiary or asset that is to be sold and such sale is permitted hereunder, (d) prohibitions or restrictions imposed by any agreement related to secured Indebtedness or other obligations permitted by this Agreement if such restriction or condition applies only to property secured or financed by such Indebtedness or other obligations and (e) the foregoing shall not apply to (A) customary provisions in leases, licenses and other contracts relating to the use and occupancy of premises and facilities restricting the assignment thereof or (B) customary provisions restricting licensing, sublicensing or assignments of a contract or subletting or assignment of leases governing leasehold interests of the Credit Parties and their Subsidiaries.

6.16    <u>Limitation on Negative Pledge Clauses</u>.  No Credit Party will, nor will it seek approval to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Credit Party or any Subsidiary to create, incur, assume or permit to exist any Lien to secure its Obligations under the Loan Documents; provided that (i) the foregoing shall not apply to restrictions and

conditions imposed by law or by this Agreement or any of the other Loan Documents, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Disclosure Schedule 6.16 (but shall apply to any amendment or modification expanding the scope or duration of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any asset pending such sale, provided such restrictions and conditions apply only to the Subsidiary or asset that is to be sold and such sale is permitted hereunder, (iv) the foregoing shall not apply to prohibitions or restrictions imposed by any agreement related to secured Indebtedness or other obligations permitted by this Agreement if such restriction or condition applies only to property secured or financed by such Indebtedness or other obligations and (v) the foregoing shall not apply to customary provisions in leases, licenses and other contracts relating to the use and occupancy of airport premises and facilities restricting the assignment thereof.

6.17    No Speculative Transactions.  No Credit Party will, nor will it seek approval to engage in any transaction involving commodity options, futures contracts or similar transactions, except solely to hedge in the ordinary course of business.

6.18    Expenditures.  No Credit Party or a Subsidiary of a Credit Party will, directly or indirectly, make or commit to make, whether through purchase, leases or otherwise, in a single transaction or a series of related transactions, expenditures not permitted under the Budget and in excess of $100,000, other than expenditures for payment of professional fees, without the prior written consent of the Lender.

## 7.    TERM

7.1    Termination.  The financing arrangements contemplated hereby shall be in effect until the Maturity Date, and the Term Loans and all other Obligations shall be automatically due and payable in full on such date.

7.2    Survival of Obligations Upon Termination of Financing Arrangements.  Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Credit Parties or the rights of the Lender relating to any unpaid portion of the Term Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Maturity Date. All undertakings, agreements, covenants, warranties and representations of or binding upon the Credit Parties, and all rights of the Lender, all as contained in the Loan Documents, shall terminate and expire on the Termination Date; provided, that the provisions of Sections 13.3, 13.8, 13.9, 13.13, the payment obligations under Sections 1.11 and 1.13 shall survive the Termination Date.

## 8.    EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1    Events of Default.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)      The Borrower (i) fails to make any payment of principal of the Term Loans when due and payable, (ii) fails to make any payment of interest on the Term Loans or any of the other Obligations (other than the reimbursement or payment of expenses) when due and payable within five (5) days following the demand for such interest or other Obligations, or (iii) fails to pay or reimburse the Lender for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following the demand for such reimbursement or payment of expenses.

(b)      Any Credit Party fails or neglects to perform, keep or observe any of the provisions of Sections 1.3(b), 1.5 1.7, 1.14, 5.4, 5.8, 5.15 or Article 6, the insurance provisions in the Collateral Documents or any of the provisions set forth in Annex B, Sections (h) of Annex D and Annex G, respectively.

(c)      Any Credit Party fails or neglects to perform, keep or observe any of the provisions of Section (e) of Annex D and the same shall remain unremedied for three (3) Business Days.

(d)      The Borrower fails or neglects to perform, keep or observe any of the provisions of Section 4.1 or any provisions set forth in Annex D (other than Sections (e), (h), (o) and (p)) respectively, and the same shall remain unremedied for five (5) Business Days.

(e)      (x) The Borrower fails to perform or observe any covenant, condition or agreement to be performed or observed by it under this Agreement or any other Loan Document (other than as described in clauses (a), (b), (c) or (d) above) and such failure shall remain unremedied for 30 days from notice to or knowledge of any Credit Party.

(f)      Any event shall have occurred that permits the Consenting Secured Lender to terminate its obligations under the Restructuring Support Agreement.

(g)      Any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Lender by any Credit Party is untrue or incorrect or false in any material respect, in each case, as of the date when made or deemed made.

(h)      [Reserved].

(i)      The Loan Documents, the Interim Order and, to the extent entered, the Final Order shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided for herein and in the Interim Order and, to the extent entered, the Final Order, or any Credit Party shall so allege in any pleading filed in any court or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on each Credit Party party thereto (or any Credit Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms).

(j)      Any judgment or judgments for the payment of any post-petition obligations in excess of $500,000 in the aggregate at any time are outstanding against one or more of the Credit Parties (which judgments are not covered by insurance policies as to which liability has been accepted by the insurance carrier) and, in each case, the same are not, within thirty (30) days after the entry thereof, discharged or bonded pending appeal, or such judgments are not discharged, satisfied or vacated prior to the expiration of any such stay.

(k)      Any Change of Control occurs.

(l)      [reserved].

(m)      An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect.

(n)      (i) Any of the Cases shall be dismissed without a provision for indefeasible payment of all of the Obligations in full in cash (or the Bankruptcy Court shall make a ruling requiring the dismissal of the Cases) or converted to a case under chapter 7 of the Bankruptcy Code, (ii) any Credit Party shall file any pleading requesting any such relief, (iii) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases without the prior written consent of the Lender; or (iv) an application shall be filed by any Credit Party for the approval of, or the Bankruptcy Court shall enter an order (x) granting any Lien that is *pari passu* or senior to any lien granted to the Lender under the Loan Documents, the Interim Order or, to the extent entered, the Final Order, except as expressly permitted therein; (y) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (z) to grant a superpriority claim, other than that granted in the Interim Order and, to the extent entered, the Final Order (and other than with respect to the Carve-Out), which is *pari passu* with or senior to any of the claims of the Lender against the Borrower or any other Guarantor hereunder or under the Interim Order and, to the extent entered, the Final Order (or there shall arise or be granted any superpriority claim *pari passu* or senior to any such claims).

(o)      Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving any payment (as adequate protection or otherwise) on account of any Claim against any Credit Party arising or deemed to have arisen prior to the Petition Date, other than a Permitted Prepetition Payment, or any Credit Party shall make such a payment, (ii) approving any other First Day Order not acceptable to the Lender, (iii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or Lien (other than the Lender) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Collateral with a value in excess of $500,000 subject to any such relief from the automatic stay, or granting any form of adequate protection, including, without limitation, requiring cash payments by such Credit Party to such holder or holders, in lieu of such relief other than in connection with granting the first day relief as proposed by the Credit Parties (that is acceptable to the Lender), (iv) authorizing the sale of all or substantially all of the Borrower's assets (unless such order contemplates the

indefeasible payment in full in cash of the Obligations upon consummation of such sale, whether pursuant to a Plan of Reorganization or otherwise); (v) except as permitted under <u>Section 6.8</u>, approving the implementation of liquidation under chapter 11 of the Bankruptcy Code in any Case or (vi) any plan of reorganization or liquidation which does not provide for the indefeasible payment in full in cash of all Obligations on or before the date of the effectiveness of such plan is confirmed without the express prior written consent of the Lender.

(p)     Any other party shall both seek and obtain allowance of any order in the Cases to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code.

(q)     (i) the Final Order shall not have been entered by the Bankruptcy Court on or before the 30th day following the Petition Date, or (ii) from and after the date of entry thereof, the Interim Order (or the Final Order, when applicable) shall cease to be in full force and effect, or (iii) any Credit Party shall fail to comply with the terms of the Interim Order (or the Final Order, when applicable) or (iv) the Interim Order (or the Final Order, when applicable) shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any of the Credit Parties shall apply for authority to do so), in each case, without the prior written consent of the Lender.

8.2     <u>Remedies</u>.

(a)     [Reserved].

(b)     If any Event of Default has occurred and is continuing, without further order of, application to, or action by, the Bankruptcy Court, (i) the Lender may, without notice, declare all or any portion of the Obligations, including all or any portion of any Term Loans to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Borrower and each other Credit Party; and (ii) the Lender may, without notice except as required by the Interim Order or, to the extent entered, the Final Order, exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the Code; provided that the Lender shall provide to the Credit Parties (with a copy to counsel for (A) the Credit Parties, (B) any statutory committee appointed in the Cases and (C) the United States Trustee for the District of Delaware) within five (5) Business Days prior written notice (the "<u>Notice Period</u>").

(c)     In addition, subject solely to any requirement of the giving of notice by the terms the Interim Order (or the Final Order, when applicable), the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Lender shall be entitled to exercise all of its rights and remedies under the Loan Documents, including, without limitation, all rights and remedies with respect to the Collateral and the Guarantors.

8.3     <u>Waivers by Credit Parties</u>.  Except as otherwise provided for in this Agreement or by applicable law, each Credit Party waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all

commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which any Credit Party may in any way be liable, and hereby ratifies and confirms whatever the Lender may do in this regard; (b) all rights to notice and a hearing prior to the Lender taking possession or control of, or to the Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the Lender to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 9.    GUARANTY

9.1    <u>Guaranty of Obligations of the Borrower</u>. Each Guarantor hereby jointly and severally and absolutely and unconditionally guarantees to the Lender, and its successors, endorsees, transferees and assigns, the prompt payment when due (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations of the Borrower.  The Guarantors agree that this Guaranty is a guaranty of payment and performance and not of collection, and that their obligations under this Guaranty shall be primary, absolute and unconditional, irrespective of, and unaffected by:

(a)    any claim of waiver, release, amendment, extension, renewal, settlement, surrender, alteration, or compromise of any of the Obligations or any of the Loan Documents, by operation of law or otherwise (other than the payment in full in cash of the Obligations (other than unasserted contingent indemnification obligations));

(b)    any change in the corporate existence, structure or ownership of the Borrower or any other Guarantor;

(c)    the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Credit Party, the Lender or any other person, whether in connection herewith or in any unrelated transactions;

(d)    the genuineness, validity, regularity, enforceability or any future amendment of, or change in any other Loan Document or any other agreement, document or instrument to which any Credit Party and/or the Guarantors are or may become a party;

(e)    the absence of any action, claim or demand to enforce any of the Obligations or any other Loan Document or the waiver or consent by the Lender with respect to any of the provisions thereof;

(f)    the existence, release, non-perfection, invalidity, value or condition of, or failure to perfect its Lien against, any collateral for the Obligations or any action, or the absence of any action, by the Lender in respect thereof (including, without limitation, the release of any such security);

(g)    the insolvency of any Credit Party; or

(h)    any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or the guarantor, it being agreed by each Guarantor that its obligations under this Guaranty shall not be discharged until the Termination Date. Each

Guarantor shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations. Each Guarantor agrees that any notice or directive given at any time to the Lender which is inconsistent with the waiver in the immediately preceding sentence shall be null and void and may be ignored by the Lender, and, in addition, may not be pleaded or introduced as evidence in any litigation relating to this Guaranty for the reason that such pleading or introduction would be at variance with the written terms of this Guaranty, unless the Lender has specifically agreed otherwise in writing. It is agreed among each Guarantor and and the Lender that the foregoing waivers are of the essence of the transaction contemplated by the Loan Documents and that, but for this Guaranty and such waivers, the Lender would decline to enter into this Agreement.

9.2     Demand the Lender. In addition to the terms of the Guaranty set forth in Section 9.1 hereof, and in no manner imposing any limitation on such terms, it is expressly understood and agreed that, if, at any time, the outstanding Obligations under this Agreement (including all accrued interest thereon) are declared to be immediately due and payable, then the Guarantors shall, without demand, pay to the holders of the Obligations the entire amount of the outstanding Obligations due and owing to such holders. Payment by the Guarantors shall be made to the Lender in immediately available Federal funds to a Blocked Account and applied to the Obligations.

9.3     Enforcement of Guaranty. In no event shall the Lender have any obligation (although it is entitled, at its option) to proceed against the Borrower or any other Credit Party or any Collateral pledged to secure Obligations or any other Guarantor before seeking satisfaction from any or all of the Guarantors, and the Lender may proceed, prior or subsequent to, or simultaneously with, the enforcement of their rights hereunder, to exercise any right or remedy which it may have against any Collateral, as a result of any Lien it may have as security for all or any portion of the Obligations.

9.4     Waiver. To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Guarantor, other than, subject to Section 9.9, the payment in full in cash of the Obligations (other than unasserted contingent indemnification obligations). Without limiting the foregoing, in addition to the waivers contained in Section 9.1 hereof, the Guarantors waive, and agree that they shall not at any time insist upon, plead or in any manner whatever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshaling of assets or redemption laws, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance by the Guarantors of their Obligations under, or the enforcement by Lender of, this Guaranty. Each Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Guarantors hereby waive diligence, presentment and demand (whether for non-payment or protest or of acceptance, maturity, extension of time, change in nature or form of the Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Obligations, notice of adverse change in the Borrower's financial condition or any other fact which might increase the risk to the Guarantors) with respect to any of the Obligations or all other demands whatsoever and waive the benefit of all provisions of law which are or might be

in conflict with the terms of this Guaranty. The Guarantors represent, warrant and jointly and severally agree that, as of the date of this Guaranty, their obligations under this Guaranty are not subject to any offsets or defenses against the Lender or any Credit Party of any kind. The Guarantors further jointly and severally agree that their obligations under this Guaranty shall not be subject to any counterclaims or offsets or defenses against the Lender or against any Credit Party of any kind which may arise in the future (other than, subject to <u>Section 9.9</u>, the payment in full in cash of the Obligations (other than unasserted contingent indemnification obligations)).

9.5    <u>Benefit of Guaranty</u>. The provisions of this Guaranty are for the benefit of the Lender and its successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any Credit Party and the Lender, the obligations of any Credit Party under the Loan Documents. In the event all or any part of the Obligations are transferred, indorsed or assigned by the Lender to any Person or Persons, any reference to the Lender herein shall be deemed to refer equally to such Person or Persons.

9.6    <u>Modification of Obligations, Etc</u>. Each Guarantor hereby acknowledges and agrees that the Lender may at any time or from time to time, with or without the consent of, or notice to, the Guarantors or any of them:

(a)    change or extend the manner, place or terms of payment of, or renew or alter all or any portion of, the Obligations;

(b)    take any action under or in respect of the Loan Documents in the exercise of any remedy, power or privilege contained therein or available to it at law, equity or otherwise, or waive or refrain from exercising any such remedies, powers or privileges;

(c)    amend or modify, in any manner whatsoever, the Loan Documents;

(d)    extend or waive the time for any Credit Party's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the Loan Documents, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance;

(e)    take and hold collateral for the payment of the Obligations guaranteed hereby or sell, exchange, release, dispose of, or otherwise deal with, any property pledged, mortgaged or conveyed, or in which the Lender has been granted a Lien, to secure any Obligations;

(f)    release anyone who may be liable in any manner for the payment of any amounts owed by other the Guarantors or any other Credit Party to any Secured Party;

(g)    modify or terminate the terms of any intercreditor or subordination agreement pursuant to which claims of other creditors of any Guarantor or any Credit Party are subordinated to the claims of the Lender; and/or

(h)    apply any sums by whomever paid or however realized to any amounts owing by any other Guarantor or any other Credit Party to the Lender in such manner as the Lender shall determine in its discretion; and the Lender shall not incur any liability to the Guarantors as a

result thereof, and no such action shall impair or release the Obligations of the Guarantors or any of them under this Guaranty.

9.7    Subordination of Subrogation, Etc.  Notwithstanding anything to the contrary in this Guaranty, or in any other Loan Document, each Guarantor hereby:

(a)    expressly and irrevocably subordinates until the Termination Date, on behalf of itself and its successors and assigns (including any surety), any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which such Guarantor may have or hereafter acquire against any Credit Party in connection with or as a result of such Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which such Guarantor is a party or otherwise; and

(b)    acknowledges and agrees (i) that this waiver is intended to benefit the Lender and shall not limit or otherwise effect any Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the Lender and its successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 9.7.

9.8    Election of Remedies. If the Lender may, under applicable law, proceed to realize benefits under any of the Loan Documents giving the Lender a Lien upon any Collateral owned by any Credit Party, either by judicial foreclosure or by non-judicial sale or enforcement, the Lender may, at its sole option, determine which of such remedies or rights it may pursue without affecting any of such rights and remedies under this Guaranty. If, in the exercise of any of its rights and remedies, the Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Credit Party, whether because of any applicable laws pertaining to election of remedies or the like, the Guarantors hereby consent to such action by the Lender and waive any claim based upon such action, even if such action by the Lender shall result in a full or partial loss of any rights of subrogation which the Guarantors might otherwise have had but for such action by the Lender. Any election of remedies which results in the denial or impairment of the right of the Lender to seek a deficiency judgment against any Credit Party shall not impair each Guarantor's obligation to pay the full amount of the Obligations. In the event the Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, the Lender may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by the Lender but shall be credited against the Obligations. The amount of the successful bid at any such sale shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Guaranty, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which the Lender might otherwise be entitled but for such bidding at any such sale.

9.9    Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Obligations is rescinded or must otherwise be restored or returned, each Guarantor's obligations under this Agreement with respect to that payment shall be reinstated at such time as

though the payment had not been made.  If acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Lender.

9.10    Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Agreement, and agrees that the Lender shall not have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

9.11    Taxes.  All payments of the Obligations will be made by each Guarantor free and clear of and without deduction or withholding for any Taxes; provided that if any Guarantor shall be required to deduct or withhold any Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 9.11) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

9.12    Maximum Liability.  The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability").  This Section 9.12 with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Lender to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section 9.12 with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

9.13    Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article IX,

41

each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the indefeasible payment in full in cash of the Obligations.  This provision is for the benefit of the Lender and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

9.14    <u>Liability Cumulative</u>.  The liability of each Loan Party as a Guarantor under this Guaranty is in addition to and shall be cumulative with all liabilities of each Loan Party to the Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## 10.    SECURITY

10.1    <u>Security</u>.

(a)    To secure the prompt and complete payment, performance and observance of all of the Secured Obligations, in addition to other Collateral upon which a Lien is granted under the other Collateral Documents, each Credit Party hereby grants, collaterally assigns, conveys, mortgages, pledges, hypothecates and transfers to the Lender (subject to the Carve-Out and the Interim Order, or, to the extent entered, the Final Order) a first priority Lien in accordance with sections 364(c) and 364(d) of the Bankruptcy Code upon all of the following property now owned or at any time hereafter acquired by a Credit Party or in which such Credit Party now has or at any time in the future may acquire any right, title or interest:

(i)    all Accounts;

(ii)    all Chattel Paper;

(iii)    all Copyrights, Patents and Trademarks;

(iv)    all Documents;

(v)    all Fixtures;

(vi)    all General Intangibles (including Payment Intangibles and Software);

(vii)    all Goods, Inventory and Equipment, including personal property, whether tangible or intangible or wherever located;

(viii)    all Instruments;

(ix)    all Investment Property, including Securities Accounts;

(x)    all Real Property;

(xi)    the Commercial Tort Claims described on Disclosure Schedule 10.1;

(xii)    all Deposit Accounts of any Credit Party, including all Blocked Accounts, Concentration Accounts and all other bank accounts and all deposits therein;

(xiii)    all money, cash or cash equivalents of any Credit Party;

(xiv)    all Supporting Obligations and Letter of Credit Rights of any Credit Party;

(xv)    to the extent not otherwise included, all monies and other property of any kind which is, after the Petition Date, received by such Credit Party in connection with refunds with respect to taxes, assessments and governmental charges imposed on such Credit Party or any of its property or income;

(xvi)    to the extent not otherwise included, all causes of action including, for the avoidance of doubt, all claims and causes of action of the Credit Parties under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550, and 553 and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise, and all monies and other property of any kind received therefrom, and all monies and other property of any kind recovered by any Credit Party;

(xvii)    all property of any Credit Party held by the Lender, including all property of every description, in the possession or custody of or in transit to the Lender for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power; and

(xviii)    to the extent not otherwise included, all Proceeds of each of the foregoing, tort claims, insurance claims and other rights to payment not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing.

(b)    Collateral shall not include the Excluded Equity or any assets upon which security may not be lawfully granted provided that if and when any property shall cease to be Excluded Equity or when any such security may be lawfully granted, such property shall be deemed at all times from and after the date to constitute Collateral.

(c)     In addition, to secure the prompt and complete payment, performance and observance of the Obligations and in order to induce the Lender as aforesaid, each Credit Party hereby grants to the Lender a right of setoff against the cash or cash equivalents of such Credit Party held by the Lender, consisting of Collateral now or hereafter in the possession or custody of or in transit to the Lender, for any purpose, including safekeeping, collection or pledge, for the account of such Credit Party, or as to which such Credit Party may have any right or power. Upon the occurrence and during the continuation of an Event of Default, the Lender may exercise such right of setoff upon at least five (5) Business Days' prior written notice to the Credit Parties and the Committee (or the U.S. Trustee if no Committee has been appointed) (or upon such longer period of time or after delivering such other notices as may be required by the Interim Order or Final Order, as applicable).

(d)     To the extent a security interest hereunder would be created in any asset in which a security interest is created under any Loan Document, to the extent of conflict, the rights, remedies and obligations of the relevant Credit Party, the Lender with respect to such asset shall be governed by such Loan Document and not this Agreement.

10.2     Perfection of Security Interests.

(a)     At any time and from time to time until the Termination Date, upon the reasonable request of the Lender and at the sole expense of the Credit Parties, each Credit Party shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as the Lender may reasonably deem necessary to obtain the full benefits of any security interest granted or purported to be granted by such Credit Party hereunder and of the rights and powers herein granted, including (i) upon the reasonable request of the Lender using its commercially reasonable efforts to secure all consents and approvals necessary or appropriate for the assignment to or for the benefit of the Lender of any License or Contract held by such Credit Party and to enforce the security interests granted hereunder, (i) upon the request of the Lender, delivering to the Lender all Collateral consisting of negotiable Documents, certificated Securities, Chattel Paper and Instruments (in each case, accompanied by stock powers, alonges or other instruments of transfer executed in blank) promptly after such Credit Party receives the same, (i) obtaining (x) a blocked account or similar agreement with each bank or financial institution holding a Deposit Account for such Credit Party and (y) authenticated Control Letters from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities, in each case constituting Collateral, to or for any Credit Party; provided, that the Lender shall not deliver a notice that it is exercising exclusive control over any financial assets or commodities to any such issuer, securities intermediary or commodities intermediary unless an Event of Default has occurred and is continuing, (i) for each Credit Party that is or becomes the beneficiary of a letter of credit with a face amount in excess of $500,000, promptly, and in any event within two (2) Business Days after becoming a beneficiary (or such longer period of time as the Lender may agree to in its sole discretion), notifying the Lender thereof and thereafter, unless the related Letter-of-Credit Rights constitute a Supporting Obligation for which the Lender's security interest is perfected, using its commercially reasonable efforts to cause the issuer and/or confirmation bank with respect to such Letter-of-Credit Rights to enter into a tri-party agreement with the Lender assigning such Letter-of-Credit Rights to the Lender and directing all payments thereunder to a Blocked Account, all in form and substance reasonably

44

satisfactory to the Lender, (i) promptly, and in any event within five (5) Business Days after the same is acquired by it (or such longer period of time as may be agreed to by the Lender in its sole discretion), notifying the Lender of any Commercial Tort Claim involving a claim of more than $500,000 acquired by it and if requested by the Lender, entering into a supplement to this Agreement, granting to the Lender a Lien in such Commercial Tort Claim and (i) maintaining complete and accurate stock records.

(b)     Each Credit Party hereby irrevocably authorizes the Lender at any time and from time to time until the Termination Date to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as "all assets of such Credit Party" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Code in such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Credit Party is an organization, the type of organization and any organization identification number issued to such Credit Party, and (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Each Credit Party agrees to furnish any such information to the Lender promptly upon request. Each Credit Party also ratifies its authorization for the Lender to have filed in any Uniform Commercial Code jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(c)     Each Credit Party hereby irrevocably authorizes the Lender at any time and from time to time until the Termination Date to file any filings with the United States Patent and Trademark Office or United States Copyright Office (or any successor office or any similar office in any other country) or other documents in order to perfect the Lender's security interest in the Collateral.

(d)     Notwithstanding subsections (a) , (b) and (c) of this Section 10.2, or any failure on the part of any Credit Party or the Lender to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Order and the Final Order. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement, the Interim Order or the Final Order.

10.3    Rights of Lender; Limitations on Lender Obligations.

(a)     Subject to each Credit Party's rights and duties under the Bankruptcy Code (including section 365 of the Bankruptcy Code), it is expressly agreed by each Credit Party that, anything herein to the contrary notwithstanding, each such Credit Party shall remain liable under each of its Contracts and each of its Licenses to observe and perform all the conditions and obligations to be observed and performed by it thereunder, unless such Credit Party determines in its reasonable good faith judgment and in accordance with the terms of this Agreement that such Contract or License is no longer valuable or useful to such Credit Party's business, economically or otherwise with the Lender's prior consent. The Lender shall not have any obligation or liability under any Contract or License by reason of or arising out of this

45

Agreement or the granting herein of a Lien thereon or the receipt by the Lender of any payment relating to any Contract or License pursuant hereto. The Lender shall not be required or obligated in any manner to perform or fulfill any of the obligations of any Credit Party under or pursuant to any Contract or License, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract or License, or to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Subject to Section 10.5 hereof, the Lender authorizes each Credit Party to collect its Accounts, provided that such collection is performed in accordance with such Credit Party's customary procedures, and the Lender may, upon the occurrence and during the continuation of any Event of Default and upon prior or concurrent written notice to Borrower (in addition to any requirement of notice provided in the Interim Order (or the Final Order, when applicable)), limit or terminate said authority at any time.

(c)     The Lender may, at any time upon the occurrence and during the continuation of an Event of Default, notify Account Debtors and other Persons obligated on the Collateral that the Lender has a security interest therein, and that payments shall be made directly to the Lender. Subject to any requirement of notice provided in the Interim Order (or the Final Order, when applicable), upon the occurrence and during the continuation of an Event of Default and upon the reasonable request of the Lender, each Credit Party shall so notify Account Debtors and other Persons obligated on Collateral. Once any such notice has been given to any Account Debtor or other Person obligated on the Collateral and so long as an Event of Default remains outstanding, the affected Credit Party shall not give any contrary instructions to such Account Debtor or other Person without the Lender's prior written consent. Subject to any requirement of notice provided in the Interim Order (or the Final Order, when applicable), upon the occurrence and during the continuation of an Event of Default, the Lender may in its own name, or in the name of others, communicate with such parties to such Accounts, Contracts, Instruments, Investment Property and Chattel Paper to verify with such Persons to the Lender's reasonable satisfaction the existence, amount and terms of any such Accounts, Contracts, Instruments, Investment Property or Chattel Paper.

(d)     The Lender may, at any time upon the occurrence and during the continuation of an Event of Default, in the Lender's own name, in the name of a nominee of the Lender or in the name of any Credit Party communicate (by mail, telephone, facsimile or otherwise) with Account Debtors to verify with such Persons, to the Lender's satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts and/or payment intangibles comprising Collateral; provided that the Lender shall not do any of the foregoing except during normal business hours and after giving such Credit Party reasonable prior notice and opportunity to be present. If an Event of Default shall have occurred and be continuing, each Credit Party, at its own expense, shall prepare and deliver, or use commercially reasonable efforts to cause the independent certified public accountants then engaged by such Credit Party to prepare and deliver, to the Lender from time to time promptly upon the Lender's reasonable written request the following reports with respect to each Credit Party: (i) a reconciliation of all Accounts; (ii) an aging of all Accounts; (iii) trial balances; and (iv) a test verification of such Accounts as the Lender may request. The Lender may at any time upon the occurrence and during the

continuation of an Event of Default in the Lender's own name, in the name of a nominee of the Lender or in the name of any Credit Party communicate (by mail, telephone, facsimile or otherwise) with parties to Contracts and obligors in respect of Instruments to verify with such Persons, to the Lender's satisfaction, the existence, amount, terms of, and any other matter relating to, Instruments, Chattel Paper and/or payment intangibles comprising Collateral; provided that the Lender shall not do any of the foregoing except during normal business hours and after giving such Credit Party reasonable prior notice and opportunity to be present. Upon Lender's reasonable written request, each Credit Party, at its own expense, shall deliver to the Lender the results of each physical verification of a recent date, if any, which such Credit Party may in its discretion have made, or caused any other Person to have made on its behalf, of all or any portion of its Inventory.

10.4    <u>Covenants of the Credit Parties with Respect to Collateral</u>. Each Credit Party covenants and agrees with the Lender that from and after the date of this Agreement and until the Termination Date:

(a)    <u>Maintenance of Records</u>. Credit Parties shall keep and maintain, at their own cost and expense, satisfactory and complete records of the Collateral, including a record of any and all payments received and any and all credits granted with respect to the Collateral and all other dealings with the Collateral, in each case in a manner required under GAAP. Upon reasonable request by the Lender, Credit Parties shall mark their books and records pertaining to the Collateral to evidence this Agreement and the Liens granted hereby. If any Credit Party retains possession of any Chattel Paper or Instruments with the Lender's consent, such Chattel Paper and Instruments shall, if requested by the Lender, be marked with the following legend: This writing and the obligations evidenced or secured hereby are subject to the security interest of the Lender.

(b)    <u>Covenants Regarding Patent, Trademark and Copyright Collateral</u>.

(i)    Each Credit Party shall notify the Lender promptly if it knows or has reason to know that any application or registration relating to any material Patent, Trademark or Copyright (now or hereafter existing) may become abandoned or dedicated, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) regarding any Credit Party's ownership of any material Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same, except to the extent such Credit Party is otherwise permitted to dispose or allow for the lapse of such Intellectual Property under this Agreement.

(ii)    Concurrently with the delivery of the quarterly financial statements pursuant to clause (b) of <u>Annex D</u>, each Credit Party shall give the Lender written notice of any filings for an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office during the applicable fiscal quarter, and upon request of the Lender, the applicable Credit Party shall execute and deliver any and all Patent Security Agreements, Copyright Security Agreements or Trademark Security Agreements as the Lender may request to evidence the Lender's Lien on

such Patent, Trademark or Copyright, and the General Intangibles of such Credit Party relating thereto or represented thereby.

(iii)    Except to the extent otherwise consented to by the Lender, the Credit Parties shall take all actions necessary or reasonably requested by the Lender to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of the Patents, Trademarks and Copyrights (now or hereafter existing), including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings.

(iv)    In the event that any of the Patent, Trademark or Copyright Collateral is infringed upon, or misappropriated or diluted by a third party, such Credit Party shall comply with Section 10.2 of this Agreement. Such Credit Party shall, unless such Credit Party reasonably determines that such Patent, Trademark or Copyright Collateral is in not material or, with respect to Trademarks and Copyrights, useful to the conduct of its business or operations, sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as the Lender shall deem appropriate under the circumstances to protect such Patent, Trademark or Copyright Collateral.

(c)    Compliance with Terms of Accounts, etc. Each Credit Party will perform and comply in all material respects with all obligations in respect of the Collateral and all other agreements to which it is a party or by which it is bound relating to the Collateral.

(d)    Further Identification of Collateral. Subject to the limitations set forth herein or in any other Loan Document, the Credit Parties will, if so requested by the Lender, furnish to the Lender, as often as the Lender requests (but in any event, no more often than any times otherwise specified hereunder or under the Loan Documents), statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in such detail as the Lender may specify.

(e)    Notices. Credit Parties will advise the Lender promptly upon becoming aware thereof, in reasonable detail, (i) of any Lien or claim made or asserted against any of the Collateral other than in respect of Permitted Liens, and (ii) of the occurrence of any other event which has had a material adverse effect on the aggregate value of the Collateral or on the Liens created hereunder or under any other Loan Document.

(f)    [Reserved].

(g)    Terminations; Amendments Not Authorized. Except to the extent permitted by clause (h), each Credit Party acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement relating to the Collateral and filed pursuant to the terms hereof without the prior written consent of the Lender and agrees that it will not do so without the prior written consent of the Lender, subject to such Credit Party's rights under Section 9-509(d)(2) of the Code.

(h)    Authorized Terminations and Subordinations. The Lender will promptly deliver to each Credit Party, after a reasonable period of time following receipt of an officer's certificate

48

from such Credit Party, for filing or authorize each Credit Party to prepare and file termination statements and releases in respect of any sales, transfers, conveyances, assignments or other dispositions of Collateral made in accordance with <u>Section 6.8</u> of this Agreement; provided that such Credit Party shall represent and warrant in such officer's certificate that such sale, transfer, conveyance assignment or other disposition of Collateral was made in compliance with this Agreement or other Loan Document, as applicable. The Lender will, upon request of any Credit Party, and after a reasonable period of time following receipt of an officer's certificate from such Credit Party, expressly subordinate, in form and substance reasonably satisfactory to the Lender the Liens granted hereunder to any prior Lien permitted under <u>Section 6.7</u> of this Agreement; provided that such Credit Party shall represent and warrant in such officer's certificate that such prior Lien is permitted under <u>Section 6.7</u>.

(i)     [Reserved].

(j)     <u>Pledged Collateral</u>.

(i)     All certificates and all promissory notes and Instruments evidencing the Pledged Collateral shall be delivered to and held by or on behalf of the Lender pursuant hereto. All Pledged Shares shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender and all promissory notes or other instruments evidencing the Pledged Indebtedness shall be endorsed by the applicable Credit Party. In addition, the Lender shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations.

(ii)     No Credit Party will sell, assign, transfer, pledge, or otherwise encumber any of its rights in or to the Pledged Collateral, or any unpaid dividends, interest or other distributions or payments with respect to the Pledged Collateral or grant a Lien in the Pledged Collateral, unless otherwise expressly permitted by this Agreement or any other Loan Document;

(iii)     Subject to the limitations set forth herein or in any other Loan Document, each Credit Party will, at its expense, promptly execute, acknowledge and deliver all such instruments and take all such actions as the Lender from time to time may reasonably request in order to ensure to the Lender the benefits of the Liens in and to the Pledged Collateral intended to be created by this Agreement, including the filing of any necessary Code financing statements, which may be filed by the Lender with or (to the extent permitted by law) without the signature of Credit Party, and will cooperate with the Lender, at such Credit Party's expense, in obtaining all necessary approvals and making all necessary filings under federal, state, local or foreign law in connection with such Liens or any sale or transfer of the Pledged Collateral; <u>provided</u> that the Lender shall not, prior to the occurrence of any Event of Default, require any actions to be taken with respect to property the acquisition or construction of which was financed through Indebtedness (existing as of the Closing Date or as permitted by <u>Section 6.3(a)</u> of this Agreement);

(iv)     Each Credit Party will use commercially reasonable efforts to defend the title to the Pledged Collateral and the Liens of the Lender in the Pledged Collateral against the

claim of any Person (other than the holder of a Permitted Lien) and will maintain and preserve such Liens; and

(v)     Each Credit Party will, upon obtaining ownership of any additional Stock issued by an entity that has issued Pledged Shares or promissory notes or instruments representing Pledged Indebtedness or Stock or promissory notes or instruments otherwise required to be pledged to the Lender pursuant to any of the Loan Documents, which Stock, notes or instruments are not already Pledged Collateral, promptly (and in any event within ten (10) Business Days or such longer period as determined by Lender in its sole discretion) deliver to the Lender a Pledge Amendment, duly executed by such Credit Party, in form and substance reasonably acceptable to the Lender (a "Pledge Amendment") in respect of any such additional Stock, notes or instruments, pursuant to which such Credit Party shall pledge to the Lender all of such additional Stock, notes and instruments; provided, that such Credit Party shall be required to do the foregoing with respect to any such promissory note or instrument only if requested to do so by the Lender pursuant to Section 10.2(a)(ii) of this Agreement. Credit Party hereby authorizes the Lender to attach each Pledge Amendment to this Agreement and agrees that all Pledged Shares and Pledged Indebtedness listed on any Pledge Amendment delivered to the Lender shall for all purposes hereunder be considered Pledged Collateral. This clause (v) shall not apply to any Excluded Equity.

(vi)     At any time that an Event of Default has occurred and is then continuing, upon two Business Days prior written notice to the applicable Pledgor and subject to any requirement of notice provided in the Interim Order (or the Final Order, when applicable):

A.     All rights of the Pledgor to exercise voting and other consensual rights in respect of the Pledged Shares shall immediately cease and all such voting and other consensual rights shall become vested in the Pledgee, and the Pledgee shall thereupon have the sole right to exercise such voting and other consensual rights; provided, the voting and other consensual rights of the Pledgor in respect of the Pledged Shares shall automatically be restored in full upon the cure or waiver of all Events of Default then existing.  In order to effect the foregoing, the Pledgor hereby grants to the Pledgee an irrevocable proxy to vote the Pledged Shares and, any time that an Event of Default exists, the Pledgor agrees to execute such other proxies as the Pledgee may request; and

B.     All rights of the Pledgor to receive and retain any distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper or other property paid or payable with respect to any of the Pledged Shares (other than any of the foregoing permitted under Section 6.13) shall immediately cease and any such distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper or other property paid or payable with respect to any of the Pledged Shares shall be paid to the Pledgee (for application to the Obligations with respect to any cash or cash equivalents, or to be held by the Pledgee as additional security).  Any distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper or other property paid or payable with respect to any of the Pledged Shares and received by the Pledgor contrary to the provisions of this Agreement shall be received in trust for the

50

benefit of the Pledgee, shall be segregated from other assets (including, in the case of cash or cash equivalents, other funds) of Pledgor and shall be immediately delivered to the Pledgee (for application to the Obligations with respect to any cash or cash equivalents, or to be held by the Pledgee as additional security).

10.5    Performance by the Lender of the Credit Parties Obligations. If any Credit Party fails to perform or comply with any of its agreements contained herein and the Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of the Lender incurred in connection with such performance or compliance, together with interest thereon at the rate then in effect in respect of the Term Loans, shall be payable by such Credit Party to the Lender on demand and shall constitute Obligations secured by the Collateral. Performance of such Credit Party's obligations as permitted under this Section 10.5 shall in no way constitute a violation of the automatic stay provided by section 362 of the Bankruptcy Code and each Credit Party hereby waives applicability thereof. Moreover, the Lender shall in no way be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to section 506(c) of the Bankruptcy Code and the Collateral may not be charged for the incurrence of any such cost.

10.6    Limitation on the Lender's duty in Respect of Collateral. The Lender shall use reasonable care with respect to the Collateral in its possession or under its control. The Lender shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Lender or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

10.7    Remedies; Rights Upon Default.

(a)    In addition to all other rights and remedies granted to it under the other Loan Documents and under any other instrument or agreement securing, evidencing or relating to any of the Secured Obligations and subject to any notice requirements hereunder or under any other Loan Document or provided for in the Interim Order or Final Order, as applicable, if any Event of Default shall have occurred and be continuing, the Lender may exercise all rights and remedies of a secured party under the Code. Without limiting the generality of the foregoing, each Credit Party expressly agrees that in any such event the Lender, without demand of performance or other demand, advertisement or notice of any kind (except the notice required by the Interim Order (or the Final Order, when applicable) or the notice specified below of time and place of public or private sale or any other notice required hereunder or under any other Loan Document) to or upon such Credit Party or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code and other applicable law), may, to the maximum extent permitted by law, forthwith enter upon the premises of such Credit Party where any Collateral is located through self-help, without judicial process, without first obtaining a final judgment or giving such Credit Party or any other Person notice and opportunity for a hearing on the Lender's claim or action and may collect, receive, assemble, process, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, license, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at a public or private sale or sales, at any exchange at such prices as it may deem

acceptable, for cash or on credit or for future delivery without assumption of any credit risk. The Lender shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Credit Party hereby releases. Such sales may be adjourned and continued from time to time with or without notice. The Lender shall have the right to conduct such sales on any Credit Party's premises or elsewhere and shall have the right to use any Credit Party's premises without charge for such time or times as the Lender may deem necessary or advisable. EACH CREDIT PARTY HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE LENDER AS THE PROXY AND ATTORNEY-IN-FACT OF SUCH CREDIT PARTY WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING THE RIGHT TO VOTE THE PLEDGED SHARES, WITH FULL POWER OF SUBSTITUTION TO DO SO. THE APPOINTMENT OF THE LENDER AS PROXY AND ATTORNEY-IN-FACT IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE TERMINATION DATE. IN ADDITION TO THE RIGHT TO VOTE THE PLEDGED SHARES, THE APPOINTMENT OF THE LENDER AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED SHARES WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS). SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED SHARES ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF THE PLEDGED SHARES OR ANY OFFICER OR AGENT THEREOF, OTHER THAN ANY NOTICES REQUIRED HEREUNDER OR UNDER APPLICABLE LAW). NOTWITHSTANDING THE FOREGOING, THE LENDER SHALL NOT HAVE ANY DUTY TO EXERCISE ANY SUCH RIGHT OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO AND THE LENDER SHALL NOT EXERCISE SUCH PROXY OR POWER OF ATTORNEY-IN-FACT UNLESS AN EVENT OF DEFAULT HAS OCCURRED AND IS CONTINUING.

(b)      If any Event of Default shall have occurred and be continuing, each Credit Party further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at a place or places designated by the Lender which are reasonably convenient to the Lender and such Credit Party, whether at such Credit Party's premises or elsewhere. Until the Lender is able to effect a sale, lease, or other disposition of Collateral, the Lender shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Lender. The Lender shall have no obligation to any Credit Party to maintain or preserve the rights of Credit Party as against third parties with respect to Collateral while Collateral is in the possession of the Lender. The Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Lender's remedies, with respect to such appointment without prior notice or hearing as to such appointment. The Lender shall deposit the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale to a Blocked Account and such net proceeds shall be applied in accordance with Section 1.3. To the maximum extent permitted by applicable law, each Credit Party waives all claims, damages, and demands against the Lender arising out of the repossession, retention or sale of the

Collateral except such as arise solely out of the gross negligence or willful misconduct of the Lender as finally determined by a court of competent jurisdiction. Each Credit Party agrees that ten (10) days prior notice by the Lender of the time and place of any public sale or of the time after which a private sale may take place is reasonable notification of such matters. Credit Parties shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Secured Obligations, including any attorneys fees and other expenses incurred by the Lender to collect such deficiency.

(c)     Except as otherwise specifically provided herein, each Credit Party hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d)     To the extent that applicable law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, each Credit Party acknowledges and agrees that it is not commercially unreasonable for the Lender (i) to fail to incur expenses reasonably deemed significant by the Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as the Credit Parties, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral. Each Credit Party acknowledges that the purpose of this Section 10.7(d) is to provide non-exhaustive indications of what actions or omissions by the Lender would not be commercially unreasonable in the Lender's exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 10.7(d). Without limitation upon the foregoing, nothing contained in this Section 10.7(d) shall be construed to grant any rights to any Credit Party or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 10.7(d).

(e)     The Lender shall not be required to make any demand upon, or pursue or exhaust any of its rights or remedies against, any Credit Party, any other obligor, the Guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of its rights or remedies with respect to any Collateral therefore or any direct or indirect guarantee thereof. The Lender shall not be required to marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, and all of its and its rights hereunder or under any other Loan Document shall be cumulative. To the extent it may lawfully do so, each Credit Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.

(f)     Upon the occurrence of an Event of Default and during the continuation of such Event of Default (and subject to the notice requirements set forth in Section 10.4(j)(vi)), the Lender is hereby authorized and empowered to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations, to exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon, to sell in one or more sales after ten (10) days notice of the time and place of any public sale or of the time at which a private sale is to take place (which notice Credit Parties agree is commercially reasonable) the whole or any part of the Pledged Collateral and to otherwise act with respect to the Pledged Collateral as though the Lender was the outright owner thereof. Any sale shall be made at a public or private sale at the Lender's place of business, or at any place to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as the Lender may deem fair, and the Lender may be the purchaser of the whole or any part of the Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of such Credit Party or any right of redemption. Each sale shall be made to the highest bidder, but the Lender reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate. Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived and any sale hereunder may be conducted by an auctioneer or any officer or agent of the Lender.

(g)     If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Obligations, or if the Pledged Collateral has been offered for sale in lots, and if at any of such sales, the highest bid for the lot offered for sale would indicate to the Lender, in its discretion, that the proceeds of the sales of the whole of the Pledged Collateral would be unlikely to be sufficient to discharge all the Secured Obligations, the Lender may, on one or more occasions and in its sole discretion, postpone effectuating any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived.

(h)    If, at any time when the Lender in its sole discretion determines, following the occurrence and during the continuance of an Event of Default, that, in connection with any actual or contemplated exercise of its rights, when permitted under this Section (h) to sell the whole or any part of the Pledged Shares hereunder, it is necessary or advisable to effect a public registration of all or part of the Pledged Collateral pursuant to the Securities Act of 1933, as amended (or any similar statute then in effect) (the "Act" ), such Credit Party shall, in an expeditious manner, cause the issuers of Pledged Collateral to:

(i)    Prepare and file with the Commission a registration statement with respect to the Pledged Shares and in good faith use commercially reasonable efforts to cause such registration statement to become and remain effective;

(ii)    Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Act with respect to the sale or other disposition of the Pledged Shares covered by such registration statement whenever the Lender shall desire to sell or otherwise dispose of the Pledged Shares;

(iii)    Furnish to the Lender such numbers of copies of a prospectus and a preliminary prospectus, in conformity with the requirements of the Act, and such other documents as the Lender may request in order to facilitate the public sale or other disposition of the Pledged Shares by the Lender;

(iv)    Use commercially reasonable efforts to register or qualify the Pledged Shares covered by such registration statement under such other securities or blue sky laws of such jurisdictions within the United States and Puerto Rico as the Lender shall request, and do such other reasonable acts and things as may be required of it to enable the Lender to consummate the public sale or other disposition in such jurisdictions of the Pledged Shares by the Lender;

(v)    Furnish, at the request of the Lender, on the date that shares of the Pledged Collateral are delivered to the underwriters for sale pursuant to such registration or, if the security is not being sold through underwriters, on the date that the registration statement with respect to such Pledged Shares becomes effective, (A) an opinion, dated such date, of the independent counsel representing such registrant for the purposes of such registration, addressed to the underwriters, if any, and in the event the Pledged Shares are not being sold through underwriters, then to the Lender, in customary form and covering matters of the type customarily covered in such legal opinions; and (B) a comfort letter, dated such date, from the independent certified public accountants of such registrant, addressed to the underwriters, if any, and in the event the Pledged Shares are not being sold through underwriters, then to the Lender, in a customary form and covering matters of the type customarily covered by such comfort letters and as the underwriters or the Lender shall reasonably request. The opinion of counsel referred to above shall additionally cover such other legal matters with respect to the registration in respect of which such opinion is being given as the Lender may reasonably request. The letter referred to above from the independent certified public accountants shall additionally cover such other financial matters (including information as to the period ending

not more than five (5) Business Days prior to the date of such letter) with respect to the registration in respect of which such letter is being given as the Lender may reasonably request; and

(vi)    Otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable but not later than 18 months after the effective date of the registration statement, an earnings statement covering the period of at least 12 months beginning with the first full month after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Act.

(i)    All expenses incurred in complying with Section 10.7 hereof, including, without limitation, all registration and filing fees (including all expenses incident to filing with the National Association of Securities Dealers, Inc.), printing expenses, fees and disbursements of counsel for the registrant, the fees and expenses of counsel for the Lender, expenses of the independent certified public accountants (including any special audits incident to or required by any such registration) and expenses of complying with the securities or blue sky laws or any jurisdictions, shall be paid by Credit Parties.

(j)    If, at any time when the Lender shall determine to exercise its right to sell the whole or any part of the Pledged Collateral hereunder, such Pledged Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Act, the Lender may, in its discretion (subject only to applicable requirements of law), sell such Pledged Collateral or part thereof by private sale in such manner and under such circumstances as the Lender may deem necessary or advisable, but subject to the other requirements of this Section 10.7, and shall not be required to effect such registration or to cause the same to be effected. Without limiting the generality of the foregoing, in any such event, the Lender in its discretion (i) may, in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Pledged Collateral or part thereof could be or shall have been filed under said Act (or similar statute), (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who is an accredited investor under the Act and who will represent and agree that such purchaser is purchasing for its own account, for investment and not with a view to the distribution or sale of such Pledged Collateral or any part thereof. In addition to a private sale as provided above in this Section 10.7, if any of the Pledged Collateral shall not be freely distributable to the public without registration under the Act (or similar statute) at the time of any proposed sale pursuant to this Section 10.7, then the Lender shall not be required to effect such registration or cause the same to be effected but, in its discretion (subject only to applicable requirements of law), may require that any sale hereunder (including a sale at auction) be conducted subject to restrictions:

(i)    as to the financial sophistication and ability of any Person permitted to bid or purchase at any such sale;

(ii)    as to the content of legends to be placed upon any certificates representing the Pledged Collateral sold in such sale, including restrictions on future transfer thereof;

    (iii) as to the representations required to be made by each Person bidding or purchasing at such sale relating to that Person's access to financial information about such Credit Party and such Person's intentions as to the holding of the Pledged Collateral so sold for investment for its own account and not with a view to the distribution thereof; and

    (iv) as to such other matters as the Lender may, in its discretion, reasonably deem necessary or appropriate in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy Code and other laws affecting the enforcement of creditors rights and the Act and all applicable state securities laws.

    (k) Each Credit Party recognizes that the Lender may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof in accordance with clause (j) above. Each Credit Party also acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private. The Lender shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the issuer of any Pledged Shares to register such securities for public sale under the Act, or under applicable state securities laws, even if such Credit Party and such issuer would agree to do so.

    (l) Each Credit Party agrees to the maximum extent permitted by applicable law that following the occurrence and during the continuance of an Event of Default it will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Agreement, or the absolute sale of the whole or any part of the Pledged Collateral or the possession thereof by any purchaser at any sale hereunder, and each Credit Party waives the benefit of all such laws to the extent it lawfully may do so. Each Credit Party agrees that it will not interfere with any right, power and remedy of the Lender provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Lender of any one or more of such rights, powers or remedies. No failure or delay on the part of the Lender to exercise any such right, power or remedy and no notice or demand which may be given to or made upon Credit Parties by the Lender with respect to any such remedies shall operate as a waiver thereof, or limit or impair the Lender's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against any Credit Party in any respect.

    (m) Each Credit Party further agrees that a breach of any of the covenants contained in this Section 10.7 will cause irreparable injury to the Lender, that the Lender shall have no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section 10.7 shall be specifically enforceable against the Credit Parties, and each Credit Party hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that the Secured Obligations are not then due and payable in accordance with the agreements and instruments governing and evidencing such Obligations.

(n)     To the extent that any rights and remedies under this <u>Section 10.7</u> would otherwise be in violation of the automatic stay of section 362 of the Bankruptcy Code, to the extent provided for in the Interim Order or Final Order, as applicable, and permitted by applicable law, such stay shall be deemed modified, as set forth in the Interim Order (or the Final Order, when applicable), to the extent necessary to permit the Lender to exercise such rights and remedies.

10.8    <u>The Lender's Appointment as Attorney-in-Fact</u>.

(a)     On the Closing Date each Credit Party shall execute and deliver to the Lender a power of attorney (the "<u>Power of Attorney</u>") substantially in the form attached hereto as <u>Exhibit 10.8</u>. The power of attorney granted pursuant to the Power of Attorney is a power coupled with an interest and shall be irrevocable until the Termination Date. The powers conferred on the Lender under the Power of Attorney are solely to protect the Lender's interests in the Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender agrees that it shall account for any moneys received by the Lender in respect of any foreclosure on or disposition of Collateral pursuant to the Power of Attorney; <u>provided</u>, that the Lender shall not have any duty as to any Collateral, and the Lender shall be accountable only for amounts that they actually receive as a result of the exercise of such powers and that the Lender shall not exercise such powers unless an Event of Default has occurred and is continuing. THE LENDER AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL NOT BE RESPONSIBLE TO ANY CREDIT PARTY FOR ANY ACT OR FAILURE TO ACT UNDER ANY POWER OF ATTORNEY OR OTHERWISE, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION, NOR FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

(b)     The Credit Parties hereby ratify, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. [Exercise by the Lender of the powers granted hereunder is not a violation of the automatic stay provided by section 362 of the Bankruptcy Code and each Credit Party waives applicability thereof]. The power of attorney granted pursuant to this <u>Section 10.8</u> is a power coupled with an interest and shall be irrevocable until the Obligations are paid in full in cash.

(c)     The powers conferred on the Lender hereunder are solely to protect the Lender's interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers.

(d)     Each Credit Party also authorizes the Lender, at any time and from time to time upon the occurrence and during the continuation of any Event of Default or as otherwise expressly permitted by this Agreement, (i) to communicate in its own name or the name of its Subsidiaries with any party to any Contract with regard to the assignment of the right, title and interest of such Credit Party in and under the Contracts hereunder and other matters relating thereto and (ii) to execute any endorsements, assignments or other instruments of conveyance or

transfer with respect to the Collateral (subject to any notice requirements hereunder or under any other Loan Document or as required by the Interim Order or Final Order, as applicable).

(e)    All Obligations shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, claims against the Borrower and each Credit Party in their respective Cases which are administrative expense claims having priority over any all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

10.9    Modifications.

(a)    The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Interim Order and, to the extent entered, the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any of the Credit Parties (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except for the Carve-Out having priority over the Obligations, no costs or expenses of administration which have been or may be incurred in any of the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Credit Parties in respect of any Obligation;

(ii)    the Liens and security interests granted herein shall constitute valid and perfected Liens on and security interests (having the priority provided for herein and in the Interim Order and the Final Order); in all right, title and interest in the Collateral; and

(iii)    the Liens and security interests granted hereunder shall continue valid and perfected without the necessity that financing statements be filed or that any other action be taken under applicable nonbankruptcy law.

(b)    Notwithstanding any failure on the part of any Credit Party or the Lender to perfect, maintain, protect or enforce the liens and security interests in the Collateral granted hereunder, the Interim Order and the Final Order (when entered) shall automatically, and without further action by any Person, perfect such Liens and security interests against the Collateral.

## 11.    ASSIGNMENT AND PARTICIPATIONS

11.1    Assignment and Participations.

(a)    Right to Assign. The Lender may sell, transfer, negotiate or assign (an "Assignment") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Term Loans) with the Borrower's (so long as no Event of Default is continuing) reasonable approval, such approval not to be unreasonably withheld, delayed or conditioned.

(b)  Grant of Security Interests. In addition to the other rights provided in this Section 11.1, the Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Term Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board) or (B) any holder of, or trustee for the benefit of the holders of, the Lender's Securities or any debt obligations; provided, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of the Lender hereunder and the Lender shall not be relieved of any of its obligations hereunder.

(c)  Participants.  If the Lender sells a participation, the Lender shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Term Loans or other obligations under the Loan Documents (the "Participant Register"); provided that the Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

11.2  The Lender's Reliance, Etc. None of the Lender or any of its Affiliates or any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for damages caused by its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, the Lender: (a) may treat the payee of any Note as the holder thereof until the Lender receives written notice of the assignment or transfer thereof signed by such payee and in form reasonably satisfactory to the Lender; (b) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts; (c) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Credit Party or to inspect the Collateral (including the Books and Records to the extent not prohibited by a confidentiality agreement in favor of a third party) of any Credit Party; and (d) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopy, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

11.3  Setoff .  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, the Lender is hereby authorized upon the occurrence and during the continuance of any Event of Default, at any time or from time to time, without prior notice to any Credit Party or to any Person, any such notice being hereby expressly

waived, to offset and to appropriate and to apply any and all balances held by the Lender at any of its offices for the account of the Borrower or any Guarantor (regardless of whether such balances are then due to the Borrower or any Guarantor) and any other properties or assets at any time held or owing by the Lender or that holder to or for the credit or for the account of the Borrower or any Guarantor against and on account of any of the Obligations that are not paid when due; provided, that the Lender exercising such offset rights shall not be required to give notice thereof to the affected Credit Party, except as otherwise required by the Interim Order (or the Final Order, when applicable), promptly after exercising such rights.

## 12.   SUCCESSORS AND ASSIGNS

12.1   <u>Successors and Assigns</u>.  This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of each Credit Party, the Lender and its successors and assigns (including, in the case of any Credit Party, a debtor-in-possession on behalf of such Credit Party), except as otherwise provided herein or therein. No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Lender. Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of the Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, the Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## 13.   MISCELLANEOUS

13.1   <u>Complete Agreement; Modification of Agreement</u>.  The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in <u>Section 13.2</u>. Any fee letter or confidentiality agreement, if any, between any Credit Party and the Lender or any of their respective Affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

13.2   <u>Amendments and Waivers</u>.

(a)      Except as otherwise expressly provided in this Agreement, the Lender, on the one hand, and the Borrower, on the other hand, may from time to time enter into written amendments, supplements or modifications for the purpose of adding, deleting or modifying any provision of any Loan Document or changing in any manner the rights, remedies, obligations and duties of the parties thereto, and the Lender may execute and deliver a written instrument waiving, on such terms and conditions as may be specified in such instrument, any of the requirements applicable to the Credit Parties, as the case may be, party to any Loan Document, or any Default or Event of Default and its consequences.

(b)      Upon the Termination Date, to the extent reasonably requested by the Borrower, the Lender shall promptly deliver to the Borrower termination statements, mortgage releases,

reconveyances and other documents necessary to evidence the termination of the Liens securing payment and performance of the Obligations.

13.3    <u>Costs and Expenses</u>.  The Borrower shall reimburse the Lender for all fees, and reasonable and documented out-of-pocket costs and expenses incurred in connection with the negotiation, preparation and filing and/or recordation of the Loan Documents and incurred in connection with:

(a)    any amendment, modification or waiver of, or consent with respect to, or termination of, any of the Loan Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(b)    [reserved];

(c)    any attempt to enforce any remedies of the Lender against any or all of the Credit Parties or any other Person that may be obligated to the Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(d)    any workout or restructuring of the Term Loans; and

(e)    efforts to (i) monitor the Term Loans or any of the other Obligations, (ii) evaluate, observe or assess any of the Credit Parties or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral, in each case pursuant to and in accordance with the terms of the Loan Documents;

including, as to each of <u>clauses (a)</u> through (e) above, the fees of a single counsel (and any special or local counsel) and a single advisor for the Lender arising from such services and other advice, assistance or other representation, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this <u>Section 13.3</u>, all of which shall be payable, on demand, by the Borrower to the Lender. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; charges for any E-System; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

13.4    <u>No Waiver</u>.  The Lender's failure, at any time or times, to require strict performance by the Credit Parties of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of the Lender thereafter to demand strict compliance and performance herewith or therewith. Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type. Subject to the provisions of <u>Section 13.2</u>, none of the undertakings, agreements, warranties, covenants and representations of any Credit Party contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by any Credit Party shall be deemed to have been suspended or

waived by the Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of the Lender and directed to the Borrower specifying such suspension or waiver.

13.5    Remedies.  The Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that the Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

13.6    Severability.  Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

13.7    Conflict of Terms.  Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, (i) if any provision contained in this Agreement or any of the other Loan Documents conflicts with the Interim Order or, to the extent entered, the Final Order, the provision contained in the Interim Order or, to the extent entered, the Final Order shall govern and control and (ii) if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

13.8    Confidentiality.  The Lender agrees to use commercially reasonable efforts (equivalent to the efforts the Lender applies to maintain the confidentiality of its own confidential information) to maintain as confidential all confidential information provided to the Lender by the Credit Parties, except that the Lender may disclose such information (a) to Persons employed or engaged by the Lender; (b) to any bona fide assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 13.8 (and any such bona fide assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (c) as required or requested by any Governmental Authority or reasonably believed by the Lender to be compelled by any court decree, subpoena or legal or administrative order or process (in which case, you agree to provide Borrower with prior notice thereof, except to the extent prohibited by law); (d) as is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any Litigation to which the Lender is a party; (f) that ceases to be confidential through no fault of the Lender; (g) to its affiliates and its and their directors, officers, employees, advisors, representatives or agents that has agreed to comply with the covenant contained in this Section 13.8, and (h) to ratings agencies.

13.9    GOVERNING LAW.  **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND**

**PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. EACH CREDIT PARTY HEREBY CONSENTS AND AGREES TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT; <u>PROVIDED</u>, THAT IF THE BANKRUPTCY COURT DECLINES TO EXERCISE JURISDICTION, THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, CITY OF NEW YORK, NEW YORK SHALL HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES AND THE LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; <u>PROVIDED</u>, <u>FURTHER</u> THAT THE LENDER AND THE CREDIT PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF NEW YORK COUNTY AND; <u>PROVIDED</u>, <u>FURTHER</u> THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER. EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH CREDIT PARTY HEREBY WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY OBJECTION THAT SUCH CREDIT PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR <u>FORUM NON CONVENIENS</u> AND HEREBY CONSENTS, TO THE EXTENT PERMITTED BY LAW, TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH CREDIT PARTY HEREBY WAIVES, TO THE EXTENT PERMITTED BY LAW, PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH CREDIT PARTY AT THE ADDRESS SET FORTH IN <u>ANNEX H</u>  OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL, TO THE EXTENT PERMITTED BY LAW, BE DEEMED COMPLETED UPON THE EARLIER OF SUCH CREDIT PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE UNITED STATES MAILS, PROPER POSTAGE PREPAID.**

13.10  <u>Notices</u>.

(a)      Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (i) upon the earlier of actual receipt and three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) upon transmission, when sent by telecopy or other similar facsimile transmission

(with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section 13.10); (iii) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid or (iv) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in Annex H or to such other address (or facsimile number) as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than the Borrower or the Lender) designated in Annex H to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

(b)    Subject to the provisions of Section 13.10(a), each of the Lender, the Borrower, and their authorized agents is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein; provided, that notices to any Credit Party shall not be made by any posting to an Internet or extranet based site or other equivalent service but may be made by e-mail or E-fax, if available, so long as such notices are also sent in accordance with Section 13.10(a). Each Credit Party and the Lender hereby acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(c)    Subject to the provisions of Section 13.10(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a signature and (C) each such posting shall be deemed sufficient to satisfy any requirement for a writing, in each case including pursuant to any Loan Document, any applicable provision of any Uniform Commercial Code, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which the Lender and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(d)    All uses of an E-System shall be governed by and subject to, in addition to this Section 13.10, separate terms and conditions posted or referenced in such E-System and related contractual obligations executed by the Lender and the Credit Parties in connection with the use of such E-System.

(e)    ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED <u>AS IS</u> AND <u>AS AVAILABLE</u>. NONE OF THE LENDER OR ANY OF ITS AFFILIATES WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN. NO WARRANTY OF ANY KIND IS MADE BY THE LENDER OR ANY OF ITS AFFILIATES IN CONNECTION WITH ANY E SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS. The Credit Parties agree (and the Borrower shall cause each other Credit Party to agree) that the Lender has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

13.11    <u>Section Titles</u>.  The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

13.12    <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.  Any counterpart delivered via facsimile or other electronic transmission shall be deemed to be an original signature hereto.

13.13    <u>WAIVER OF JURY TRIAL</u>.  **BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE LENDER AND ANY CREDIT PARTY ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.**

13.14    <u>Press Releases and Related Matters</u>.  Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Lender or its Affiliates or referring to this Agreement, the other Loan Documents without at least two (2) Business Days prior notice to the Lender, and without the prior written consent of the Lender, unless (and only to the extent that) such Credit Party or Affiliate is required to do so under law and then, in any event, such Credit Party or Affiliate will consult, to the extent permitted by law, with the Lender before issuing such press release or other public disclosure.

13.15   [Reserved].

13.16   <u>Advice of Counsel</u>.  Each of the parties represents to each other party hereto that it has discussed this Agreement and, specifically, the provisions of <u>Sections 13.9</u> and <u>13.13</u>, with its counsel.

13.17   <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONEXANT SYSTEMS, INC.**, as the Borrower

By: _____
Name: _____
Title: _____

**QP SFM CAPITAL HOLDINGS LTD.**, as the Lender


By: _____

Name: _____

Title: _____

The following Persons are signatories to this Agreement in their capacity as Credit Parties and not as Borrower:

**BROOKTREE BROADBAND HOLDING, INC.**


By: _____
Name:_____
Title: _____


**CONEXANT SYSTEMS WORLDWIDE, INC.**


By: _____
Name:_____
Title: _____


**CONEXANT, INC.**


By: _____
Name:_____
Title: _____


**CONEXANT CF, LLC**


By: _____
Name:_____
Title: _____

**ANNEX A (Recitals)**
**to**
**CREDIT AGREEMENT**

**DEFINITIONS**

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"363 Sale" has the meaning ascribed to it in the Restructuring Support Agreement.

"363 Sale Amendment" has the meaning ascribed to it in Section 1.14.

"363 Triggering Event" has the meaning ascribed to it in the Restructuring Support Agreement.

"Account Debtor" means any Person who may become obligated to any Credit Party under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a payment intangible).

"Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board (the "FASB"), the Emerging Issues Task Force ("EITF") of the FASB or, if applicable, the SEC.

"Accounts" means all accounts, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments), (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of each Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all Healthcare Insurance Receivables (as such term is defined in the Code), and (e) all collateral security of any kind, now or hereafter in existence, given by any Account Debtor or other Person with respect to any of the foregoing.

"Adequate Protection Obligations" shall have the meaning set forth in the Interim Order or if the Final Order has been entered, the Final Order.

"Adjusted LIBOR" means a rate per annum equal to the greater of (a) 1.00% per annum and (b) the offered rate for deposits in Dollars for a period of three months as determined by the Lender from the Reuters Screen LIBOR01 Page as of approximately 11:00 a.m., New York, New York time, on the first day of each Interest Period, or if such day is not a Business Day, then on the first Business Day in the applicable Fiscal Month in which such Interest Period commences (to be applicable for each day in such Interest Period), or the rate for such deposits reasonably

determined by the Lender at such time based on such other published service of general application as shall be selected by the Lender for such purpose; provided, that if the LIBOR Rate is not determinable in the foregoing manner, the Lender may determine the rate based on rates offered to the Lender for deposits in Dollars in the interbank eurodollar market at such time for delivery on the first day of the Interest Period for the number of days comprised therein.  If the Board of Governors of the Federal Reserve System (or any successor) prescribes a reserve percentage (the "Reserve Percentage") for "Eurocurrency liabilities" (as defined in Regulation D of the Federal Reserve Board, as amended), then the above definition of LIBOR Rate shall be the "Base LIBOR Rate", and "LIBOR Rate" shall mean:  Base LIBOR Rate divided by (100% minus LIBOR Reserve Percentage).  Each determination by the Lender of the applicable LIBOR Rate shall be conclusive and binding upon the parties hereto, in the absence of demonstrable error.

"Affiliate" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 10% or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, and (c) each of such Person's beneficial owner and partners who are Affiliates under clause (a) hereof. For the purposes of this definition, control of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, that the term Affiliate, when used with reference to a Credit Party, shall specifically exclude the Lender.

"Aggregate Cash On Hand" means the amount of cash and Cash Equivalents of the Credit Parties that may be classified, in accordance with GAAP, as unrestricted on the consolidated balance sheets of the Borrower.

"Appendices" has the meaning ascribed to it in the recitals to the Agreement.

"Appraisers" shall mean any appraiser reasonably acceptable to the Lender.

"Asset Sale" has the meaning ascribed to it in Section 6.8.

"Assignment" has the meaning ascribed to it in Section 11.1(a).

"Assignment Agreement" means the agreement, in a form reasonably acceptable to the Lender, by which an Assignment shall be made.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" has the meaning ascribed to it in the Preamble or shall mean any other court having competent jurisdiction over the Cases.

"Blocked Account" means any account of any Credit Party that is subject to a Blocked Account Agreement or a Control Letter pursuant to Annex B.

"Blocked Account Agreement" means a control agreement, in form and substance reasonably satisfactory to the Lender, among any Credit Party, the Lender and the applicable bank or financial institution.

"Books and Records" means books and records of the Credit Parties, including financial, corporate, operations and sales books, records, books of account, sales and purchase records, lists of suppliers and customers, formulae, business reports, plans and projections and all other documents, logs, surveys, plans, files, records, assessments, correspondence, and other data and information, financial or otherwise, and all log books and other documents and records, including all data and information stored on computer-related or other electronic media.

"Borrower" has the meaning ascribed thereto in the preamble to the Agreement.

"Borrowing Date" shall mean any Business Day specified by the Borrower as a date on which the Borrower requests the Lender to make Term Loans hereunder.

"Budget" means the Initial Budget and, as delivered thereafter in accordance with section (e) of Annex D, the applicable updated 13-week Budget, which updates shall be acceptable to the Lender in its sole discretion. Notwithstanding anything to the contrary contained herein, the Lender's approval of the Budget is given solely in its capacity as the Lender hereunder, and such approval does not constitute approval of the Budget for any other purpose, including without limitation, any other contractual arrangement between the Lender and the Credit Parties.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person; provided, that for purposes of this Agreement, GAAP will be deemed to treat operating leases and capital leases in a manner consistent with their current treatment under generally accepted accounting principles as in effect on the Closing Date, notwithstanding any modifications or interpretive changes thereto that may occur hereafter.

"Carve-Out" shall have the meaning set forth in the Interim Order or if the Final Order has been entered, the Final Order.

"Cases" has the meaning ascribed to it in the Preamble.

"Cash Equivalents" means Permitted Investments.

"Cash Management Order" means Interim Order Authorizing (i) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process Related Checks and Transactions, entered on [___], 2013 Docket No. [__] and any final order entered into in connection therewith.

"Cash Management Systems" has the meaning ascribed to it in Section 1.7.

"Change of Control" shall mean (i) after the Closing Date, the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Commission thereunder as in effect on the date hereof), of shares representing ordinary voting power represented by the issued and outstanding capital stock of the Borrower and (ii) the occupation of a majority of the seats (other than vacant seats) on the board of directors of a Person by Persons who were neither (A) nominated or appointed by the board of directors of the Person nor (B) appointed by directors so nominated or appointed.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.).

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes owed to the PBGC at the time due and payable), levies, assessments, charges, liens, claims or encumbrances (including interest and penalties relating thereto) upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Credit Party, (d) any Credit Party's ownership or use of any properties or other assets, or (e) any other aspect of any Credit Party's business.

"Chattel Paper" means any chattel paper, as such term is defined in the Code, including Electronic Chattel Paper, now owned or hereafter acquired by any Credit Party, wherever located.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing Checklist" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with the Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached hereto as Annex C.

"Closing Date" has the meaning ascribed to it in Section 2.1.

"Code" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided, further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term Code shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" means all property and interests in property and proceeds thereof now owned or hereafter acquired by any Credit Party in or upon which a Lien is granted under this Agreement or any Collateral Documents.

"Collateral Documents" means this Agreement, the Interim Order, the Final Order, any Copyright Security Agreement, any Patent Security Agreement, any Trademark Security Agreement, any Blocked Account Agreement and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations.

"Collateral Reports" means the reports with respect to the Collateral referred to in Annex E.

"Collection Account" means that certain account of the Lender as may be specified in writing by the Lender as the Collection Account.

"Commercial Tort Claims" means any commercial tort claim, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"Commission" means the Securities and Exchange Commission.

"Commitments" means the Commitments set forth on Annex I to this Agreement, as such Commitments may be reduced, amortized or adjusted from time to time in accordance with this Agreement.

"Committee" means the official statutory committee of unsecured creditors approved in the Cases pursuant to section 1102 of the Bankruptcy Code.

"Commodities Account" shall have the meaning ascribed to it in the Code.

"Concentration Account" has the meaning ascribed to it in Section (c) of Annex B.

"Consenting Secured Lender" has the meaning ascribed to it in the Restructuring Support Agreement.

"Contracts" means all contracts, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, in any event, including all contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which any Credit Party may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"Control Letter" means a letter agreement, in form and substance reasonably satisfactory to the Lender, between the Lender and (i) the issuer of uncertificated securities with respect to uncertificated securities in the name of any Credit Party, (ii) a securities intermediary with respect to securities, whether certificated or uncertificated, securities entitlements and other financial assets held in a securities account in the name of any Credit Party, (iii) a futures commission merchant or clearinghouse, as applicable, with respect to commodity accounts and commodity contracts held by any Credit Party, whereby, among other things, the issuer,

securities intermediary or futures commission merchant limits any security interest in the applicable financial assets in a manner satisfactory to the Lender, acknowledges the Lien of the Lender on such financial assets, and agrees to follow the instructions or entitlement orders of the Lender without further consent by the affected Credit Party.

"Copyright" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency under United States, any State or territory thereof, Canadian, multinational or foreign laws or otherwise, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"Copyright License" means any and all rights now owned or hereafter acquired by any Credit Party under any written agreement granting any right to use any Copyright or Copyright registration.

"Copyright Security Agreements" means the Copyright Security Agreements made in favor of the Lender by each applicable Credit Party in form and substance acceptable o the Lender.

"Credit Parties" means the Borrower and each of the Guarantors.

"Default" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning ascribed to it in Section 1.6(d).

"Deposit Accounts" means all deposit accounts as such term is defined in the Code, now or hereafter held in the name of any Credit Party.

"DIP Motion" has the meaning ascribed to it in Section 2.1(b).

"Documents" means any documents, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"Dollars" or "$" means lawful currency of the United States of America.

"Domestic Subsidiary" means a Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States of America.

"E-Fax" means any system used to receive or transmit faxes electronically.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system, including Intralinks® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender, any of its Affiliates or any other Person, providing for access to data protected by passcodes or other security system.

"Electronic Chattel Paper" means any electronic chattel paper, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"Electronic Transmission" means each notice, request, instruction, demand, report, authorization, agreement, document, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail, E-Fax, Internet or extranet based site or any other equivalent electronic service, whether owned, operated or hosted by the Lender, any Affiliate of the Lender or any other Person.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include CERCLA; the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" means all equipment as such term is defined in the Code.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, any regulations promulgated thereunder or any successor statute.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Credit Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means, with respect to any Credit Party or any ERISA Affiliate, (a) any reportable event described in Section 4043 of ERISA with respect to a Title IV Plan (other than a reportable event to which the 30-day notice is waived; (b) the withdrawal of any Credit Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) the failure by any Credit Party or ERISA Affiliate to make when due required contributions to a Multiemployer Plan or Title IV Plan unless such failure is cured within thirty (30) days; (g) any other event or condition that would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (h) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; or (i) the loss of a Qualified Plan's qualification or tax exempt status.

"Event of Default" has the meaning ascribed to it in Section 8.1.

"Excluded Account" means any of the following: (i) any collateral account permitted under Section 6.7 hereof; (ii) any imprest account solely to fund health-related claims; (iii) the investment accounts, which, in the aggregate, hold cash, Cash Equivalents or Permitted Investments with Fair Market Value of not more than $100,000 at any time; (iv) any payroll, tax, trust or similar fiduciary account, (v) any other deposit account, in which, when aggregated with any other deposit account that does not constitute a Blocked Account (other than the deposit accounts described in clauses (i) through (iv) herein) not more than $100,000 is maintained at any time.

"Excluded Equity" means any Voting Stock in excess of 65% of the total outstanding Voting Stock of any Foreign Subsidiary of any Credit Party. For purposes of this definition, "Voting Stock" means, as to any issuer, the issued and outstanding shares of each class of capital stock or other membership interests of such issuer entitled to vote (within the meaning of Treasury Regulations § 1.956-2(c)(2)).

"Excluded Obligations" means contingent indemnification and expense reimbursement obligations not yet due and owing or for which no demand has been made.

"<u>Excluded Taxes</u>" means, with respect to the Lender, (a) income or franchise taxes imposed on (or measured by) its net income (i) by any Governmental Authority or other authority, by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located, or in which its Funding Office is located or (ii) as a result of a present or former connection between such person and the jurisdiction imposing such tax (other than connections solely arising from such person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned any interest in any Term Loan or Loan Document), (b) any branch profits taxes imposed (i) by any Governmental Authority or any similar tax imposed by any other jurisdiction in which the Borrower is located or (ii) as a result of a present or former connection between such person and the jurisdiction imposing such tax (other than connections solely arising from such person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold assigned an interest in any Loan or Loan Document), (c) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 1.13(e), (d) U.S. backup withholding tax and (e) any taxes imposed under FATCA.

"<u>Existing Liens</u>" has the meaning ascribed to it in <u>Section 3.18(b)(iii)</u>.

"<u>Fair Market Value</u>" means (a) with respect to any asset or group of assets (other than a marketable Security) at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Chief Financial Officer or Treasurer and (b) with respect to any marketable Security at any date, the closing sale price of such Security on the Business Day next preceding such date, as appearing in any published list of any national securities exchange or the NASDAQ Stock Market or, if there is no such closing sale price of such Security, the final price for the purchase of such Security at face value quoted on such Business Day by a financial institution of recognized standing regularly dealing in Securities of such type and selected by the Lender and Borrower.

"<u>FATCA</u>" means Sections 1471-1474 of the IRC in effect as of the date hereof or any amended or successor version and any current or future Treasury regulations issued thereunder.

"<u>Federal Reserve Board</u>" means the Board of Governors of the Federal Reserve System.

"<u>Final Order</u>" means an order substantially in the form of the Interim Order, with such modifications thereto as are satisfactory to the Lender.

"<u>Financial Covenants</u>" means the financial covenants set forth in <u>Annex G</u>.

"<u>Financial Statements</u>" means the consolidated income statements and stockholders' equity, statements of cash flows and balance sheets of the Borrower delivered in accordance with <u>Section 3.4</u> and <u>Annex D</u>.

"<u>First Day Orders</u>" means all orders entered by the Bankruptcy Court in respect of all motions and all related pleadings filed on the Petition Date or within five Business Days thereafter.

"<u>Fiscal Month</u>" means any of the monthly accounting periods of the Borrower.

"<u>Fiscal Quarter</u>" means any of the quarterly accounting periods of the Borrower, ending on March 31, June 29, September 30 and December 31 of each year.

"<u>Fiscal Year</u>" means any of the annual accounting periods of the Borrower ending on September 30 of each year.

"<u>Fixtures</u>" means all fixtures as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"<u>Foreign Subsidiary</u>" means any Subsidiary which is a controlled foreign corporation within the meaning of the Internal Revenue Code of 1986, as amended from time to time.

"<u>Funding Office</u>" shall mean the office of the Lender set forth on <u>Annex H</u> to the Agreement or such other office as may be specified from time to time by the Lender as its funding office by written notice to the Borrower.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, consistently applied, as such term is further defined in <u>Annex G</u> to the Agreement.

"<u>General Intangibles</u>" means general intangibles, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including all right, title and interest that such Credit Party may now or hereafter have in or under any Contract, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, Software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all Books and Records, correspondence, credit files, invoices and other papers, including without limitation all tapes, cards, computer runs and other papers and documents in the possession or under the

control of such Credit Party or any computer bureau or service company from time to time acting for such Credit Party.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranteed Indebtedness" means, as to any Person, any obligation of such Person guaranteeing or otherwise supporting any Indebtedness (primary obligation) of any other Person (the primary obligor) in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof. The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"Guarantors" means each Domestic Subsidiary of the Borrower and each other Person, if any, that executes a guaranty or other similar agreement in favor of the Lender in connection with the transactions contemplated by the Agreement and the other Loan Documents.

"Hazardous Material" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a solid waste, hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, hazardous constituent, special waste, toxic substance or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Hedging Obligations" has the meaning ascribed to it in the definition of Indebtedness.

"Indebtedness" means, with respect to any Person, without duplication (a) all obligations of such Person for borrowed money, (b) obligations for the deferred purchase price of property but excluding trade payables incurred in the ordinary course of business, (c) all reimbursement and other obligations with respect to letters of credit, bankers acceptances and surety bonds, whether or not matured, (d) all obligations evidenced by notes, bonds, debentures or similar instruments, (e) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to

A-11

repossession or sale of such property), (f) all Capital Lease Obligations and the present value of future rental payments under all synthetic leases, (g) all Guaranteed Indebtedness, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) "earnouts" and similar payment obligations of such Person, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under (i) commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (ii) any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured (collectively, "Hedging Obligations"), (l) all Indebtedness referred to above secured by any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (m) the Obligations.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" has the meaning ascribed to it in Section 1.11.

"Indemnified Person" has the meaning ascribed to it in Section 1.11.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Initial Budget" means the initial thirteen (13) week budget annexed as Exhibit 2 to this Agreement.

"Instruments" means all instruments, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and, in any event, including all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks, and Technology.

"Interest Payment Date" means the thirtieth (30th) calendar day of each Fiscal Month to occur while any Term Loans are outstanding (or the Business Day immediately preceding the 30th calendar day if such day is not a Business Day); provided, that in addition to the foregoing, each of (x) the date upon which all of the Commitments have been terminated and the Term Loans have been paid in full and (y) the Maturity Date shall be deemed to be an Interest Payment Date with respect to any interest that has then accrued under the Agreement.

"Interest Period" means, with respect to any Term Loan borrowed from time to time, each period beginning on the first day, and ending on the last day, of each Fiscal Month, provided that the initial Interest Period for any Term Loan shall commence on the date of the initial borrowing of such Term Loan hereunder and end on the last day of the Fiscal Month in which such borrowing occurs.

"Interim Order" means the order of the Bankruptcy Court entered in the Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 2001 and other applicable law), approving and authorizing, on an interim basis, (a) the Term Loans and transactions contemplated herein, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, (b) extensions of credit in amounts not in excess of $15,000,000, (c) payment by the Borrower of all of the costs and expenses provided for in this Agreement, (d) estate stipulations, (e) releases from liability for all claims and causes of action arising out of or relating to the Loan Documents and all agreements, certificates, instruments and other documents and statements related thereto effective immediately, (f) indemnification for the Lender relating to the Loan Documents and (g) other customary provisions.

 "Inventory" means any inventory, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of any Credit Party for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, supplies or materials of any kind, nature or description used or consumed or to be used or consumed in such Credit Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded Software.

"Investment Property" means all investment property as such term is defined in the Code now owned or hereafter acquired by any Credit Party, wherever located, including (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares, (ii) all securities entitlements of any Credit Party, including the rights of such Credit Party to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account, (iii) all Securities Accounts of any Credit Party, (iv) all commodity contracts of any Credit Party and (v) all Commodity Accounts held by any Credit Party.

"Investments" means the purchase, holding or acquisition (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) of any Stock, evidence of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing), any investment, loan or advance or any other interest in, any other Person, and the purchase or other acquisition of (in one transaction or a series of transactions) any assets of any other Person constituting a business unit.

"IRC" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

"IRS" means the Internal Revenue Service.

"Lender" has the  meaning ascribed to it in the Preamble.

"<u>Liabilities</u>" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"<u>License</u>" means any Copyright License, Patent License, Trademark License or other similar license of rights or interests now held or hereafter acquired by any Credit Party.

"<u>Lien</u>" means, with respect to any asset or property, or any interest therein, (i) any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or property and (iii) in the case of securities, any purchase option, call or similar right of a third party with respect to such security.

"<u>Litigation</u>" has the meaning ascribed to it in <u>Section 3.13</u>.

"<u>Loan</u>" means any loan made by the Lender pursuant to this Agreement.

"<u>Loan Account</u>" has the meaning ascribed to it in <u>Section 1.10</u>.

"<u>Loan Documents</u>" means the Agreement, the Notes, the Collateral Documents and all other agreements, instruments, documents and certificates executed by a Credit Party and delivered to, or in favor of, the Lender in connection with the Agreement and the transactions contemplated thereby and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written agreements whether heretofore, now or hereafter executed by or on behalf of any Credit Party and delivered to the Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.  For the avoidance of doubt, the Senior Secured Notes Indenture and the documents delivered in connection therewith shall not constitute Loan Documents.

"<u>Margin Stock</u>" has the meaning ascribed to it in <u>Section 3.10</u>.

"<u>Material Adverse Effect</u>" means a material adverse effect on (i) the business, assets, properties, operations or financial condition of the Credit Parties taken as a whole, (ii) the ability of the Credit Parties to pay any of the Term Loans or any of the other Obligations in accordance with the terms of this Agreement, (iii) the Collateral or the Liens in favor of the Lender on the Collateral or the priority of such Liens, or (iv) the Lender's rights and remedies under the Agreement and the other Loan Documents, in each case, other than the commencement of the

Cases and any change of the type that customarily occurs as a result of the commencement of the Cases.

"Material Budget Deviation" shall mean, with respect to each Test Period, if (i) the actual cash disbursements of the Credit Parties during such Test Period exceed one hundred fifteen percent (115%) of the projected cash disbursements during such Test Period as reflected in the Testing Budget or (ii) the actual cash receipts of the Credit Parties during such Test Period is less than eighty percent (80%) of the projected cash receipts during such Test Period as reflected in the Testing Budget.  For purposes of this definition, "cash disbursements" shall be calculated excluding cash disbursements for the payment of professional fees.

"Material Contract" means any contract, agreement or other arrangement to which the Borrower or any of its Subsidiaries is a party for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Term Loans) of any one or more of the Credit Parties in an aggregate principal amount outstanding or committed as of the date of such determination  including undrawn committed or available amounts) equal to or exceeding $100,000.

"Material Real Estate Contracts" means (for purposes of the Agreement only) any lease, usufruct, use agreement, license, permit or other occupancy or facility use agreement under which a Credit Party is a tenant or counterparty, that (i) requires a Credit Party make lease payments in excess of $100,000 in any year or (ii) relates to facilities required for a Credit Party's operations, the loss of the lease, usufruct, use agreement, license, permit or other occupancy or facility use agreement with respect thereto could reasonably be expected to adversely affect a Credit Party's ability to conduct its business as now being conducted (after giving effect to the Operating Forecast and the Budget).

"Maturity Date" the earliest of (a) Scheduled Maturity Date, (b) the effective date of a Plan of Reorganization and (c) the consummation of any sale of all or substantially all of the assets of the Borrower and its Subsidiaries pursuant to section 363 of the Bankruptcy Code.

"Milestones" shall have the meaning in Annex F.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a plan as defined in Section 4001(a)(3) of ERISA, and to which any Credit Party or ERISA Affiliate is making, is obligated to make or has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"Net Cash Proceeds" means proceeds received by any Credit Party after the Closing Date in cash or Cash Equivalents from:

(a)       (i) Asset Sales other than any Asset Sale permitted under Sections 6.8(d), in each case, net of (1) the reasonable cash costs of sale, assignment or other disposition, (2) taxes paid or reasonably estimated to be payable as a result thereof, (3) reserves provided, to the extent

required by GAAP, against any liabilities that are directly attributed to such Asset Sale (<u>clauses (1), (2) and (3)</u> collectively referred to herein as the "<u>Sale Costs</u>") and (4) any amount of Indebtedness or other obligations (other than the Obligations) payable to a Person that is not an Affiliate of a Credit Party which is secured by the assets subject to such Asset Sale, or otherwise required to be repaid as a result of such Asset Sale, in each case only to the extent that such Person's security is senior in right of payment to the Lender;

(b)      Property Loss Event, net of (1) the costs of collection (the "<u>Collection Costs</u>" and, together with the Sale Costs, "<u>Costs</u>"), (2) any amount of Indebtedness or other obligations (other than the Obligations) payable to a Person that is not an Affiliate of a Credit Party which is secured by the assets subject to such Property Loss Event, or otherwise required to be repaid as a result of such Property Loss Event, in each case only to the extent that such Person's security is senior in right of payment to the Lender, and (3) taxes paid or reasonably estimated to be payable as a result thereof; and

(c)      the incurrence of Indebtedness, net of (i) the reasonable costs, fees and expenses paid or required to be paid in connection therewith (including any brokers', advisors'' and investment banking fees), (ii) any taxes paid or reasonably expected to be payable as a result thereof, (iii) any other reasonable underwriting discounts and commissions incurred in connection with such transaction .

"<u>Non-Stayed Order</u>" means an order of the Bankruptcy Court which is in full force and effect, as to which no stay has been entered and which has not been reversed, modified, vacated or overturned.

"<u>Note</u>" has the meaning assigned to it in <u>Section 1.1(e)</u>.

"<u>Notice of Borrowing</u>" has the meaning assigned to it in <u>Section 1.2</u>.

"<u>Notice Period</u>" has the meaning assigned to it in <u>Section 8.2</u>.

"<u>Obligations</u>" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Credit Party to the Lender under the Loan Documents, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, or other instrument, arising under the Agreement or any of the other Loan Documents. This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party in bankruptcy, whether or not allowed in such case or proceeding), expenses, attorneys fees and any other sum chargeable to any Credit Party under the Agreement or any of the other Loan Documents. For the avoidance of doubt, the obligations under the Senior Secured Notes Indenture and the documents delivered in connection therewith shall not constitute Obligations.

"<u>Operating Forecast</u>" shall have the meaning given to such term in Item 9 of Annex C attached hereto.  Notwithstanding anything to the contrary contained herein, the Lender has approved the Operating Forecast solely in its capacity as the Lender hereunder, and such

approval does not constitute approval of the Operating Forecast for any other purpose, including without limitation, any other contractual arrangement between the Lender and the Credit Parties.

"Other Taxes" has the meaning specified in Section 1.13(b).

"Participant Register" has the meaning ascribed to it in Section 11.1(c).

"Patent License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right with respect to any invention on which a Patent is in existence.

"Patent Security Agreement" means a Patent Security Agreements made in favor of the Lender by each applicable Credit Party, in form and substance acceptable to the Lender.

"Patents" means all of the following in which any Credit Party now holds or hereafter acquires any interest: (a) all letters patent under United States, any State or territory thereof, Canadian, multinational or foreign laws or otherwise, all registrations and recordings thereof, and all applications for letters patent under United States, Canadian, multinational or foreign laws or otherwise, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency under United States, State, Canadian, multinational or foreign laws or otherwise, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Investments" means Investments made in accordance with the Investment Guidelines set forth in Annex K.

"Permitted Liens" means: (i) Liens securing Indebtedness under this Agreement; (ii) Liens existing on the date of this Agreement and listed in Disclosure Schedule 6.7 hereto; (iii) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, and for which adequate reserves in accordance with GAAP are being maintained on the financial statements of the applicable Credit Party; (iv) landlords', carriers', workmen's, warehousemen's, mechanic's, materialmen's, repairmen's, employees' or other like Liens arising in the ordinary course of business with respect to amounts which are not yet delinquent or that are being contested in good faith by appropriate proceedings; (v) pledges or deposits made in the ordinary course of business in connection with (a) leases, performance bonds or similar obligations, (b) workers' compensation, unemployment insurance and other social security legislation or public liability laws or similar legislation or (c) securing the performance of surety bonds and appeal or customs bonds required (I) in the ordinary course of business or in connection with the enforcement of rights or claims of the Credit Parties or (II) in connection with judgments that do not give rise to an Event of a Default; (vi) with respect to Real Property or interests therein, zoning restrictions, easements, licenses, rights-of-way, restrictions, minor defects or irregularities in title and other similar encumbrances which, in the aggregate, do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Credit Parties or liens disclosed in title reports; (vii)

Liens in favor of depository institutions or collecting banks arising by operation of law under Sections 4-203 or 4-210 of the UCC; and (viii) Liens in favor of customs revenue authorities arising as a matter of law which secure payment of customs duties in the ordinary course of business.

"Permitted Prepetition Payment" means a payment (as adequate protection or otherwise) on account of any Claim against any Credit Party arising or deemed to have arisen prior to the Petition Date, which payments are permitted pursuant to the Interim Order and, to the extent entered, the Final Order, First Day Order or otherwise approved by the Bankruptcy Court and the Lender.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" has the meaning ascribed to it in the Preamble.

"Plan of Reorganization" means a plan of reorganization in the Cases under chapter 11 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Lender.

"Pledged Collateral" means all of the following property now owned or at anytime acquired by a Credit Party or in which such Credit Party now has or at any time in the future may acquire any right, title or interest:

(a)      the Pledged Shares, the certificates representing the Pledged Shares and all other stock, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares; and

(b)      the Pledged Indebtedness and the promissory notes or instruments evidencing the Pledged Indebtedness, and all interest, cash, instruments and other property and assets from time to time received, receivable or otherwise distributed in respect of the Pledged Indebtedness; and

(c)      all additional Indebtedness arising after the date hereof and owing to a Credit Party and evidenced by promissory notes or other instruments, together with such promissory notes and instruments, and all interest, cash, instruments and other property and assets from time to time received, receivable or otherwise distributed in respect of that Indebtedness.

"Pledged Indebtedness" means the Indebtedness evidenced by promissory notes and instruments listed on Part 2 of Disclosure Schedule 10.4 hereto (as amended from time to time).

"Pledged Shares" means the stock listed on Part 1 of Disclosure Schedule 10.4 hereto.

"Primed Liens" has the meaning ascribed to it in Section 3.18(b)(iv).

"Proceeds" means proceeds, as such term is defined in the Code, including (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Credit Party from time to time with respect to any asset, (b) any and all payments (in any form whatsoever) made or due and payable to any Credit Party from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such property by any Governmental Authority (or any Person acting under color of governmental authority), (c) any claim of any Credit Party against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, or for injury to the goodwill associated with any Trademark or Trademark License, (d) any recoveries by any Credit Party against third parties with respect to any litigation or dispute concerning such property including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, such property, (e) all amounts collected on, or distributed on account of, other property, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of such property and all rights arising out of such property.

"Professionals" shall have the meaning set forth in the Interim Order, or if the Final Order has been entered, the Final Order.

"Projections" means the Borrower's forecasted consolidated (a) balance sheets, (b) profit and loss statements and (c) cash flow statements consistent with the historical Financial Statements of the Borrower (other than adjustments related to the impact of the Cases), together with appropriate supporting details and a statement of underlying assumptions.

"Property Loss Event" means (a) any loss of or damage to property of any Credit Party that results in the receipt by such Person of proceeds of insurance or (b) any taking of property of any Credit Party that results in the receipt by such Person of a compensation payment in respect thereof.

"Qualified Plan" means an employee benefit plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"Real Estate" has the meaning ascribed to it in Section 3.6(b).

"Real Property" means all real property as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"Release" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Requirement of Law" means, with respect to any Person, the common law and all federal, state, local and foreign laws, treaties, rules and regulations, orders, judgments, decrees and other legal requirements or determinations of any Governmental Authority or arbitrator,

applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means, with respect to any Credit Party (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Credit Party's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; and (c) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Credit Party now or hereafter outstanding.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, in form and substance reasonably satisfactory to the Lender, among the Borrower, the pre-petition holders of the Senior Secured Notes and the holders of the issued and outstanding capital stock of the Borrower.

"S&P" means Standard & Poor's Ratings Group.

"Scheduled Maturity Date" means [____][1].

"Sell" means, with respect to any property, to sell, convey, transfer, assign, license, lease or otherwise dispose of, any interest therein or to permit any Person to acquire any such interest, including, in each case, through a Sale and Leaseback Transaction or through a sale, factoring at maturity, collection of or other disposal, with or without recourse, of any notes or accounts receivable. Conjugated forms thereof and the noun Sale have correlative meanings.

"Secured Obligations" means, in the case of the Borrower, the Obligations and, in the case of any other Credit Party, the obligations of such Credit Party under the Guaranties and the other Loan Documents to which it is a party.

"Securities Account" shall have the meaning set forth in the Code.

"Security" means any Stock, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"Senior Secured Notes" means the $175,000,000 aggregate principal amount of 11.25% Senior Secured Notes due 2015 of the Borrower issued on March 10, 2010 under the Senior Secured Notes Indenture.

"Senior Secured Notes Collateral" means all assets pledged as collateral to secure obligations with respect to the Senior Secured Notes.

---

[1] Insert the [120th] day after the Closing Date.

"Senior Secured Notes Indenture" means the Indenture, dated as of March 10, 2010, by and between the Borrower, as borrower, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral trustee, as amended, restated, supplemented or otherwise modified from time to time.

"Software" shall mean computer programs whether in source code or object code form, together with all related documentation.

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other equity security (as such term is defined in Rule 3(a) of the General Rules and Regulations promulgated by the Commission under the Securities Exchange Act of 1934).

"Stockholder" means, with respect to any Person, each holder of Stock of such Person.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (ii) more than half of the issued share capital is at the time beneficially owned.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Super-Priority Claim" shall mean a claim against any Credit Party in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

"Taxes" has the meaning set forth in Section 1.13.

"Technology" means, collectively, all designs, formulas, algorithms, procedures, methods, techniques, ideas, know-how, programs, subroutines, tools, inventions, creations, improvements, works of authorship, Software, other similar materials, and all recordings, graphs, drawings, reports, analyses, other writings, and any other embodiment of the above, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in or displayed by any of the foregoing, or used or useful in the design, development, reproduction, maintenance or modification of any of the foregoing.

"Term Loans" shall have the meaning ascribed to it in Section 1.1(a)(i).

"Termination Date" means the date on which (a) the Term Loans have been repaid in full in cash, (b) all other monetary Obligations (other than Excluded Obligations) pursuant to the Agreement and the other Loan Documents have been completely discharged, and (c) the Borrower shall not have any further right to borrow any monies under the Agreement.

"Test Period" shall mean, as of each measurement date, the cumulative period beginning with the Closing Date and ending on the applicable measurement date, (i) with such first measurement date being [●][2] and (ii) thereafter, each subsequent Friday.

"Testing Budget" shall mean, the Initial Budget, the Budget delivered on the Wednesday following [●][3] and thereafter, the Budget delivered on the Wednesday following each four week anniversary of [●][4].

"Title IV Plan" means a plan (other than a Multiemployer Plan), that is covered by Title IV of ERISA, and that any Credit Party or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Total Operating Expenses" shall mean, as defined in the Operating Forecast, expenses incurred by the Credit Parties associated with performing their business operations.

"Trademark Security Agreements" means the Trademark Security Agreements made in favor of the Lender by each applicable Credit Party, in form and substance acceptable o the Lender.

"Trademark License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right to use any Trademark.

"Trademarks" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency under United States, any State or territory thereof, Canadian, multinational or foreign laws or otherwise; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"Uniform Commercial Code jurisdiction" means any jurisdiction that has adopted all or substantially all of Article 9 as contained in the 2000 Official Text of the Uniform Commercial Code, as recommended by the National Conference of Commissioners on Uniform State Laws and the American Law Institute, together with any subsequent amendments or modifications to the Official Text.

Rules of construction with respect to accounting terms used in the Agreement or the other Loan Documents shall be as set forth in Annex G. All other undefined terms contained in any of

---

[2] To be the Friday closest to the end of the 4th week after the Petition Date.

[3] See prior footnote.

[4] See prior footnote.

the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Code, the definition contained in Article or Division 9 shall control. Unless otherwise specified, references in the Agreement or any of the Appendices to a Section, subsection or clause refer to such Section, subsection or clause as contained in the Agreement. The words "herein", "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Annex, Exhibit or Schedule.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive.  References to a Person includes its respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons.  References to statutes and related regulations shall include any amendments, modifications, restatements and successors of the same and any successor statutes and regulations. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Credit Party has actual knowledge or awareness of a particular fact or circumstance.

**ANNEX B (Section 1.7)**
**to**
**CREDIT AGREEMENT**

**CASH MANAGEMENT SYSTEM**

Each Credit Party shall establish and maintain the Cash Management Systems described below:

(a)     On or before the thirtieth Business Day after the Closing Date (or such later date as the Lender shall consent to in writing) and until the Termination Date, each Credit Party shall cause each of its accounts to be Blocked Accounts; provided, Excluded Accounts shall not be required to be Blocked Accounts.

(b)     On or before the thirtieth Business Day after the Closing Date (or such later date as the Lender shall consent to in writing), (i) each bank or financial institution where any Credit Party maintains a deposit account (other than an Excluded Account) shall have entered into a Blocked Account Agreement with the applicable Credit Party and the Lender and (ii) each financial institution where any Credit Party has an investment account (other than an Excluded Account) shall have entered into a Control Letter, with the applicable Credit Party and the Lender, in each effective as of the Closing Date (or such later date as the Lender shall consent to in writing). Each such Blocked Account Agreement and Control Letter shall provide, unless otherwise agreed by the Lender, that  (i) upon notice from the Lender, such bank or financial institution agrees to forward immediately all amounts in each Blocked Account or investment account to the account set forth by the Lender in such notice or to any other account designated by the Lender (the "Concentration Account") and to commence the process of daily sweeps from such Blocked Account into the Concentration Account and otherwise accept directions from the Lender without consent of any Credit Party.

(c)     The Borrower may only open accounts (other than Excluded Accounts) if, prior to the time of the opening of such account (unless such account is an Excluded Account) after the Closing Date, the relevant Credit Party and such bank or financial institution shall have executed and delivered to the Lender a Blocked Account Agreement or Control Letter, as applicable.

(d)     The Blocked Accounts and Concentration Account shall be cash collateral accounts, with all cash, checks and other similar items of payment in such accounts securing payment of the Term Loans and all other Obligations, and in which each applicable Credit Party shall have granted a Lien to the Lender pursuant to the Agreement and the other Loan Documents.

(e)     All amounts deposited in the Collection Account shall be deemed received by the Lender in accordance with Section 1.9 and shall be applied (and allocated) by the Lender in accordance with Section 1.4. In no event shall any amount be so applied unless and until such amount shall have been credited in immediately available funds to the Collection Account.

(f)     Each Credit Party, on behalf of itself and each of its Affiliates, agrees to hold in trust for the Lender all checks, cash and other items of payment received by such Credit Party or any such Affiliate to the extent constituting Collateral, provided that any such checks, cash and

other items may be applied in any manner not prohibited by the Credit Agreement. Each Credit Party, on behalf of itself and each Affiliate, acknowledges and agrees that all cash, checks or other items of payment constituting proceeds of the Collateral are part of the Collateral. All Net Cash Proceeds arising from the sale or other disposition of any assets shall be deposited directly into a Blocked Account unless such Net Cash Proceeds are used to prepay the Term Loans in accordance with Section 1.3 of the Agreement.

(g)    The Lender shall not deliver a notice that it is exercising exclusive control over any Blocked Account to any such bank or financial institution unless an Event of Default has occurred and is continuing.

**ANNEX C (Section 2.1(e))**
**to**
**CREDIT AGREEMENT**

**CLOSING CHECKLIST**

See the attached closing checklist.

**ANNEX D (Section 4.1(a))**
**to**
**CREDIT AGREEMENT**

**FINANCIAL STATEMENTS AND PROJECTIONS – REPORTING**

The Borrower shall deliver or cause to be delivered to the Lender the following:

(a)     Monthly Financials. Within thirty (30) days after the end of the first two Fiscal Months of each Fiscal Quarter, financial information regarding the Borrower and its Subsidiaries, certified by the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower, consisting of consolidated (i) unaudited balance sheets as of the close of such Fiscal Month and the related statements of income and cash flows for that portion of the Fiscal Year ending as of the close of such Fiscal Month; and (ii) unaudited statements of income and cash flows for such Fiscal Month, setting forth in comparative form the figures for the corresponding period in the prior year , all prepared in accordance with GAAP (subject to normal quarter-end or year-end adjustments). Such financial information shall be accompanied by the certification of the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower that (1) such financial information presents fairly in all material respects in accordance with GAAP (subject to normal quarter-end or year-end adjustments) the financial position and results of operations of the Borrower and its Subsidiaries, on a consolidated basis, in each case as at the end of such Fiscal Month and for that portion of the Fiscal Year then ended and (2) that there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default shall have occurred and be continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default.

(b)     Quarterly Financials. Within forty-five (45) days after the end of the first three Fiscal Quarters of each Fiscal Year, consolidated financial information regarding the Borrower and its Subsidiaries, certified by the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower, consisting of (i) unaudited consolidated balance sheet as of the close of such Fiscal Quarter and the related statements of income, cash flow and stockholders' equity for that portion of the Fiscal Year ending as of the close of such Fiscal Quarter, and (ii) unaudited consolidated statements of income and cash flows for such Fiscal Quarter, in each case setting forth in comparative form the figures for the corresponding period in the prior year, all prepared in accordance with GAAP (subject to normal year-end adjustments). Such financial information shall be accompanied by the certification of the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower that (A) such financial information presents fairly in all material respects in accordance with GAAP (subject to normal year-end adjustments) the financial position, results of operations and statements of cash flows of the Borrower and its Subsidiaries, on a consolidated or a consolidating basis (as applicable), as at the end of such Fiscal Quarter and for that portion of the Fiscal Year then ended, (B) that there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default has occurred and is continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default. In addition, the Borrower shall deliver to the Lender, within forty-five (45) days after the end of each Fiscal Quarter, a management discussion and analysis for the Borrower and its Subsidiaries on a

consolidated basis that includes a comparison of performance for that Fiscal Quarter to the corresponding period in the prior year.

(c) <u>Operating Plan</u>. As soon as available, but not later than thirty (30) days after the end of each Fiscal Year, an annual operating plan for the Borrower, approved by the Board of Directors of the Borrower, for the following Fiscal Year, which (i) includes a statement of all of the material assumptions on which such plan is based, (ii) includes monthly balance sheets and a monthly budget for the following year and (iii) integrates operating revenues, operating expenses, operating profit and cash flow projections, all prepared on the same basis and in similar detail as that on which operating results are reported (and in the case of cash flow projections, based on assumptions believed by the Borrower to be reasonable at the time such projections were delivered in light of conditions and facts known to the Borrower as of the date of their delivery).

(d) [Reserved].

(e) <u>Budget</u>.  By no later than the Wednesday after the last day of each Test Period (or such later date as the Lender may agree to in its sole discretion), the Borrower shall furnish, in form and substance reasonably satisfactory to the Lender, (i) a report that sets forth for the relevant Test Period a comparison of the actual cumulative cash receipts and cash disbursements for such Test Period to the projected cash receipts and cash disbursements for such Test Period set forth in the Testing Budget on a line item basis, noting all variances (it being agreed and understood that any such report in a form substantially similar to any such report delivered prior to the Closing Date shall be in a form reasonably satisfactory to the Lender), together with (ii) a management's (or Chief Financial Officer's) discussion and analysis with respect to any material variance between the projected cash receipts and cash disbursements for such period and the actual cash receipts and cash disbursements for such period. By no later than the Wednesday after the last day of each Test Period (or such later date as the Lender may agree to in its sole discretion), a subsequent thirteen (13) week Budget, which subsequent Budget(s) shall (A) roll-forward by one week the then existing Budget, (B) be in a form and include such information substantially similar to the Budgets delivered prior to the Closing Date, (C) be approved by the Consultant and (D) be acceptable to the Lender in its sole discretion (it being agreed and understood that a Budget in a form substantially similar to the Budget delivered prior to the Closing Date shall be in a form acceptable to the Lender).

(f) <u>[Reserved]</u>.

(g) <u>Management Letters</u>. Promptly after receipt thereof by any Credit Party, copies of all management letters, exception reports or similar letters or reports received by such Credit Party from its independent registered public accountants.

(h) <u>Default Notices</u>. As soon as practicable, and in any event within five (5) Business Days after a responsible officer of a Credit Party obtains knowledge of the existence of any Default, Event of Default, written notice specifying the nature of such Default or Event of Default, including the anticipated effect thereof.

(i)     <u>SEC Filings and Press Releases</u>. Promptly upon their becoming available, copies of: (i) all Financial Statements, reports, notices and proxy statements made publicly available by any Credit Party to its security holders; (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by any Credit Party with any securities exchange or with the Commission or any governmental or private regulatory authority; and (iii) all press releases and other statements made available by any Credit Party to the public concerning material changes or developments in the business of any such Person.

(j)     <u>Litigation</u>. In writing, promptly upon any responsible officer of a Credit Party obtaining knowledge thereof, notice of any Litigation commenced or threatened against any Credit Party that (i) seeks damages in excess of $500,000, (ii) seeks injunctive relief that could reasonably be expected to result in costs and/or liabilities or loss of revenues to Credit Parties in excess of $500,000, (iii) is asserted or instituted against any Plan of Reorganization, its fiduciaries or its assets or against any Credit Party or ERISA Affiliate in connection with any Plan of Reorganization, (iv) alleges criminal misconduct by any Credit Party, or (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Liabilities if such Litigation is reasonably likely to result in any Credit Party incurring Environmental Liabilities in excess of $100,000 individually.

(k)     <u>Governmental Investigation</u>.  In writing, promptly upon any responsible officer of any Credit Party obtaining knowledge thereof, notice of the commencement of any investigation by a Governmental Authority of any Credit Party.

(l)     <u>Change in Accounting Practices</u>.  In writing, notice of any change in any Credit Party's accounting practices with regard to depreciation and/or establishing reserves for any or all of the Collateral or any other material change in any accounting practices or procedures of the Credit Parties, in each case no later than five (5) Business Days after such change (or such later date as the Lender may agree to in its sole discretion).

(m)     <u>Insurance Notices</u>. Disclosure of losses or casualties required by <u>Section 5.4</u>.

(n)     <u>Documents Filed with Bankruptcy Court</u>. To the Lender, delivery of, reasonably in advance of filing under the circumstances to permit review by the Lender, any motions, pleadings, replies, objections, memoranda, financial information, applications, judicial information or other documents to be filed with the Bankruptcy Court (or any other court) in, or in connection with, the Cases (the "<u>Court Documents</u>").

(o)     <u>Documents Provided to Committees</u>. Substantially contemporaneous with delivery of any Committee Documents (as defined below) to any official committee (the "<u>Committee</u>"), copies of any reports filed in any Case and provided to the Committee (collectively, the "<u>Committee Documents</u>"); <u>provided</u>, <u>however</u>, that any such Committee Documents that are subject to attorney client privilege or filed under seal or subject to confidentiality or other restrictions prohibiting disclosure to the Lender shall not be provided to Lender.

(p)      <u>Other Documents</u>. Such other financial information respecting any Credit Party's business, assets, prospects, or financial condition as the Lender shall, from time to time, reasonably request, subject to any limitations under applicable law.

(q)      Documents required to be delivered pursuant to <u>paragraphs (b), (d) or (g)</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which the Borrower gives notice to the Lender that such documents have been posted to the Borrower's Internet site on the Internet at <u>www.conexant.com</u> at <u>www.sec.gov/edaux/searches.html</u> or at another website identified in such notice and accessible to the Lender without charge; <u>provided</u> that upon request by the Lender, the Borrower shall deliver paper copies of such documents to the Lender.

**ANNEX E (Section 4.1(b))**
**to**
**CREDIT AGREEMENT**

**COLLATERAL REPORTS AND APPRAISALS**

The Borrower shall deliver or cause to be delivered the following:

(a)      [reserved]; and

(b)      Such other reports, statements and reconciliations with respect to the Collateral or Obligations of any or all Credit Parties as the Lender shall from time to time reasonably request in its discretion, subject to any limitations under applicable law.

**ANNEX F (Section 5.8)**
**to**
**CREDIT AGREEMENT**

**MILESTONES**

The Credit Parties are required to meet the following milestones in Cases (the "Milestones"):

[To conform to RSA Milestones.]

**ANNEX G (Section 6.10)**
**to**
**CREDIT AGREEMENT**

**FINANCIAL COVENANTS**

The Credit Parties shall not cause or permit there to be a Material Budget Deviation for any Test Period.

**ANNEX H (Section 13.10)**
**to**
**CREDIT AGREEMENT**

**NOTICE ADDRESSES**

If to the Borrower, at Conexant Systems, Inc.

Conexant Systems, Inc.
Attn: Chief Financial Officer
Attn: General Counsel
4000 MacArthur Blvd
Newport Beach, CA 92660
Telephone: (949) 483 4600
Telecopier No.: (949) 483 4176

with a copy to:

Samantha Good
Kirkland & Ellis LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439 1914
Telecopier No.: (415) 439 1500

If to the Lender, at QP SFM Capital Holdings Ltd.

QP SFM Capital Holdings Ltd.
c/o Soros Fund Management LLC
888 Seventh Avenue
Suite 3300
New York, NY 10106

Attention: Cynthia Paul
Telephone: (212) 320-5431
Telecopier No.: (646) 731-5431

Attention: Jay Schoenfarber
Telephone: (212) 320-5584
Telecopier No.: (646) 731-5584

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention: Frederick Lee

Telephone: (212) 872-1034
Telecopier No.: (212) 872-1002

**ANNEX I (from Annex A - Commitments definition)**
**to**
**CREDIT AGREEMENT**

| Lender | Commitment |
|---|---|
| QP SFM Capital Holdings Ltd. | $15,000,000 |

**ANNEX J (from Annex A Permitted Investments definition)**
**to**
**CREDIT AGREEMENT**

**INVESTMENT GUIDELINES**

a    Direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

b    Investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, rated at least "A-1" by S&P or "P-1" by Moody's;

c    Investments in certificates of deposit, banker's acceptances, time deposits, eurodollar time deposits or overnight bank deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any other commercial bank of recognized standing organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

d    Investments of money in an investment company organized under the Investment Company Act of 1940, as amended, or in pooled accounts or funds offered through mutual funds, investment advisors, banks and brokerage houses which invest its assets in obligations of the type described in (a) through (c) above. This could include, but not be limited to, money market funds or short-term and intermediate bonds funds;

e    Securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A-1" by S&P or "P-1" by Moody's;

f    Money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA (or the equivalent thereof) by S&P and Aaa (or the equivalent thereof) by Moody's and (iii) have portfolio assets of at least $500,000,000; and

g    Deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $500,000,000.

**Exhibit D**

Form of Joinder

The undersigned (the "***Transferee***") hereby acknowledges that it has reviewed the Agreement, dated as of _____, 2013 (the "***Agreement***"), among (i) Conexant Systems, Inc., ("***Conexant***"), on behalf of itself and certain of its affiliates and subsidiaries (collectively, the "***Company***"); (ii) OP SFM Capital Holdings Ltd. and its affiliates and subsidiaries, as the sole holder (the "***Consenting Secured Lender***") of the $175 million 11.25% Senior Secured Notes due 2015 (the "***Senior Secured Notes***") and the Bank of New York Mellon Trust Company N.A. as the agent thereto (the "***Agent***"); (iii) each of (a) Golden Gate Private Equity, Inc. and its affiliates and subsidiaries (collectively, "***Golden Gate***") and (b) August Capital and its affiliates and subsidiaries (collectively, "***August Capital***"), as holders of the common shares of Conexant Holdings, Inc. (Golden Gate and August Capital are together the "***Sponsors***," and collectively with the Consenting Secured Lender and the Agent, the "***Consenting Parties***"), and agrees to be bound by the terms and conditions thereof binding on the **[Consenting Secured Lender/Sponsors]** to the extent the Transferor was thereby bound, without modification and shall be deemed a **[Consenting Secured Lender/Sponsors] under the Agreement.**

Date: _____, 2013

**[Transferee]**

By:_____

Name:_____

Title:_____

Principal amount of [Debt/Equity Interests] held: $_____ of **[_____ Debt]**.

Date: _____

**[Address]**

Attention:

Fax: **[*]**

Email: